LOFTUS & EISENBERG, LTD.
ALEXANDER N. LOFTUS, ESQ. (#630384)
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T:  (312) 772-5396
alex@loftusandeisenberg.com
*Pro Hac Vice Applied for*

ARON LAW FIRM
WILLIAM ARON, ESQ. (#234408)
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT—NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| JOCELYN CARTER, on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY SPIEGEL and RYAN SPIEGEL<br><br>Defendants. | Case No.: 21-CV- 3990<br><br>**CLASS ACTION COMPLAINT FOR:**<br>**1. NEGLIGENT MISREPRESENTATION**<br>**2. SECURITIES FRAUD (VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25501)**<br>**3. SECURITIES FRAUD (VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25501.5)**<br>**4. UNJUST ENRICHMENT**<br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff, JOCELYN CARTER, on behalf of a class of similarly situated individuals, by and through her undersigned attorneys, complains against Defendants, JEFFREY SPIEGEL and RYAN SPIEGEL, as follows:

## I.       INTRODUCTION

1.       SAC Advisory Group ("SAC") served as the de facto placement agent or broker for a Los Angeles Ponzi Schemer, Zachary Horwitz ("Horwitz") and his 1inMM Capital, LLC ("1inMM") venture. SAC's managers were Jeffrey Spiegel ("Jeff"), Ryan Spiegel ("Ryan")(collectively "The Spiegels" or "Defendants").

2.       Horwitz's scheme was absurd and it wouldn't have been funded but for sophisticated placement agents including Defendants parroting his lies, cloaking the scheme in their own credibility as financial professionals, and selling the offering to their closest friends.

3.       Defendants acted as brokers for investment in 1inMM and owed well defined duties in that role they assumed to do some investigation into the investment before offering it. Instead, Defendants operated in willful ignorance and never sought any third party confirmation of Horwitz's stories nor registered as brokers.

4.       Defendants, as de facto brokers, and were the gatekeepers of any information from Horwitz.

5.       Had either one of the Defendants called HBO or Netflix, obtained 1inMM bank records, or ordered an audit, as required by controlling regulations, before recommending this investment all of this would have been prevented and Plaintiff would not have even been presented with this "opportunity".

## II.      PARTIES

6.       Plaintiff, JOCELYN CARTER, is an individual and resident of California and domiciled in California.

7.       Defendant, JEFFREY SPEIGEL, is an individual and citizen of California and domiciled in California.

8.      Defendant, RYAN SPEIGEL, is an individual and citizen of California and domiciled in California.

### III.    JURISDICTION

9.      Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

10.     This is a class action. Members of the proposed Plaintiff Class are citizens of states different from the Spiegels home state.

11.     Aggregate claims of individual Class Members exceed $5,000,000, exclusive of interest and costs.

### IV.    VENUE

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

13.     The Spiegels reside in this district pursuant to 28 U.S.C. § 1391(c), so personal jurisdiction is appropriate.

14.     In addition, a substantial part of the events or omissions giving rise to these claims occurred in this district.

15.     California law applies to all claims in this action.

16.     All of The Spiegels' relevant business, including the formulation and execution of the unlawful practices alleged herein, occurred in or emanated from California, where The Spiegels have their principal place of business. Thus, California has significant contacts and/or a significant aggregation of contacts to the claims asserted by Plaintiffs and Class Members.

17.     California has a materially greater interest than any other State in enforcing the rights and remedies granted to consumers under the California laws invoked in this Complaint. These rights and remedies further strong fundamental public policies of the State of California.

18.     The unregistered securities at issue in this case are not "covered securities" within the meaning of National Securities Market Improvement Act of 1996 (NMSIA), 15 U.S.C. § 77r(b), and accordingly this action is not subject to the procedural requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(a). The securities were not issued by a nationally registered investment company nor was it designated for trading in a national securities exchange.

## V.     FACTS COMMON TO ALL COUNTS

### A.  Horwitz's Obvious Ponzi Scheme

19.     Zachary Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM conducted Ponzi scheme raising over $690 million from investors through several de facto placement agents including SAC and its funds using fabricated agreements and fake emails with prominent third party companies with whom Horwitz had no actual business relationship.

20.     Horwitz told Defendants that the purpose of the 1inMM offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

21.     Horwitz told Defendants he had experience acquiring and licensing distribution rights in movies to HBO and Netflix. Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]"

22.     In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

23.     Horwitz obtained funds from SAC's three funds and other firms asking as placement agents via promissory notes which were funded by units in the funds to individual investors.

24.     Horwitz relied on The Spiegels to act as his brokers or investment bankers to raise funds and serve as a gatekeeper of his lies delivered to retail investors.

25.     The Promissory Notes issued by 1inMM to the  de facto placement agents including SAC's funds had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

26.     Horwitz told Defendants that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

27.     Horwitz told Defendants he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

28.     Horwitz promised to use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

29.     The manner Horwitz claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

30.     Any of these supposed revenue streams could have been confirmed by reputable third parties directly but never were.

31.     Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

32.     To support his false representations, Horwitz sent forged documents to The Spiegels that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

33.     Horwitz's representations were false and the documents he sent to SAC were fabricated.

34.     These falsehoods could have easily been confirmed prior to any investment by Plaintiff and the Class with a phone call to Netflix or HBO but that call was not made until long after the scheme imploded and The Spiegels had reaped millions in "commissions".

35.     Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

36.     Horwitz used money "invested" in his "company" to pay earlier investors for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the purchase of a multi-million-dollar home.

37.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding promissory notes.

38.     Horwitz provided Defendants false explanations for why he had stopped making payments.

39.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

40.     Horwitz told Defendants that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM

41.     Throughout 2020, Horwitz lulled The Spiegels, with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

**B. Defendant's Ignorant Participation in the Scheme**

42.     Horwitz raised money with five principal firms who acted as placement agents selling securities, including SAC, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

43.     The Spiegels relied on personal relationships and word-of-mouth referrals to obtain investors.

44.     The Spiegels solicited $75,132,950 in investment via sales of units in three funds in the 1inMM Offering of which $29,733,025 remains outstanding.

45.     Upon information and belief, Ryan was introduced to 1inMM by its co-founder Craig Cole.

46.     Defendants published an information statement to investors which stated, "Ryan has known Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company.  With strong returns in SAC Movie Fund One, LLC, Ryan jumped at the opportunity to launch a second fund." (Information Statement Attached hereto as Exhibit "A" and incorporated herein).

47. Horwitz made representations regarding 1inMM to Ryan and Jeff regarding Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

48. Defendants negligently relied on only representations from Horwitz and Cole when recommending the investment to Plaintiff rather than confirming anything with third parties.

49. In or about March of 2017, SAC Movie Fund One, LLC was created by Defendants for the purpose of selling investment into 1inMM.

50. In or about October 2017, Defendants created Fortune Film Fund One, LLC for the sole purpose of selling investment into 1inMM.

51. In or about February 2018, Defendants created Fortune Film Fund Two, LLC for the sole purpose of selling investment into 1inMM.

52. Ryan is the managing member of each SAC Advisory Group, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC and all operate from the offices of Jeff Spiegel's accounting firm, Spiegel Accountancy Corp. Upon information and belief, neither Jeff nor Ryan are personally members of Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC or parties to their operating agreements.

53. According to the Information Statement, SAC Advisory Group, LLC, is operated by Jeff and Ryan.

54. The capital deployed by SAC in each of the three funds was provided by Plaintiff and the Class.

55. During this time, Horwitz made representations and provided purported contracts, emails, and other information to the Jeff and Ryan, which Defendants negligently believed to be true and accurate without investigating the obvious holes in the story that was far too good to be true.

56. Defendants proceeded to sell Plaintiff investment in the 1inMM Offering by regurgitating the lies told by Horwitz.

57.     Rather than relying on any substantive investigation of their own, Defendants relied on the fact that 1inMM kept paying as sufficient evidence that the obvious Ponzi Scheme was legitimate.

58.     Defendants did not bother to do their own independent due diligence when promoting the Ponzi Scheme as a suitable investment to Plaintiff as required professionals selling investment.

59.     Horwitz peppered Defendants with hundreds of bogus documents supporting his scheme and even forged documents from reputable attorneys to perpetuate the fraud.

60.     Defendants relied exclusively on Horwitz's own due diligence of himself and 1inMM rather than doing their own investigation.

61.     Defendants kept their head in the sand long after other funds feeding 1inMM realized the fraud.

62.     The amount repaid by 1inMM to SAC during this period for these promissory notes, inclusive of specified interest, was approximately $56,888,512 of this, upon information and belief, in excess of $20,000,000 was retained by Defendants.

63.     At present, the proposed class is owed approximately $29,733,025 for amounts loaned in or about 2018 and 2019 pursuant to the 1inMM Offerings.

**C.  SAC's Duty to Plaintiff and the Class**

64.     The 1inMM Offerings were structured as follows: funds managed by SAC lent money to 1inMM for defined projects at a rate of 25% to 35% interest, SAC funded the loan to 1INMM via the sale of units in the funds managed by SAC to Class Members,  and SAC received 50% of profits on the money invested by the funds it managed.

65.     For all intents and purposes SAC was acting as a placement agent for 1inMM and paid a 12.5% to 17.5% commission on the sales.

66.     Placement agents such as SAC who sell private placements to retail customers for a commission such as SAC are required to register with the Financial Industry Regulatory Authority ("FINRA").

67.     FINRA regulates broker/dealer firms like Defendants and their registered representatives (*i.e.*, stockbrokers), and promulgates rules and regulations that brokerage firms and their registered representatives must adhere to.

68.     While SAC was not a licensed broker-dealer it acted as if it was one when selling the 1inMM Offering in exchange for what amounted to a hefty commission.

69.     A placement agent, or at least a party acting in that role such as SAC, is required to perform reasonable due diligence on a private placement prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

70.     SEC Regulation Best Interest ("Reg BI") provides SAC as a placement agent owed the following duties to Plaintiff and the Class:

> (ii) Care obligation. The broker, dealer, or natural person who is an associated person of a broker or dealer, in making the recommendation, exercises reasonable diligence, care, and skill to:
> (A) Understand the potential risks, rewards, and costs associated with the recommendation, and have **a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers**;
> (B) **Have a reasonable basis to believe that the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile and the potential risks**, rewards, and costs associated with the recommendation and does not place the financial or other interest of the broker, dealer, or such natural person ahead of the interest of the retail customer;
> (C) Have a reasonable basis to believe that a series of recommended transactions, even if in the retail customer's best interest when viewed in isolation, is not excessive and is in the retail customer's best interest when taken together in light of the retail customer's investment profile and does not place the financial or other interest of the broker, dealer, **or such natural person** making the series of recommendations ahead of the interest of the retail customer.

(17 C.F.R. § 240.15l-1(b)(I).)

71.     In order to ensure that it has fulfilled its responsibilities, FINRA requires that a broker-dealer in a Regulation D offering must, at a minimum, conduct a reasonable investigation concerning:

a.      the issuer and its management;

b.      the business prospects of the issuer;

c.      the assets held by or to be acquired by the issuer;

d.      the claims being made; and

e.      the intended use of proceeds of the offering.

72.    Defendants had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer.

73.    FINRA has also provided detailed guidance on how a broker-dealer such as SAC was acting with the 1inMM Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

74.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM and its history by Defendants would have included:

a.      Examining historical financial statements of 1inMM, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.      Looking for any trends indicated by 1inMM's financial statements;

c.      Contacting customers and suppliers regarding their dealings with 1inMM;

d.      Reviewing 1inMM's contracts, leases, and financing arrangements;

e.      Inquiring about 1inMM's past securities offerings and the degree of their success;

f.      Inquiring about the length of time that 1inMM had been in business and whether the focus of its business was expected to change.

75.    This was not done here. The full extent of the investigation was reliance on information supplied by the Ponzi Schemer. There was zero independent investigation done by Defendants.

76.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM's business prospects by SAC should include:

a.    Inquiring about the viability and value of any movies funded by 1INMM;

b.    Inquiring about the industry in which 1INMM operates, and the competitive position of 1INMM; and

c.    Requesting any business plan, business model or other description of the business intentions of 1INMM and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

77.    This was not done here. The contracts were fictitious. Defendants did not engage HBO or Netflix independent of Horwitz in any way to confirm Horwitz's wild story.

78.    Jeff is a Certified Public Accountant and Plaintiff and the Class relied on his financial expertise when deciding to invest with him.

79.    The American Institute of Certified Public Accountants' ("AICPA") Code of Professional Conduct Section 1.000.020 addresses how CPAs such as Jeff should respond to certain ethical conflicts.

80.    The AICPA Code of Professional Conduct Section 1.400.001 "Acts Discreditable" provides: "A member shall not commit an act discreditable to the profession." .

81.    Section 0.300.060 of the Code provides:

> Due care principle. A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability. ... **Due care requires a member to discharge professional responsibilities with competence and diligence**. It imposes the obligation to perform professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and **consistent with the profession's responsibility to the public**. ... **Each member is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed**...**Members**

**should be diligent in discharging responsibilities to clients, employers, and the public.**

82.     The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants is another standard that defines the duties owed by Jeff.

83.     Section 100.1 provides:

> **A distinguishing mark of the accountancy profession is its acceptance of the responsibility to act in the public interest**. Therefore, a professional accountant's responsibility is not exclusively to satisfy the needs of an individual client or employer. In acting in the public interest, a professional accountant shall observe and comply with this Code.

84.     Section 110 of the Code provides:

> A professional accountant shall not **knowingly be associated with** reports, returns, **communications** or other information where the professional accountant believes that the information: (a) Contains a materially false or misleading statement; (b) Contains statements or information furnished recklessly; or (c)  Omits or obscures information required to be included where such omission or obscurity would be misleading.

85.     When a professional accountant becomes aware that the accountant has been associated with such information, the accountant shall take steps to be disassociated from that information

86.     Defendants did not engage directly with 1inMM bankers, accountants, or attorneys in order to vet the wild lies they were told.

87.     Jeff violated his most basic duties as a professional by failing to at all investigate this absurd investment.

88.     Minimal investigation would have confirmed the purported counsel at Netflix was not even  working at Netflix at the time of the supposed emails or that HBO had no record of 1inMM.

89.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1INMM's assets and facilities should include:

a.     Carefully examining any reports by third-party experts that may raise red flags;

b.   Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors.

c.   Inquiring about previous or potential regulatory or disciplinary problems of the issuer.

d.   Obtaining a credit check of 1INMM.

e.   Making reasonable inquiries concerning the issuer's management. SAC should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change.

f.   Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.   Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

90.   Defendants failed to do this third party confirmation of this supposedly $600,000,000 operation.

91.   A broker-dealer that offers securities, including those offered under Regulation D, must meet the suitability requirements of FINRA Rule 2111. This means that the broker-dealer must have a reasonable basis to believe that a recommendation to purchase, sell or exchange a security is suitable for the customer.

92.   FINRA Rule 2111.05(a) is the source of a broker-dealer's obligation to perform a reasonable investigation of the issuer and offered securities before offering securities in a Regulation D for sale to its clients.

93.     Reasonable-basis suitability requires that a broker-dealer (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

94.     Defendants could not rely blindly upon the issuer for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

95.     While broker-dealers like SAC are not expected to have the same knowledge as an issuer or its management, firms are required to exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

96.     Of course, under these circumstances, Defendants were in a position to know more about 1inMM, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as it's placement agent or investment banker raising capital exclusively for 1inMM.

97.     As the de facto placement agent and investment banker for 1inMM, SAC was in a unique position compared to another broker-dealer that was merely part of the investment banking syndicate.

98.     In the course of a reasonable investigation, a broker-dealer, such as The Spiegels were acting, must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the

broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

99.     As described below, unfortunately for the Plaintiff and the Class, SAC failed to conduct proper due diligence, which caused Defendant's conduct to fall below the standard of care thereby breaching the duties that it owed the Plaintiffs and the Class.

### D.  1INMM DEFAULTS

87.     On January 22, 2020 Ryan advised class members that the fund was not able to take on new investment purportedly because "Our partners ended up securing another funding source, so we are going to continue with what we currently have for the time being"

88.     On January 31, 2020 Ryan advised class members that there would be some changes in the fund based on Horwitz's imagined deal with HBO:

> Participation Amendments- You may or may not know that TimeWarner (who owned HBO) was recently acquired by AT&T, so there has been some changes in the process between our distribution partner and HBO. These changes are now taking place and we are amending our agreements with our distribution partner to cater to these process changes. HBO has expanded their diligence period on the front end of the purchase cycle, meaning that there is anywhere from 1-3 weeks of diligence before the LOI is inked and the 6 month process starts for the minimum guarantee payment (where we are liquidated from the deal). In addition, there is a 1-2 week processing time from when the minimum guarantee is due to our distribution partner and they actually receive the funds.
> As a result of these processing changes, we are amending our agreement with our distribution partner [1inMM]. The new agreement will be a maturity date of 7.5 months and a yield of 26%, which is amended from the original agreement of a maturity date of 6 months and a yield of 22%. The effective yield is very similar to our original agreement. While our new maturity date is slated to be at 7.5 months, there is the possibility that we are paid before that on some films, which would only increase the effective yield. We still expect for investor returns to be over 20% and on par with the returns from 2019.

89.     Throughout 2020 Ryan relayed Horwitz's elaborate lies about delays in payment to lull investors into not pursuing action.

90.     On April 17, 2020 Ryan and Jeff advised Class Members that 1inMM had defaulted on its loans and advised investors "With this news, **we have decided to wind down the equity fund as**

**participations are paid over the coming months. We will return capital and earnings to investors as the participations in our portfolio are paid off.**" Despite it appearing to be a sufficiently dire situation to warrant shutting down the fund, Ryan and Jeff promised "We want to reassure you again, that although we are having some delays, we know that no funds have been lost. We expect that we will be receiving all of the funds due and will be returning your capital and earnings." (April Investor Update attached hereto as Exhibit "B" and incorporated herein).

87.     By the fall of 2020 Ryan and Jeff engaged counsel to assist them in spreading Horwitz's falsehoods and providing another layer of credibility to the absurd story told to lull the victims.

88.     On October 4, 2020, Ryan emailed a Class Member, "We will be getting clarity on payments and documentation this week from 1inMM. Our lawyer is in direct contact with their legal counsel, who also confirmed the execution of the agreement."

89.     On November 4, 2020, SAC's counsel, Richard Bowels, sent a letter to all Class Members that provided in pertinent part:

> As you know, 1inMM Capital ( our distribution partner) and HBO (the licensor of our films), have been in negotiations over the past many months to restructure their agreement. That amended agreement was finally executed on October 13, 2020. I was provided a severely redacted copy of this agreement in order to verify that it had been signed and what the terms were regarding the catch up payment owed on film investments. I received the redacted version
> on October 20, 2020. **While the agreement is highly confidential, I am able to tell you that I was able to verify its execution and was further able to verify the terms of payment of past due amounts to 1inMM**. SAC has also been in communication with 1inMM Capital regarding how 1inMM will satisfy its obligations to SAC and its entities. The following information has been provided:
> • 1inMM has confirmed that it agrees with the total amount due and owing as asserted by
> SAC and its entities.
> • 1inMM has agreed to notify SAC of payments made by HBO over the coming months. What I can tell you is that the redacted agreement provides that **HBO will be making full payment by the end of the year, unless it exercises options to extend, which would require making substantial interim payments**.
> • 1inMM has committed that it will make pro rata or proportionate payments to SAC for its share of the total advances. These payments will be made within 14 days of 1inMM receiving any payment from HBO.

• 1inMM has told SAC that March 1, 2021 is the latest date by which full payment will be made.

• SAC will remit payments to its investors in a timely manner as soon as received from 1inMM. These payments will be remitted on a first in first out basis based on the original maturity date of each film.

(Emphasis added, Bowels Letter, attached hereto as Exhibit "C" and incorporated herein)

88     On February 28, 2021 investors in JJMT Capital, LLC who also invested funds in 1inMM, were advised that 1inMM was a fraud after JJMT's new counsel at King & Spalding discovered Horwitz's fraud and Ponzi Scheme **after just one day of investigating.**

89     On March 15, 2021, while the fraud was obvious to hundreds of other investors, Ryan continued to pass along lies to his investors stating: "We wanted to provide a quick update as to where everything currently stands. After discussions with their investment groups, 1inMM has agreed to accept the payment proposal from Warner Media and were told they will be receiving the agreement this week. Once all the details are finalized and the agreement is executed we will be sharing all the information with investors. We are optimistic that this will get finalized and payments will be remitted."

90     On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud that was easily unraveled with minimal investigation.

91     Two days later, on April 7, 2021, Ryan communicates to investors "we received some shocking and disheartening news yesterday regarding 1inMM Capital" that the SEC initiated action against 1inMM.

92     This was not shocking to Ryan, he had supplied documents to the SEC at least a month earlier in support of its investigation, and it was readily apparent that Horwitz was running a Ponzi Scheme as was confirmed by counsel at King & Spalding after one day of investigation months earlier.

93     Plaintiff justifiably relied on The Spiegels' representations about the suitability of investment in 1inMM because the SAC principals were professionals and had personal relationships with a 1inMM founder.

94     Plaintiff relied on Defendants to investigate the investment it was offering and confirm facts presented in the offering materials.

95     Plaintiff justifiably relied on Defendants' statements about the investment and that Defendants had a reasonable basis for recommending the investment.

**E. Plaintiff's Investment in SAC**

98.     On or about January 4, 2018 Carter first agreed to invest in Fortune Film Fund Two, LLC.

99.     Defendants offered and Carter agreed to purchase 200,000 Units in Fortune Film Fund Two, LLC in consideration of $200,000.

100.    On January 18, 2018 Carter elected to reinvest 50% of her earnings and receive distributions of 50%.

101.    On September 1, 2018, Carter agreed to purchase 50,000 Units in Fortune Film Fund Two, LLC in consideration of $50,000.

102.    By the end of 2020 her investment purportedly grew to a value of $400,716.87.

103.    Carter's investment in the Ponzi Scheme was a total loss.

104.    To date, Carter is owed over $400,000 from SAC.

## VI.    CLASS ALLEGATIONS

105.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of herself and all others similarly situated, comprising a class consisting of:

> All persons who invested in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC from January 1, 2018 to December 31, 2020.

Excluded from the proposed Class and subclasses are Defendants, their respective officers, directors, and employees, affiliates, legal representatives, heirs, successors, or assignees. Plaintiffs reserve the right to amend the Class definition as necessary.

106.    Plaintiff is a member of the Class.

107.    Excluded from the Class are judicial personnel involved in considering the claims herein, all persons and entities with claims for personal injury, the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs and successors.

108.    It is estimated that the Class consists of thousands of persons throughout the continental United States. The members of the Class are so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to Plaintiffs, but can easily be ascertained from the sales and warranty claim records of Defendant.

109.    There are numerous questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

a.    Whether Defendants, owed an extra-contractual duty of ordinary care to Class Members;

b.    Whether Defendants, breached their duty of ordinary care to Class Members;

c.    Whether Defendants, negligently misrepresented the facts regarding 1inMM to Class Members;

d.    Whether Defendants violated California Securities Law; and

e.    Whether Defendants were unjustly enriched.

110.   The claims asserted by Plaintiff are typical of the claims of the members of the Class.

111.   This class action satisfies the criteria set forth in Fed. R. Civ. P. 23(a) and 23(b)(3) in that Plaintiffs are members of the Class; Plaintiff will fairly and adequately protect the interests of the members of the Class; Plaintiff's interests are coincident with and not antagonistic to those of the Class; Plaintiffs have retained attorneys experienced in class and complex litigation; and Plaintiff have, through their counsel, access to adequate financial resources to assure that the interests of the Class are adequately protected.

112.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.    It is economically impractical for most members of the Class to prosecute separate, individual actions;

b.    After the liability of Defendants has been adjudicated, the individual and aggregate claims of all members of the class can be determined readily by the Court; and

c.    Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members that would substantially impair or impede the ability of other Class members to protect their interests.

113.   Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiff and the Class Members.

## V. CLAIMS

### FIRST CLAIM FOR RELIEF
### Negligent Misrepresentation
### [Against all Defendants]

114.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 114.

115.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Defendants include the rules promulgated by FINRA, which each broker offering securities such as the 1inMM notes should be a member of.

116.    Those who undertake any work or calling for which a special skill is required such as a broker-dealer have a duty not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability.

117.    Defendants owed Plaintiff and the Class a duty to act as a reasonably prudent professional would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties and obligations flow to Plaintiff and the Class Members as a result of the relationship between Defendants, the Plaintiff, and the Class.

118.    As set forth above, Defendant breached its legal duty to provide accurate information to Plaintiff and the Class as prospective purchasers of investments in SAC funds by omitting material facts, and such material facts were necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

119.    By reason of the aforesaid, Defendants are guilty of negligent misrepresentation and omission in connection with the offer and sale of investments in 1inMM Offerings.

120.    At all times relevant to this action, Defendants had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged

to exist, and with this knowledge, Defendants made material omissions of fact with respect to the offer and sale of securities.

121.    As described above, Defendants negligently breached their duties to Plaintiff and the members of the Class.

122.    Had a reasonably prudent broker-dealer under the same or similar circumstances conducted adequate due diligence on 1inMM to understand the risks and rewards of the 1inMM Offerings, it would have concluded that the risks in investing in 1inMM far outweighed any potential reward, and it would not have approved of the 1inMM Offerings for sale to any of its clients.

123.    By approving of the sale of the 1inMM Offerings to its clients, notwithstanding the numerous red flags identified herein, 1inMM demonstrated that it failed to understand the risks and rewards of the 1inMM offerings, or consciously ignored the risks presented by these red flags in order to ensure it maximized its fees and commissions.

124.    Defendants knew or should have known that Plaintiff and the Class would place their trust and confidence in Defendants that it had a reasonable-basis to conclude that 1inMM was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the 1inMM offering.

125.    Defendants knew or should have known that it was reasonably foreseeable that Plaintiff and the Class would act in reliance on Defendants approval to sell the 1inMM Offerings.

126.    Plaintiff and the Class acted in reliance on SAC's approval to offer to sell the 1inMM offerings.

127.    But for Defendants' approval to sell the 1inMM Offerings, Plaintiff or the Class members would not have even been presented the opportunity to participate in the 1inMM Offerings.

128.    As a direct and proximate result of Defendants negligence, 1inMM is liable to Plaintiff and the Class for all of the investment losses that they suffered in 1inMM.

**SECOND CLAIM FOR RELIEF**
**Violation of California Corporations Code Section 25401 -**
**Untrue Statements or Omissions in Connection with Sale of Security**

129.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 129.

130.    California Corporations Code Section 25401 reads as follows:

"It is unlawful for any person to offer to sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

131.    By its terms, Corporations Code Section 25401 does not require any fraudulent misrepresentation or and intent to deceive, rather simply the making of untrue statements of material fact or the non-disclosure of a material fact.

132.    As more fully set forth in General Allegations and in the First Claim for Relief, plaintiffs are informed and believe and based thereon allege that the above described representations, promises, assurances, expressions of opinion and non-disclosures of material fact by defendants were made negligently, recklessly and carelessly.

133.    California Corporations Code Section 25501 is the remedial statute for Code 23 Section 25401, and reads as follows:

Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells security to him, who may sue either for rescission or damages.

134.    Jeff and Ryan are jointly and severally liable pursuant to California Corporations Code Section 25504 which provides in pertinent part:

Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker–dealer or agent who materially aids in the act or transaction constituting the violation, are

1   also liable jointly and severally with and to the same extent as such person, unless
2   the other person who is so liable had no knowledge of or reasonable grounds to
    believe in the existence of the facts by reason of which the liability is alleged to
3   exist.

4       135.    Defendants offered to sell Plaintiff securities, consisting of units in SAC Movie Fund

5   One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC, to plaintiff and the Class

6   within the State of California, by means of both oral and written communications by Defendants to

7   Plaintiff and the Class, and said offer included untrue statements concerning the true value of the units

8   being offered, and numerous statements lulling Plaintiff to allow the fraud to continue, whereas the
9
    true facts were that 1inMM was a complete scam with no actual value at all and was a pure Ponzi
10
    Scheme.
11

12      136.    Plaintiff is therefore informed and believe and based thereon allege that Defendants

13  made untrue and misleading statements of material facts and also omitted material facts in offering

14  and selling the 1inMM Offering to plaintiff and the Class.
15
        137.    Plaintiff is informed and believes and based thereon allege that defendants Ryan and
16
    Jeff should reasonably have known these statements were untrue and misleading at the time they made
17
18  them, and that plaintiffs were in complete reliance upon his claimed superior and exc1usive

19  knowledge, information and expertise, and that the facts stated and omitted were material to plaintiff's

20  decision to participate in the Offering.

21      138.    As a result of Defendants' representations and non-disclosures, plaintiff participated in

22  the 1inMM Offering and caused investment funds to be transferred to funds operated by defendants to
23
    purchase the subject securities.
24
        139.    For all the reasons set forth above the plaintiff and the class lost the entirety of their
25
26  investment and hereby seek recovery of the full amount of their monetary detriment, damage and loss

27  in the sum in excess of $30,000,000 or in an amount or amounts to be established according to proof

28  at time of trial.

**THIRD CLAIM FOR RELIEF**
**Violation of California Corporations Code Section 25501.5**
**Untrue Statements or Omissions in Connection with Sale of Security**

140.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 140.

141.    The Spiegels were acting on behalf of SAC and SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC when selling their securities with the various entities knowledge and approval.

142.    The units in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC sold to Plaintiff and the Class were securities.

143.    When Plaintiff and the class purchased fractional interests in entities controlled by Defendants, SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC and Defendants were required to be licensed as a securities broker-dealer, or to have applied for and secured a certificate under California Corporations Code section 25200.

144.    Neither Defendants are licensed as a securities broker-dealers, nor, upon information and belief have they applied for and secured a certificate under California Corporations Code section 25200, Part 3.

145.    As a proximate result of Defendants and the controlled entities failure to obtain the proper broker-dealer licensing or certificate, Plaintiff and the Class are entitled to rescission of the investments in SAC Movie Fund One, LLC, Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC and reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

146.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 113 as though fully set forth herein as paragraph 146.

147.    Defendants each received and retained a benefit from Plaintiff and the Class totaling in excess of $10,000,000 and inequity has resulted.

148.    Defendants benefitted from negligently misrepresenting the nature and value of the Plaintiffs investment and Horwitz's gross fraud.

149.    Plaintiff conferred a benefit on Defendants by paying excessive interest on fraudulent investments.

150.    It is inequitable for Defendants to retain these benefits.

151.    Plaintiff was not aware of the true facts about the investment, and did not benefit from Defendants' conduct.

152.    Defendants knowingly accepted the benefits of their unjust conduct.

153.    As a result of Defendants' conduct, the amount of their unjust enrichment should be disgorged in an amount according to proof.

WHEREFORE, Plaintiff, individually and on behalf of the Class as defined herein, respectfully request that this Court enter a judgment against Jeffrey Spiegel and Ryan Spiegel and in favor of Plaintiffs and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B. Award Plaintiffs and Class members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiffs and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiffs and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

Dated:  May 26,  2021

Respectfully submitted,

**LOFTUS & EISENBERG, LTD.**

By: _____/s/*Alexander N. Loftus*_____
        Alexander N. Loftus
        Attorneys for Plaintiff

Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T:  (312) 772-5396
alex@loftusandeisenberg.com
*Pro Hac Vice Applied*

William Aron, Esq.
ARON LAW FIRM
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com