# Exhibit A

**AMENDED AND RESTATED OPERATING AGREEMENT**

**OF**

**FORTUNE FILM FUND ONE LLC**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS THAT ARE SET FORTH HEREIN.

# TABLE OF CONTENTS

ARTICLE I – The Company ....................................................................................................... 1
    Section 1.1      Formation ............................................................................................ 1
    Section 1.2      Name .................................................................................................. 1
    Section 1.3      Term ................................................................................................... 1
    Section 1.4      Office and Agent ............................................................................... 1
    Section 1.5      Purpose of the Company .................................................................... 1
    Section 1.6      No State-Law Partnership ................................................................. 1
    Section 1.7      Title to Company Property ................................................................ 2
    Section 1.8      Members ............................................................................................ 2
    Section 1.9      Definitions ........................................................................................ 2

ARTICLE II – Capital Contributions and Memberhsip Units ................................................ 2
    Section 2.1      Capital Contributions ........................................................................ 2
    Section 2.2      Capital Accounts ............................................................................... 2
    Section 2.3      Membership Units ............................................................................. 2
    Section 2.4      Classes of Memberhsip Units ........................................................... 2

ARTICLE III – Members .......................................................................................................... 2
    Section 3.1      Eligibility for Participation ............................................................... 2
    Section 3.2      Withdrawal and Return of Capital; Limited Liability ....................... 3
    Section 3.3      Transactions with the Company ........................................................ 3
    Section 3.4      Remuneration to Members ................................................................ 3
    Section 3.5      Manager-Managed Company ............................................................. 3
    Section 3.6      Member Voting Rights ...................................................................... 3

ARTICLE IV – Management and Control of the Company ..................................................... 4
    Section 4.1      Management of the Company ............................................................ 4
    Section 4.2      Fiduciary Relationship;  Outside Activities ...................................... 5
    Section 4.3      Liability for Acts and Omissions; Indemnification ........................... 5
    Section 4.4      Management Fee; Operating Expenses .............................................. 6

ARTICLE V – Allocations and Distributions ......................................................................... 6
    Section 5.1      Allocations of Profit and Loss .......................................................... 6
    Section 5.2      Code Section 704(c) Allocations ...................................................... 7
    Section 5.3      Profits and Losses and Distributions in Respect of a Transferred Interest ............... 7
    Section 5.4      Distributions; 10% Cumulative Preferred Retrun .............................. 7
    Section 5.5      Reinvestment of Participation Profits ................................................ 7
    Section 5.6      Limitations on Distributions to Class B Profits Units ....................... 8
    Section 5.7      Distributions with respect to a Return of Capital or Liquidation Event ................... 8
    Section 5.8      Tax Distributions ............................................................................... 9
    Section 5.9      Restrictions on Distributions ............................................................ 9
    Section 5.10     Withholding on Distributions ........................................................... 9
    Section 5.11     Return of Distributions ..................................................................... 9

ARTICLE VI – Transfers and Assignments of Membership Interests .................................... 9
    Section 6.1      Transfer and Assignment of Membership Interests ........................... 9
    Section 6.2      Substitution of Members ................................................................... 9
    Section 6.3      Rights of Legal Representatives ........................................................ 9

Section 6.4    Marital Settlements and Court Orders ..................................................... 10
Section 6.5    No Effect to Transfers in Violation of Agreement ................................... 10

ARTICLE VII – Accounting, Records and Reports for Members ............................................ 10
Section 7.1    Books and Records ................................................................................. 10
Section 7.2    Bank Accounts ....................................................................................... 10
Section 7.3    Accounting Decisions ............................................................................ 10
Section 7.4    Tax Matters Member ............................................................................. 10
Section 7.5    Reports ................................................................................................... 10

ARTICLE VIII – Dissolution and Winding Up .................................................................... 10
Section 8.1    Dissolution ............................................................................................. 10
Section 8.2    Certificate of Dissolution ...................................................................... 11
Section 8.3    Winding Up ............................................................................................ 11
Section 8.4    Distributions in Kind ............................................................................. 11
Section 8.5    Order of Payment of Liabilities Upon Dissolution ................................. 11
Section 8.6    Limitations on Payments Made in Dissolution ...................................... 11
Section 8.7    No Deficit Restoration Obligation; No Liability for Return of Capital ... 12

ARTICLE IX – Miscellaneous .......................................................................................... 12
Section 9.1    Complete Agreement; Waiver ................................................................ 12
Section 9.2    Dispute Resolution ................................................................................ 12
Section 9.3    Governing Law ...................................................................................... 12
Section 9.4    Arbitration ............................................................................................. 12
Section 9.5    Exhibits ................................................................................................. 13
Section 9.6    Severability ........................................................................................... 13
Section 9.7    Additional Documents and Acts ............................................................ 13
Section 9.8    Notices .................................................................................................. 13
Section 9.9    Waiver of Partition ................................................................................ 13
Section 9.10   Amendments .......................................................................................... 13
Section 9.11   Successors and Assigns ......................................................................... 13
Section 9.12   Attorneys Fees ...................................................................................... 14
Section 9.13   Counterparts .......................................................................................... 14

ARTICLE X – Investments Represenations ........................................................................ 14
Section 10.1   Preexisting Relationship or Experience ................................................. 14
Section 10.2   Investment Intent ................................................................................... 14
Section 10.3   Economic Risk ...................................................................................... 14
Section 10.4   No Disposition in Violation of Law ....................................................... 14
Section 10.5   Investment Risk .................................................................................... 14

Exhibit A – Glossary of Defined Terms
Exhibit B – Members Schedule

**OPERATING AGREEMENT**
**OF**
**FORTUNE FILM FUND ONE LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

This Amended and Restated Operating Agreement is entered into as of February 15, 2018 by and among SAC Advisory Group, LLC, a California limited liability company ("**SAC**") and the parties listed on the counterpart signature pages hereof, and any other persons who from time to time become parties hereto as provided herein.

R E C I T A L S

The Company has been formed as a limited liability company under the California Revised Uniform Limited Liability Company Act, as codified in California Corporations Code Sections 17701.01 – 17713.13, as the same may be amended from time to time (or any corresponding provisions of succeeding law) (the "**Act**") by filing the Company's Articles of Organization (the "**Articles**") with the Secretary of State of California.

The Company and its Members would like to amend and restate the Company's original operating agreement in order to changed the name of the Company and in order to add a provision that would allow the Members to reinvest their cash distributions.

NOW, THEREFORE, the parties agree as follows:

**ARTICLE I**

**THE COMPANY**

1.1     Formation.  Pursuant to the Act, the Members have formed a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

1.2     Name.  The name of the Company shall be "**Fortune Film Fund One LLC**."  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable.  The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable.

1.3     Term.  The term of this Agreement shall be effective as of the date hereof and shall continue until terminated as provided herein.

1.4     Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the Company and its registered agent shall be as the Manager may determine.

1.5     Purpose of the Company.  The purpose of the Company is to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies.

1.6     No State-Law Partnership.  The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member be an agent, partner or joint venturer of any other Member, for any purposes other than federal, state and local tax purposes, and this Agreement shall not be construed to suggest otherwise.

1.7     Title to Company Property.  Legal title to all property of the Company shall be held and vested and conveyed in the name of the Company and no real or other property of the Company shall be deemed to be owned by a Member individually.  The Membership Interest of a Member shall constitute the personal property of such Member.

1.8     Members.  The name, address, Capital Contribution, Membership Units and Percentage Interest of each Member are set forth on Exhibit B.

1.9     Definitions.  Capitalized terms used herein shall have the meanings specified in the Glossary of Defined Terms attached hereto as Exhibit A, or the meanings specified in the text of the Agreement.

# ARTICLE II

## CAPITAL CONTRIBUTIONS AND MEMBERSHIP UNITS

2.1     Capital Contributions. Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit B attached hereto. Except as provided in this Agreement, no Member may withdraw, demand return of or reduce its Capital Contribution.

2.2     Capital Accounts.  The Company shall establish a Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Section 1.704-1(b)(2)(iv) of the Regulations.  Except as specified herein or authorized by the written consent of the Manager, no Member shall receive any interest, salary or draw with respect to such Member's Capital Account, for services rendered on behalf of the Company, or otherwise in its capacity as a Member.

2.3     Membership Units.  The Membership Interests of the Members shall be represented by issued and outstanding Membership Units, which may be divided into one or more types, classes or series. Each type, class or series of Membership Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights set forth in this Agreement with respect to such type, class or series. The Manager shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Membership Units held by them (the **"Members Schedule"**), and shall update the Members Schedule upon the issuance or transfer of any Membership Units.  A copy of the Members Schedule as of the execution of this Agreement is attached hereto as **Exhibit B**.

2.4     Classes of Membership Units.  The Company is authorized to issue two classes of Membership Units designated as Class A Preferred Units and Class B Profits Units.  Except as provided in this Agreement, the rights and preferences of the Class A Preferred Units and the Class B Profits Units shall be identical.

# ARTICLE III

## MEMBERS

3.1     Eligibility for Participation.  The Manager is authorized to cause the Company to raise capital by offering and selling Membership Units in the Company.  The Manager shall have the sole responsibility and right, in its discretion, to determine whether a Person is eligible to be a Member, and eligible to purchase, acquire or hold a Membership Interest.  No Person shall be admitted as a Member unless the Manager approves such Person, which approval may be granted or denied in the Manager's sole discretion.  Each Person who subscribes to purchase Membership Units shall (unless the Manager determines otherwise) be admitted as a Member at the time:  (1) such Person becomes a party to this Agreement, and (2) the Person makes any Capital Contribution then required as determined by the Manager.

3.2     Return of Capital; Limited Liability.  At any time following the one-year anniversary of a Member's purchase of Class A Preferred Units, such Member may request in writing a return of all or a portion of such Member's Capital Contribution ("**Capital Withdrawal Request**") whereupon the Company will use commercially reasonable efforts to return such Member's Capital Contribution within six (6) months of the date of the Capital Withdrawal Request.  Notwithstanding the foregoing, any Member who provides the Company with a Capital Withdrawal Request understands and acknowledges that the Company's ability to return a Member's Capital Contribution is entirely dependent on the available cash of the Company and the timing of the return of the Company's investment in foreign distribution rights, and therefore, the Company's failure to return a Member's Capital Contribution within the six-month period noted above shall not be deemed a breach of the Company's obligation under this Agreement.  The return of Member's entire Capital Contribution as provided under this Section 3.2 shall be deemed a complete and full redemption of a Member's Membership Interest.  In the event only a portion of a Member's Capital Contribution is returned under this Section 3.2, such Member's Percentage Interest shall be reduced accordingly.  Except as specifically provided in this Agreement, (i) no Member may withdraw any portion of his or her Capital Contribution and (ii) no Member shall be entitled to a return of such Member's Capital Contribution.  Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

3.3     Transactions with the Company.  Subject to any limitations set forth in this Agreement and with the affirmative vote or written consent of the Manager, a Member may lend money to and transact other business with the Company.  Subject to other applicable law, such Member has the same rights and obligations with respect thereto to a Person who is not a Member.

3.4     Remuneration to Members.  Except as otherwise authorized in, or pursuant to, this Agreement, no Member is entitled to remuneration for providing services to the Company.

3.5     Manager-Managed Company.  Pursuant to Section 4.1, and notwithstanding anything to the contrary in the Articles, the management of the Company is vested solely in the Manager.

3.6     Member Voting Rights.  Except as otherwise expressly required in this Agreement or by the Act, in all matters in which a vote, approval or consent of the Members is required, the affirmative vote or written consent of those Members holding a majority of the Percentage Interests shall be required to authorize or approve such matters.

# ARTICLE IV

## MANAGEMENT AND CONTROL OF THE COMPANY

4.1     Management of Company.

(a)     Number and Term.  The Company shall have one Manager.  The initial Manager shall be SAC Advisory Group, LLC.  The number of Managers of the Company may be fixed from time to time by the unanimous affirmative vote or unanimous written consent of the Members.  Unless a Manager resigns or is removed, a Manager shall hold office until a successor shall have been elected and qualified.  A Manager may be elected or removed at any time and for any reason by the unanimous affirmative vote or unanimous written consent of the Members.

(b)     Authority of Manager.  Subject to the provisions of this Agreement, the business and affairs of the Company shall be managed solely by the Manager.  Except as otherwise provided herein, the Manager shall have full, complete and exclusive authority to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business, and the Manager may delegate any or all of its authority to one or more Persons.

(c)     Specific Authority.  In furtherance and not in limitation of Section 4.1(b) and the other provisions hereof, the Manager shall have all specific rights and powers required or appropriate for the management of the Company and are specifically authorized and empowered for and on behalf of the Company to do the following:

(1)     execute and file in the appropriate recording offices any amendment to the Articles required by the Act and any and all other documents and instruments necessary or appropriate in connection therewith and take any and all actions contemplated thereby;

(2)     make any and all decisions that the Company may be entitled and/or required to make under the terms of any and all documents, agreements, or other instruments relating to the operation of the Company's business;

(3)     generally bind the Company and execute and deliver any and all documents and instruments on the Company's behalf;

(4)     execute any and all instruments or documents with any third party, including executing any contract, bank resolution and signature card, release, discharge, and any other document or instrument in any way related thereto or necessary or appropriate in connection therewith;

(5)     admitting new Members and issuing any new Membership Units;

(6)     to the extent that Company funds are available therefor, pay all taxes, assessments, and other impositions applicable to the Company;

(7)     to the extent that Company funds are available therefor, pay all debts and other obligations of the Company;

(8)     prepare, or cause to be prepared, the books and records described in this Agreement and prepare and distribute, or cause to be prepared and distributed, the reports described in Section 7.5;

(9)     periodically distribute assets (in cash or in-kind) to the Members;

(9)     obtain all management, legal, accounting, and other services necessary or appropriate, in the Manager's discretion, in connection with the Company's business;

(11)     apply for and obtain any and all governmental and non-governmental permits, approvals, and licenses;

(12)     generally do all things in connection with any of the foregoing or any other businesses or activities of the Company, manage and administer the Company's day-to-day business and affairs, execute all documents on behalf of the Company, pay all costs or expenses connected with the operation or management of the Company, and sign or accept all checks, notes, and drafts on the Company's behalf; and

(13)     do all things generally consistent with any and all of the foregoing on the Company's behalf.

4.2     Fiduciary Relationship; Outside Activities . The Manager shall not be deemed to be a fiduciary for the Company or for any Member, except to the extent required by applicable law. The Manager may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Manager shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Manager owns and/or manages other businesses, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive any and all rights and claims which they may otherwise have against the Manager and its partners, agents, employees, and Affiliates as a result of any of such activities.

4.3     Liability for Acts and Omissions; Indemnification.

(a)     No Covered Person shall be liable, responsible, or accountable in damages to any Member or the Company for any act or omission performed or omitted by such Covered Person in good faith on the Company's behalf and in a manner reasonably believed by such Covered Person to be within the scope of the authority granted to it hereby or any other agreement contemplated hereby between such Covered Person and the Company, except for acts or omissions constituting gross negligence or willful misconduct ("**Covered Act**").  To the fullest extent permitted by law, the Company shall indemnify each Covered Person for any loss, damage, claim, liability (including any liability under the Securities Act), or expense (including attorneys' fees and disbursements, fines, and amounts paid in settlement) by reason of any Covered Act.  Any indemnity under this Section 3.3 shall be provided only out of and to the extent of Company Property, and neither the Manager nor any Member shall have or incur any personal liability on account thereof.  The Manager may, in its discretion, establish reserves for any indemnity that may be payable hereunder.

(b)     Expenses incurred in defending any action, suit, or proceeding brought against a Covered Person shall be paid by the Company in advance of final disposition thereof on receipt of an undertaking by or on behalf of such Covered Person to repay such amount (with interest thereon at the Prime Rate from the date of the advancement thereof) if it is ultimately determined that such Covered Person is not entitled to be indemnified therefor by the Company hereunder.  The indemnification required by this Section 3.3 shall continue as to a Covered Person with respect to any Covered Act even after such Covered Person ceases to occupy the position that caused it to be a "Covered Person."

4.4     Operating Expenses. The Company shall reimburse the Manager for all costs and expenses that it may incur that are appropriately reimbursable thereto, including but not limited to legal, tax return preparation and filing, accounting, administration expenses and travel.

# ARTICLE V

# ALLOCATIONS AND DISTRIBUTIONS

5.1     Allocations of Profit and Loss.  Except as otherwise expressly provided in this Agreement, all Profits or Losses of the Company for each year (including each item of income, gain, loss, deduction or credit entering into the computation thereof), other than Profits and Losses arising out of a sale of all or substantially all of the assets of the Company or otherwise in connection with a liquidation of the Company, shall be allocated among the Members as follows:

(a)     Profits for each Fiscal Year shall be allocated among the Members in the following manner and order of priority:

(i)     First, to the Members, pro rata, in the proportions that aggregate cash distributions to each Member pursuant to this Article V during or with respect to such Fiscal Year bear to the aggregate distributions to all Members pursuant to this Article V during or with respect to such Fiscal Year, until aggregate allocations of Profits pursuant to this Section 5.1(a)(i) equal the aggregate distributions to all Members pursuant to this Article V during or with respect to such Fiscal Year; and

(ii)     Second, to the Members in accordance with their respective Percentage Interests.

(b)     Losses for each Fiscal Year shall be allocated among the Members in the following manner and order of priority:

(i)     First, if one or more Members have Capital Accounts with positive balances, to those Members, pro rata, in the proportions that the positive balances of their respective Capital Accounts bear to the aggregate positive balances of all such Capital Accounts, until (after giving effect to such allocation of Losses) no Member has a Capital Account with a positive balance; and

(ii)     Second, to the Members in accordance with their respective Percentage Interests.

Provided, however, that notwithstanding the foregoing, (i) if one or more Members shall have positive balances in their Capital Accounts, Profits shall be allocated to those Members, if any, having deficit balances in their Capital Accounts to the extent of and in proportion to such deficit balances, and (ii) if one or more Members shall have deficit balances in their Capital Accounts, Losses shall be allocated to those Members, if any, having positive balances in their Capital Accounts to the extent of and in proportion to such positive balances

(b)     <u>Regulatory Allocations</u>.  Notwithstanding the allocations set forth in Section 5.1(a), Profits, Losses and items thereof shall be allocated to the Members in the manner and to the extent required by the Regulations under Section 704 of the Code, including without limitation, the provisions thereof dealing with minimum gain chargebacks, partner minimum gain chargebacks, qualified income offsets, partnership nonrecourse deductions, partner nonrecourse deductions, the provisions dealing with deficit capital accounts in Sections 1.704-2(g)(1), 1.704-2(i)(5), and 1.704-1(b)(2)(ii)(d), and any provisions dealing with allocations related to the forfeiture of a Membership Interest.  The Manager shall apply such provisions in its good faith discretion based on advice from the Company's tax advisors.

(c)     <u>Loss Limitation</u>.  Losses allocated pursuant to Section 5.1(a) or (b) shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have a negative Capital Account balance at the end of any taxable year or other period (after taking into account the adjustments, allocations and distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)).  In the event some but not all of the Members would have negative Capital Account balances as a consequence of an allocation of Losses pursuant to Section 5.1(a) or (b), the limitation set forth in this Section 5.1(c) shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to such Member under Regulations Section 1.704-1(b)(2)(ii)(d).

5.2    Code Section 704(c) Allocations.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value on the date of contribution.  If the Book Value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to that asset will take into account any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Regulations.  Any elections or other decisions relating to allocations under this Section 5.2 will be made in any manner that the Members, by unanimous written consent, determine reasonably reflects the purpose and intention of this Agreement.

5.3    Profits and Losses and Distributions in Respect of a Transferred Interest.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon its respective Membership Interest at the close of such day.

5.4    Distributions; 10% Cumulative Preferred Return.  Subject to Section 5.6, the Company may distribute all or a part of the undistributed Net Cash Flow, if any, for any period if the Manager so decides in its discretion.  All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor the Manager shall incur any liability for making distributions in accordance with this Section 5.4.  Distributions made pursuant to this Section 5.4 shall be made to the Members in the following manner and order of priority:

(a)    All Members holding Class A Preferred Units shall be entitled to an annual 10% cumulative return on their Capital Contributions during the Term of the Company (the "**Preferred Return**"), and therefore, any distributions under this Section 5.4 shall first be made to all Members holding Class A Preferred Units up to an amount equal to their Preferred Return;

(b)    After the amounts described in Section 5.4(i) have been distributed to the Members, the Company shall distribute to the holders of Class B Profits Units an amount equal to the Preferred Return; and

(c)    After the amounts described in Sections 5.4(i) and (ii) have been distributed, any remaining undistributed Net Cash Flow shall be distributed to the Members in proportion to their Percentage Interests.

5.5    Reinvestment of Participation Profits.  Notwithstanding anything to the contrary contained in this Agreement, any Member may elect on an annual basis to reinvest either 100% or 50% of such Member's allocable share of Participation Profits that would otherwise be distributed to such Member under this Agreement.  Such election shall be made on an annual basis on or before June 30 of each year, and such election shall remain in effect for the entire year beginning on July 1 and ending on June 30 (the "**Reinvestment Period**").  Failure to make a timely election to reinvest Participation Profits shall be deemed an election *not* to reinvest any Participation Profits for the subsequent Reinvestment Period.  To

the extent any Member elects to reinvest Participation Profits, such reinvestment shall be deemed a Capital Contribution and shall increase such Member's Capital Account. In addition, any Participation Profits reinvested under this Section 5.5 shall be deemed a cash distribution for all purposes under this Agreement and shall be deemed a distribution for purposes of calculating such Member's Preferred Return under Section 5.4 herein. A Member's election to reinvest Participation Profits shall not be deemed a purchase of additional Preferred Units and no Member shall be entitled to any increase in the number of Preferred Units as a result electing to reinvest Participation Profits.

5.6     Limitations on Distributions to Class B Profits Units.   It is the intention of the parties to this Agreement that distributions to any holder of Class B Profits Unit be limited to the extent necessary so that the related Membership Interest constitutes a profits interest that carries with it no initial Capital Account balance and constitutes an interest only in the future profits of the Company and that, if immediately following the issuance of a Class B Profits Unit pursuant to this Agreement, all of the Company's assets were to be sold and the proceeds therefrom were to be distributed to the Members in liquidation of the Company, no distributions would be made with respect to the Class B Profits Unit.

5.7     Distributions with respect to a Return of Capital or Liquidation Event.   Notwithstanding the foregoing, distributions of cash or property with respect to a Return of Capital or Liquidation Event shall be distributed to the Members in the following manner:

(a)     Distributions shall be made to the Members in proportion to the Members' positive Capital Account balances until all Member Capital Accounts have been reduced to zero;

(a)     Thereafter, distributions shall be made to the Members in proportion to the Members' Percentage Interests.

5.8     Tax Distributions.   Notwithstanding the foregoing, subject to applicable law and only to the extent permitted under any financing or other agreements to which the Company may be subject, the Manager shall, as soon as practicable after the close of each fiscal year, cause the Company to make distributions to all Members in proportion to the Profits allocated to them pursuant to this Article V for such fiscal year in amounts sufficient to enable the Members to discharge their United States federal, state and local income tax liabilities arising from such allocations. The amounts distributable pursuant to this Section 5.6 shall be determined by the Manager in its reasonable discretion and the same tax rate assumptions will be applied to each Member regardless of actual tax status.

5.9     Restriction on Distributions.   No distribution shall be made to the Members (i) if, after giving effect to the distribution, the Company would not be able to pay its debts as they become due in the usual course of business or (ii) the Company's total assets would be less than the sum of its total liabilities.

5.10     Withholding on Distributions.   Each Member acknowledges and agrees that to the extent required under applicable law, the Manager may withhold a portion of any distribution made hereunder in order to comply with such applicable law, and each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and comply with any applicable law. All amounts of tax paid or withheld pursuant to the Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Company or the Members, or income allocated to the Company or Members, shall be treated as amounts distributed to the Members pursuant to this Article V for all purposes under this Agreement. The

Manager shall allocate any such amounts among the Members in any manner that is consistent with the provisions of this Agreement relating to allocations and distributions.

5.11    Return of Distributions.  Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

# ARTICLE VI

## TRANSFER AND ASSIGNMENTS OF MEMBERSHIP INTERESTS

6.1    Transfer and Assignment of Membership Interests.  Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest without the express written consent of the Manager.  In the event any Member is allowed to transfer his or her Membership Interest under this Section 6.1, such Member shall forfeit any undistributed profits accrued up to the date of transfer.  Transfers in violation of this Article VI shall only be effective to the extent set forth in Section 6.5.  After the consummation of any transfer of any part of a Member's Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

6.2    Substitution of Members.  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Section 6.1 are satisfied, and (ii) such Person becomes a party to this Agreement.

6.3    Rights of Legal Representatives.  If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's right for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member.  If a Member is a trust, the power of that Member may be exercised by its trustee, legal representative or successor.

6.4    Marital Settlements and Court Orders.  All Members agree that any purported transfer of a Member's Membership Interest arising from or in connection with any divorce decree, marital settlement, arbitration award or any court order or judicial decree of any kind shall be subject to the terms and conditions contained in this Article VI, and the transferee of any purported or attempted transfer in violation of this Article VI shall be deemed to hold only an Economic Interest

6.5    No Effect to Transfers in Violation of Agreement.  Upon any transfer of a Membership Interest in violation this Article VI, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of the Company's Profits, Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

# ARTICLE VII

## ACCOUNTING, RECORDS, REPORTS FOR MEMBERS

7.1     <u>Books and Records</u>.  The Manager shall cause complete and accurate books and records of the Company to be maintained in accordance with the Act and with the accounting methods followed for federal income tax purposes.  The Manager shall report to the Members quarterly on the financial condition and results of operations of the Company.  The Company shall maintain at its principal office in California all of the documents necessary to comply with the requirements of the Act.

7.2     <u>Bank Accounts</u>.  The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

7.3     <u>Accounting Decisions</u>.  The Manager shall make all decisions as to accounting matters, and shall from time to time cause the Company to make such tax elections as he deems to be in the best interest of the Company and the Members.

7.4     <u>Tax Matters Member</u>.  SAC Advisory Group, LLC shall be designated the tax matters partner with respect to the Company, as defined in Section 6231 of the Code.

7.5     <u>Reports</u>.  The Manager shall provide the Members with quarterly financial statements that reflect the Company's profit and loss during the quarter.  The Manager shall cause the Company to deliver to the Members unaudited consolidated and consolidating financial statements and Schedule K-1s for the Company and each such Member within 90 days of the end of each year.

# ARTICLE VIII

## DISSOLUTION AND WINDING UP

8.1     <u>Dissolution</u>.  Except as otherwise provided in this Section 9.1, no Member may cause the Company's dissolution before the expiration of its stated term.  The Company shall be dissolved on the happening of any of the following events:

(a)     The Manager, in its discretion, determines to dissolve the Company, in which case the Manager will notify all Members of such determination;

(b)     As otherwise provided by the Act; or

(c)     No later than ten years from the formation date of the Company, the Manager shall begin the process of winding up and dissolving the Company.

8.2     <u>Certificate of Dissolution</u>.  As soon as possible following the occurrence of any of the events specified in Section 8.1, the Manager shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.  The Manager who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a Certificate of Cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

8.3     Winding Up.  Upon the occurrence of any event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Manager shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be sold or distributed, and if sold, shall cause the proceeds therefrom to be applied and distributed as provided in Section 8.5. The Manager winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

8.4     Distributions in Kind.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Profit or Loss that would have resulted if such asset were sold for such value, such Profit or Loss shall then be allocated pursuant to Article V, and the Member's Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).  In the event there is no public market for the non-cash asset being distributed, the fair market value of such assets shall be determined in good faith by the Manager.

8.5     Order of Payment of Liabilities Upon Dissolution.  After determining that all known debts and liabilities of the Company in the process of winding-up have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with Section 5.5.  Notwithstanding the foregoing, no distributions shall be made pursuant to this Section 8.5 before giving effect to the allocations of Profit, Loss and other items, pursuant to Article V.

8.6     Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of its positive Capital Account balance and shall have no recourse against any other Member for its Capital Contribution and/or share of Profits (upon dissolution or otherwise).

8.6     No Deficit Restoration Obligation; No Liability for Return of Capital.  A negative or deficit balance in any Member's Capital Account shall not be deemed to be an asset of the Company, and no Member with such a balance shall have any obligation to the Company, to any other Member, or to any third party or creditor to restore such balance.  No Member shall be personally liable for the return of all or any part of the Capital Contribution of any other Member.  Any such return shall be made solely from Company Property.

# ARTICLE IX

## MISCELLANEOUS

9.1     <u>Complete Agreement; Waiver</u>.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

9.2     <u>Dispute Resolution</u>.  If a dispute arises between the Members relating to this Agreement, the Members agree to use the following procedure prior to either party pursuing other available remedies:

(a)     A meeting shall be held promptly between the Members to attempt in good faith to negotiate a resolution of the dispute.

(b)     If, within thirty (30) days after such meeting, the parties have not succeeded in negotiating a resolution of the dispute, they will jointly appoint a mutually acceptable neutral person not affiliated with any of the parties (the "**Mediator**"), seeking assistance in such regard from the American Arbitration Association if they have been unable to agree upon such appointment within forty (40) days from the initial meeting.  The fees of the Mediator shall be shared equally by the parties.

(c)     In consultation with the Mediator, the parties will select or devise an alternative dispute resolution procedure ("**ADR**") by which they will attempt to resolve the dispute, and a time and place for the ADR to be held, with the Mediator making the decision as to the procedure, and/or place and time (but unless circumstances require otherwise, not later than sixty (60) days after selection of the Mediator) if the parties have been unable to agree on any of such matters within twenty (20) days after initial consultation with the Mediator.

(d)     The parties agree to participate in good faith in the ADR to its conclusion as designated by the Mediator.  If the parties are not successful in resolving the dispute through the ADR, then the parties shall submit the matter to binding arbitration pursuant to Section 9.4 below.

9.3     <u>Governing Law</u>.  The terms of this Agreement, and the rights and obligations of the Members with respect to this Agreement, shall be governed by California law, without regard to its principles of conflict of laws.

9.4     <u>Arbitration</u>.  In the event of a dispute among the parties hereto, following good faith negotiations to resolve the same, such dispute shall be settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association ("AAA") providing for the most expeditious method of arbitration resolution then offered by the AAA.  Such dispute shall be settled by an arbitration in Fresno County, California, by a disinterested arbitrator (the "Arbitrator") mutually selected by the disputing parties no later than five days prior to the commencement of the arbitration.  In the event that the parties cannot agree on the Arbitrator, each party shall select a disinterested arbitrator (each, an "Appointing

Arbitrator") of their choosing who will then mutually agree on the Arbitrator. If either party fails to appoint an Appointing Arbitrator within 10 days of a request in writing by the other party to do so, the Appointing Arbitrator appointed by the other party shall appoint the Arbitrator and such appointment shall be binding on the party failing to appoint an Appointing Arbitrator. Except as to the selection of the Arbitrator which shall be as set forth above, the arbitration shall be conducted promptly and expeditiously in accordance with the rules of the AAA providing for the most expeditious method of arbitration resolution then offered by the AAA so as to enable the Arbitrator to render a decision within 20 days of the commencement of the arbitration proceedings. The decision of the Arbitrator shall be binding upon the parties, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof. The decision of the Arbitrator shall include within the arbitration award a recovery by the prevailing party or parties of its or their expenses of arbitration, including the fees and expenses of the Arbitrator and the Appointing Arbitrators, if any, other costs associated with the arbitration proceeding and the reasonable attorneys' fees and expenses of the prevailing party or parties incurred in connection with the arbitration. Any person appointed as an Arbitrator or an Appointing Arbitrator shall be knowledgeable and experienced in the matter(s) sought to be arbitrated and shall not be employed by any Member, the Company or an Affiliate of the Company or any Member, directly, indirectly, or as an agent, except in connection with an arbitration proceeding. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, the Act, or not available in a court of law. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by any Member except (a) an action to compel arbitration pursuant to this Section 9.4 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 9.4.

9.5     Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

9.6     Severability. If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid shall not be affected thereby.

9.7     Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

9.8     Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice on Exhibit A hereto, unless the same shall have been changed by notice in accordance herewith.

9.9     Waiver of Partition. Each Member agrees to and irrevocably waives for the duration hereof any right or power such Member might have (a) to cause the Company or any of its assets to be partitioned, (b) to cause the appointment of a receiver for any Company property, or (c) to compel any sale of all or any part of any Company property pursuant to any applicable law, or to file a complaint or to institute any proceeding at law or in equity to cause the Company's termination or dissolution, except to enforce, compel, implement, or effect any dissolution, termination, or liquidation of the Company occurring or required to occur pursuant to Article VIII.

9.10     Amendments.  The terms and conditions of this Agreement may only be amended in a writing signed by all of the Members.

9.11     Successors and Assigns.  This Agreement shall be binding upon, and, as to permitted or accepted successors, transferees and assigns, inure to the benefit of the Members and the Company and their respective successors and assigns.

9.12     Attorneys' Fees.  In the event of any litigation, arbitration or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other costs and expenses incurred in connection with settling or resolving such dispute.

9.13     Counterparts.  This Agreement may be executed in several counterparts, and all counterparts so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.


# ARTICLE X

# INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

10.1     Preexisting Relationship or Experience.  He or she has a preexisting personal or business relationship with the Company, the Manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of an investment in the Company and of protecting his or her own interests in connection with this investment.

10.2     Investment Intent.  He or she is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

10.3     Economic Risk.  He or she represents that he or she is an Accredited Investor (as defined in the Securities Act of 1933) and/or is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.

10.4     No Disposition in Violation of Law.  Without limiting the representations set forth above, he or she will not make any disposition of all or any part of the Membership Interest that will result in the violation of the Securities Act or any other applicable securities laws.  Without limiting the foregoing, he or she agrees not to make any disposition of all or any part of the Membership Interest unless and until he or she has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by

the Manager, he or she has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

10.5    <u>Investment Risk</u>.  He or she acknowledges that the Membership Interest is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment in the Company, and that he or she understands and take full cognizance of the risk factors related to the purchase of the Membership Interest.

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above by the Manager on its own behalf and each Member executing a counterpart signature page.

**MANAGER:**

**Fortune Film Fund One, LLC**
a California limited liability company


_____
Ryan Spiegel, Manager

**COUNTERPART SIGNATURE PAGE**

**OF**

**OPERATING AGREEMENT**

**OF**

**SAC MOVIE FUND ONE LLC**

**BY AND AMONG**

**SAC MOVIE FUND ONE LLC**

**AND EACH MEMBER NAMED THEREIN**

The undersigned hereby executes and delivers the operating agreement of SAC Movie Fund One LLC, a California limited liability company, (the "Agreement ") to which this Counterpart Signature Page is attached, effective as of the date of this Counterpart Signature Page, together with all other Counterpart Signature Pages of all the Agreement, shall constitute one and the same document in accordance with the terms of such Agreement.

Dated: _____, 2018      _____
                                         Print Name of Member


                                         _____
                                         Signature


                                         _____
                                         Title, if applicable

                                         Address:

                                         _____

                                         _____

                                         Wire Instructions:

                                         _____

                                         _____

# EXHIBIT A

## GLOSSARY OF DEFINED TERMS

"*Act*" means the provisions of the California Revised Uniform Limited Liability Company Act, as codified in California Corporations Code Sections 17701.01 – 17713.13, as the same may be amended from time to time.

"*Affiliate*" means, when used with reference to a specified Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person who or which has the right to exercise, directly or indirectly, more than 50% of the outstanding voting interests of such Person, (iii) any spouse, child, parent, grandchild, grandparent, sibling, aunt, uncle or first cousin of such Person, and (iv) any partnership, trust or tax or estate planning vehicle established for the sole benefit of such Person or any of such Person's other Affiliates and under which such Person is the sole trustee.

"*Agreement*" means this operating agreement, as originally executed and as amended from time to time.

"*Articles*" means the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

"*Capital Account*" means with respect to any Member the capital account that the Company establishes and maintains for such Member pursuant to the terms of this Agreement.

"*Capital Contribution*" means the total value of cash contributed to the Company by each Member.

"*Class A Preferred Units*" means Membership Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class A Preferred Units" in this Agreement.

"*Class B Profits Units*" means Membership Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B Profits Units" in this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Company*" means Fortune Film Fund One LLC, a California limited liability company.

"*Covered Person*" means the Manager, agent, representative, Member, officer or employee of the Company, as applicable, and each of their respective successors and assigns.

"*Economic Interest*" means a Member's or Economic Interest Owner's share of one or more of the Company's Profits, Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management.

"*Economic Interest Owner*" means the owner of an Economic Interest who is not a Member.

"*Fiscal Year*" means the Company's fiscal year, which shall be the calendar year.

"*Gross Asset Value*" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the Manager;

(b)     The Gross Asset Values of all assets of the Company shall be adjusted to equal their respective gross fair market values as of the following times: (A) the acquisition of an additional interest in the Company by any new

or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of property (including cash) as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company; provided, however, that the adjustments pursuant to clauses (A) and (B) above shall be made only if and to the extent that the Tax Matters Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Gross Asset Value of any asset of the Company distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as reasonably determined by the Manager; and

(d)     The Gross Asset Value of the assets of the Company shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Value shall not be adjusted pursuant to this paragraph (iv) to the extent that the Tax Matters Member determines that an adjustment pursuant to paragraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph.  If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i), (ii), or (iv) of this definition, the Gross Asset Value of such asset shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

*"Liquidation Event"* means either (i) the sale, lease, transfer or other disposition, in a single transaction or series of related transactions, by the Company of all or substantially all the assets of the Company taken as a whole; or (ii) the winding up and dissolution of the Company pursuant to Article VIII.

*"Manager"* means the manager named in Section 4.1(a) of this Agreement and any Person who is elected as a manager of the Company pursuant to Section 4.1(a).

*"Member"* shall mean each Person who is an initial signatory to this Agreement, or has been admitted to the Company as a Member in accordance with the terms of this Agreement.

*"Membership Units"* represent a Member's ownership rights in the Company. For convenience, Membership Units may be referred to herein as "*Units*."   Depending on the circumstances, Units may represent a Member's entire Membership Interest in the Company or may simply represent an Economic Interest.   With respect to capital contributions made by the Members as contemplated in Articles 2 of this Agreement, each Unit represents one U.S. dollar of capital contributed to the Company.

*"Membership Interest"* shall mean a Member's entire interest in the Company, including the Member's Economic Interest, the right to vote and the right to receive information concerning the Company as set forth herein

*"Net Cash Flow"* means, with respect to any period, the net cash proceeds for such period from operations, plus cash previously set aside as reserves that the Manager, in its discretion, determines is no longer needed to be retained as reserves and is available for distribution, less (1) the part of such cash proceeds set aside as reserves (in an amount determined by the Manager in its discretion) for the conduct of business and (2) any costs and expenses payable for such period.  The items constituting "Net Cash Flow" shall be determined on a cash basis, and no deduction therefrom shall be made for depreciation or amortization or similar non-cash expenditures or for accrued but unrealized losses and expenses.

*"Participation Advance"* means the money paid by the Company to purchase the foreign distribution rights of a particular movie from the movie's producer or the person that holds such movie's foreign distribution rights.

*"Participation Fee"* means the money received by the Company from a third-party distributor or media company for the purchase of a particular movie's foreign distribution rights that are owned by the Company.

"*Participation Profits*" means the excess of the Participation Fee over the Participation Advance.

"*Percentage Interest*" means the percentage of a Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

"*Person*" means an individual, general partnership, limited partnership, corporation, trust, estate, association, limited liability company, limited liability partnership, real estate investment trust, association or other entity, whether domestic or foreign.

"*Profits*" and "*Losses*" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)        Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)        Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)        If the Gross Asset Value of any asset of the Company is adjusted pursuant to paragraph (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)        Gain or loss resulting from any disposition of property by the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(e)        Notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Section 5.1(b) shall not be taken into account in computing Profits or Losses.

"*Regulations*" means the regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

"*Reserves*" means funds set aside from Capital Contributions or revenues as reserves.  Such Reserves shall be maintained in amounts reasonably deemed sufficient by the Manager for working capital and the payment of taxes, insurance, debt service, compensation expense, fees, or other costs or expenses incident to the business and operations of the Company, or in the alternative, the dissolution of the Company.

"*Return of Capital*" means the portion of any distribution to the Members that represents a return of their Capital Contribution and doesn't represent a distribution of Net Cash Flow.

**MEMBER SCHEDULE**

| Member Name and Address | Capital Contribution | Type of Membership Units | Number of Membership Units | Percentage Interest |
|---|---|---|---|---|
| | | Class B Profits Units[1] | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |

---

[1] The number of actual Class B Profits Units issued to SAC Advisory Group will depend on the number of Class A Preferred Units sold by the Company. The number of Class B Profits Units issued by the Company will always equal the number of Class A Preferred Units sold to investors.

**FORTUNE FILM FUND TWO LLC**

**OPERATING AGREEMENT**

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS THAT ARE SET FORTH HEREIN.

# TABLE OF CONTENTS

ARTICLE I – The Company ....................................................................................................... 1
    Section 1.1    Formation .......................................................................................... 1
    Section 1.2    Name ................................................................................................. 1
    Section 1.3    Term .................................................................................................. 1
    Section 1.4    Office and Agent .............................................................................. 1
    Section 1.5    Purpose of the Company .................................................................. 1
    Section 1.6    No State-Law Partnership ................................................................ 1
    Section 1.7    Title to Company Property ............................................................... 2
    Section 1.8    Members ........................................................................................... 2
    Section 1.9    Definitions ........................................................................................ 2

ARTICLE II – Capital Contributions and Memberhsip Units ................................................. 2
    Section 2.1    Capital Contributions ....................................................................... 2
    Section 2.2    Capital Accounts .............................................................................. 2
    Section 2.3    Membership Units ............................................................................ 2
    Section 2.4    Classes of Memberhsip Units .......................................................... 2
    Section 2.5    Class C Units .................................................................................... 2

ARTICLE III – Members .......................................................................................................... 3
    Section 3.1    Eligibility for Participation .............................................................. 3
    Section 3.2    Withdrawal and Return of Capital; Limited Liability ..................... 3
    Section 3.3    Transactions with the Company ....................................................... 3
    Section 3.4    Remuneration to Members ............................................................... 3
    Section 3.5    Manager-Managed Company ............................................................ 4
    Section 3.6    Member Voting Rights ..................................................................... 4

ARTICLE IV – Management and Control of the Company ...................................................... 4
    Section 4.1    Management of the Company ........................................................... 4
    Section 4.2    Fiduciary Relationship; Outside Activities ..................................... 5
    Section 4.3    Liability for Acts and Omissions; Indemnification .......................... 6
    Section 4.4    Management Fee; Operating Expenses ............................................. 6

ARTICLE V – Allocations and Distributions ........................................................................... 6
    Section 5.1    Allocations of Profit and Loss ......................................................... 6
    Section 5.2    Code Section 704(c) Allocations ..................................................... 7
    Section 5.3    Profits and Losses and Distributions in Respect of a Transferred Interest ................. 8
    Section 5.4    Distributions; 10% Cumulative Preferred Retrun ............................ 8
    Section 5.5    Reinvesment of Profits Distributions ............................................... 8
    Section 5.6    Limitations on Distributions to Class B Profits Units ..................... 9
    Section 5.7    Distributions with respect to a Return of Capital or Liquidation Event ................... 9
    Section 5.8    Tax Distributions ............................................................................. 9
    Section 5.9    Restrictions on Distributions ........................................................... 9
    Section 5.10   Withholding on Distributions ........................................................... 9
    Section 5.11   Return of Distributions ..................................................................... 9

ARTICLE VI – Transfers and Assignments of Membership Interests .................................... 10
    Section 6.1    Transfer and Assignment of Membership Interests ........................ 10
    Section 6.2    Substitution of Members .................................................................. 10

Section 6.3 Rights of Legal Representatives ................................................................ 10
Section 6.4 Marital Settlements and Court Orders ....................................................... 10
Section 6.5 No Effect to Transfers in Violation of Agreement .................................... 10

ARTICLE VII – Accounting, Records and Reports for Members ................................... 10
Section 7.1 Books and Records .................................................................................... 10
Section 7.2 Bank Accounts ........................................................................................... 10
Section 7.3 Accounting Decisions ............................................................................... 11
Section 7.4 Tax Matters Member ................................................................................. 11
Section 7.5 Reports ....................................................................................................... 11

ARTICLE VIII – Dissolution and Winding Up ............................................................... 10
Section 8.1 Dissolution ................................................................................................ 10
Section 8.2 Certificate of Dissolution ......................................................................... 10
Section 8.3 Winding Up ............................................................................................... 11
Section 8.4 Distributions in Kind ................................................................................ 11
Section 8.5 Order of Payment of Liabilities Upon Dissolution .................................. 12
Section 8.6 Limitations on Payments Made in Dissolution ........................................ 12
Section 8.7 No Deficit Restoration Obligation; No Liability for Return of Capital .... 12

ARTICLE IX – Miscellaneous ......................................................................................... 12
Section 9.1 Complete Agreement; Waiver .................................................................. 12
Section 9.2 Dispute Resolution .................................................................................... 12
Section 9.3 Governing Law .......................................................................................... 13
Section 9.4 Arbitration ................................................................................................. 13
Section 9.5 Exhibits ..................................................................................................... 13
Section 9.6 Severability ............................................................................................... 13
Section 9.7 Additional Documents and Acts ............................................................... 13
Section 9.8 Notices ....................................................................................................... 14
Section 9.9 Waiver of Partition .................................................................................... 14
Section 9.10 Amendments .............................................................................................. 14
Section 9.11 Successors and Assigns ............................................................................. 14
Section 9.12 Attorneys Fees ........................................................................................... 14
Section 9.13 Counterparts ............................................................................................... 14

ARTICLE X – Investments Represenations ..................................................................... 14
Section 10.1 Preexisting Relationship or Experience ................................................... 14
Section 10.2 Investment Intent ....................................................................................... 14
Section 10.3 Economic Risk ........................................................................................... 15
Section 10.4 No Disposition in Violation of Law .......................................................... 15
Section 10.5 Investment Risk ......................................................................................... 15
Section 10.6 No Other Warranties .................................................................................. 15
Section 10.7 Inquiry Opportunities ................................................................................ 15

Exhibit A – Glossary of Defined Terms
Exhibit B – Members Schedule

Fortune Film Fund Two LLC
Operating Agreement

**OPERATING AGREEMENT**
**OF**
**FORTUNE FILM FUND TWO LLC**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

This Operating Agreement is entered into as of December 7, 2017 by and among SAC Advisory Group, LLC, a California limited liability company ("**SAC**") and the parties listed on the counterpart signature pages hereof, and any other persons who from time to time become parties hereto as provided herein.

R E C I T A L S

The Company has been formed as a limited liability company under the California Revised Uniform Limited Liability Company Act, as codified in California Corporations Code Sections 17701.01 – 17713.13, as the same may be amended from time to time (or any corresponding provisions of succeeding law) (the "**Act**") by filing the Company's Articles of Organization (the "**Articles**") with the Secretary of State of California.

NOW, THEREFORE, the parties agree as follows:

**ARTICLE I**

**THE COMPANY**

1.1     Formation.  Pursuant to the Act, the Members have formed a California limited liability company under the laws of the State of California by filing the Articles with the California Secretary of State and entering into this Agreement.  The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall control to the extent permitted by the Act.

1.2     Name.  The name of the Company shall be "**Fortune Film Fund Two LLC**."  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable.  The Manager shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Manager considers appropriate or advisable.

1.3     Term.  The term of this Agreement shall be effective as of the date hereof and shall continue until terminated as provided herein.

1.4     Office and Agent.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the Company and its registered agent shall be as the Manager may determine.

1.5     Purpose of the Company.  The purpose of the Company is to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies.

1.6     No State-Law Partnership.  The Members intend that the Company not be a partnership

1

(including, without limitation, a limited partnership) or joint venture, and that no Member be an agent, partner or joint venturer of any other Member, for any purposes other than federal, state and local tax purposes, and this Agreement shall not be construed to suggest otherwise.

1.7　　Title to Company Property.  Legal title to all property of the Company shall be held and vested and conveyed in the name of the Company and no real or other property of the Company shall be deemed to be owned by a Member individually.  The Membership Interest of a Member shall constitute the personal property of such Member.

1.8　　Members.  The name, address, Capital Contribution, Membership Units and Percentage Interest of each Member are set forth on Exhibit B.

1.9　　Definitions.  Capitalized terms used herein shall have the meanings specified in the Glossary of Defined Terms attached hereto as Exhibit A, or the meanings specified in the text of the Agreement.

## ARTICLE II

## CAPITAL CONTRIBUTIONS AND MEMBERSHIP UNITS

2.1　　Capital Contributions. Each Member shall make a cash contribution to the capital of the Company in the amount shown opposite the Member's name on Exhibit B attached hereto. Except as provided in this Agreement, no Member may withdraw, demand return of or reduce its Capital Contribution.

2.2　　Capital Accounts.  The Company shall establish a Capital Account for each Member.  The Company shall determine and maintain each Capital Account in accordance with Section 1.704-1(b)(2)(iv) of the Regulations.  Except as specified herein or authorized by the written consent of the Manager, no Member shall receive any interest, salary or draw with respect to such Member's Capital Account, for services rendered on behalf of the Company, or otherwise in its capacity as a Member.

2.3　　Membership Units**.** The Membership Interests of the Members shall be represented by issued and outstanding Membership Units, which may be divided into one or more types, classes or series. Each type, class or series of Membership Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights set forth in this Agreement with respect to such type, class or series. The Manager shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Membership Units held by them (the **"Members Schedule"**), and shall update the Members Schedule upon the issuance or transfer of any Membership Units.  A copy of the Members Schedule as of the execution of this Agreement is attached hereto as **Exhibit B**.

2.4　　Classes of Membership Units.  The Company is authorized to issue three classes of Membership Units designated as Class A Preferred Units, Class B Profits Units and Class C Units.  Except as provided in this Agreement, the rights and preferences of the Class A Preferred Units and the Class B Profits Units shall be identical.  The rights and preferences of the Class C Units are described in Section 2.5 below.

2.5　　Class C Units.  Every so often, the Manager may be offered the opportunity to fund the purchase of foreign distribution rights that the Manager believes would provide a good short-term return ("**Short-Term Investment**").  For all Short-Term Investments, the Manager will solicit the Members to

determine if there is enough interest among the Members to fund the Short-Term Investment. All Members will be allowed to participate in the Short-Term Investment based on their Percentage Interests. Those Members agreeing to fund the Short-Term Investment will be issued Class C Units in exchange for making a Capital Contribution equal to the purchase price of their Class C Units. Upon the receipt of the Participation Fee attributable to the Short-Term Investment, the Class C Units will be automatically redeemed by the Company and the holders of Class C Units shall be repaid their Capital Contribution attributable to the purchase of their Class C Units. The Participation Profits attributable to the Short-Term Investment will be distributed among the Manager and Members as follows: 40% shall be distributed to the holders of Class C Units, 10% shall be distributed to the holders of Class A Units and 50% shall be distributed to the Manager. Only the distribution of Participation Profits will be counted for purposes of allocating Profits to the holders of Class C Units pursuant to Article V. The holders of Class C Units will not be entitled to any preferred return. The Company may issue one or more series of Class C Units attributable each particular Short-Term Investment. All Class C Units are non-voting Membership Interests.

## ARTICLE III

## MEMBERS

3.1    Eligibility for Participation. The Manager is authorized to cause the Company to raise capital by offering and selling Membership Units in the Company. The Manager shall have the sole responsibility and right, in its discretion, to determine whether a Person is eligible to be a Member, and eligible to purchase, acquire or hold a Membership Interest. No Person shall be admitted as a Member unless the Manager approves such Person, which approval may be granted or denied in the Manager's sole discretion. Each Person who subscribes to purchase Membership Units shall (unless the Manager determines otherwise) be admitted as a Member at the time: (1) such Person becomes a party to this Agreement, and (2) the Person makes any Capital Contribution then required as determined by the Manager.

3.2    Return of Capital; Limited Liability. At any time following the one-year anniversary of a Member's purchase of Class A Preferred Units, such Member may request in writing a return of all or a portion of such Member's Capital Contribution ("**Capital Withdrawal Request**") whereupon the Company will use commercially reasonable efforts to return such Member's Capital Contribution within six (6) months of the date of the Capital Withdrawal Request. Notwithstanding the foregoing, any Member who provides the Company with a Capital Withdrawal Request understands and acknowledges that the Company's ability to return a Member's Capital Contribution is entirely dependent on the available cash of the Company and the timing of the return of the Company's investment in foreign distribution rights, and therefore, the Company's failure to return a Member's Capital Contribution within the six-month period noted above shall not be deemed a breach of the Company's obligation under this Agreement. The return of Member's entire Capital Contribution as provided under this Section 3.2 shall be deemed a complete and full redemption of a Member's Membership Interest. In the event only a portion of a Member's Capital Contribution is returned under this Section 3.2, such Member's Percentage Interest shall be reduced accordingly. Except as specifically provided in this Agreement, (i) no Member may withdraw any portion of his or her Capital Contribution and (ii) no Member shall be entitled to a return of such Member's Capital Contribution. Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

3.3    Transactions with the Company. Subject to any limitations set forth in this Agreement and

with the affirmative vote or written consent of the Manager, a Member may lend money to and transact other business with the Company. Subject to other applicable law, such Member has the same rights and obligations with respect thereto to a Person who is not a Member.

3.4 <u>Remuneration to Members</u>. Except as otherwise authorized in, or pursuant to, this Agreement, no Member is entitled to remuneration for providing services to the Company.

3.5 <u>Manager-Managed Company</u>. Pursuant to Section 4.1, and notwithstanding anything to the contrary in the Articles, the management of the Company is vested solely in the Manager.

3.6 <u>Member Voting Rights</u>. Except as otherwise expressly required in this Agreement or by the Act, in all matters in which a vote, approval or consent of the Members is required, the affirmative vote or written consent of those Members holding a majority of the Percentage Interests shall be required to authorize or approve such matters.

## ARTICLE IV

## MANAGEMENT AND CONTROL OF THE COMPANY

4.1 <u>Management of Company</u>.

(a) <u>Number and Term</u>. The Company shall have one Manager. The initial Manager shall be SAC Advisory Group, LLC. The number of Managers of the Company may be fixed from time to time by the unanimous affirmative vote or unanimous written consent of the Members. Unless a Manager resigns or is removed, a Manager shall hold office until a successor shall have been elected and qualified. A Manager may be elected or removed at any time and for any reason by the unanimous affirmative vote or unanimous written consent of the Members.

(b) <u>Authority of Manager</u>. Subject to the provisions of this Agreement, the business and affairs of the Company shall be managed solely by the Manager. Except as otherwise provided herein, the Manager shall have full, complete and exclusive authority to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business, and the Manager may delegate any or all of its authority to one or more Persons.

(c) <u>Specific Authority</u>. In furtherance and not in limitation of Section 4.1(b) and the other provisions hereof, the Manager shall have all specific rights and powers required or appropriate for the management of the Company and are specifically authorized and empowered for and on behalf of the Company to do the following:

(1) execute and file in the appropriate recording offices any amendment to the Articles required by the Act and any and all other documents and instruments necessary or appropriate in connection therewith and take any and all actions contemplated thereby;

(2) make any and all decisions that the Company may be entitled and/or required to make under the terms of any and all documents, agreements, or other instruments relating to the operation of the Company's business;

(3)     generally bind the Company and execute and deliver any and all documents and instruments on the Company's behalf;

(4)     execute any and all instruments or documents with any third party, including executing any contract, bank resolution and signature card, release, discharge, and any other document or instrument in any way related thereto or necessary or appropriate in connection therewith;

(5)     admitting new Members and issuing any new Membership Units;

(6)     to the extent that Company funds are available therefor, pay all taxes, assessments, and other impositions applicable to the Company;

(7)     to the extent that Company funds are available therefor, pay all debts and other obligations of the Company;

(8)     prepare, or cause to be prepared, the books and records described in this Agreement and prepare and distribute, or cause to be prepared and distributed, the reports described in Section 7.5;

(9)     periodically distribute assets (in cash or in-kind) to the Members;

(9)     obtain all management, legal, accounting, and other services necessary or appropriate, in the Manager's discretion, in connection with the Company's business;

(11)     apply for and obtain any and all governmental and non-governmental permits, approvals, and licenses;

(12)     generally do all things in connection with any of the foregoing or any other businesses or activities of the Company, manage and administer the Company's day-to-day business and affairs, execute all documents on behalf of the Company, pay all costs or expenses connected with the operation or management of the Company, and sign or accept all checks, notes, and drafts on the Company's behalf; and

(13)     do all things generally consistent with any and all of the foregoing on the Company's behalf.

4.2     <u>Fiduciary Relationship; Outside Activities</u> .  The Manager shall not be deemed to be a fiduciary for the Company or for any Member, except to the extent required by applicable law. The Manager may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company.  Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom.  The Manager shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Manager shall have the right to hold any investment opportunity or prospective economic advantage for its own account or to recommend such opportunity to Persons other than the Company.  The Members acknowledge that the Manager owns and/or manages other businesses, including businesses that may compete with the Company and for the Manager's time.  The Members hereby waive

any and all rights and claims which they may otherwise have against the Manager and its partners, agents, employees, and Affiliates as a result of any of such activities.

4.3　　Liability for Acts and Omissions; Indemnification.

(a)　　No Covered Person shall be liable, responsible, or accountable in damages to any Member or the Company for any act or omission performed or omitted by such Covered Person in good faith on the Company's behalf and in a manner reasonably believed by such Covered Person to be within the scope of the authority granted to it hereby or any other agreement contemplated hereby between such Covered Person and the Company, except for acts or omissions constituting gross negligence or willful misconduct ("**Covered Act**").  To the fullest extent permitted by law, the Company shall indemnify each Covered Person for any loss, damage, claim, liability (including any liability under the Securities Act), or expense (including attorneys' fees and disbursements, fines, and amounts paid in settlement) by reason of any Covered Act.  Any indemnity under this Section 3.3 shall be provided only out of and to the extent of Company Property, and neither the Manager nor any Member shall have or incur any personal liability on account thereof.  The Manager may, in its discretion, establish reserves for any indemnity that may be payable hereunder.

(b)　　Expenses incurred in defending any action, suit, or proceeding brought against a Covered Person shall be paid by the Company in advance of final disposition thereof on receipt of an undertaking by or on behalf of such Covered Person to repay such amount (with interest thereon at the Prime Rate from the date of the advancement thereof) if it is ultimately determined that such Covered Person is not entitled to be indemnified therefor by the Company hereunder.  The indemnification required by this Section 3.3 shall continue as to a Covered Person with respect to any Covered Act even after such Covered Person ceases to occupy the position that caused it to be a "Covered Person."

4.4　　Operating Expenses. The Company shall reimburse the Manager for all costs and expenses that it may incur that are appropriately reimbursable thereto, including but not limited to legal, tax return preparation and filing, accounting, administration expenses and travel.

# ARTICLE V

# ALLOCATIONS AND DISTRIBUTIONS

5.1　　Allocations of Profit and Loss.  Except as otherwise expressly provided in this Agreement, all Profits or Losses of the Company for each year (including each item of income, gain, loss, deduction or credit entering into the computation thereof), other than Profits and Losses arising out of a sale of all or substantially all of the assets of the Company or otherwise in connection with a liquidation of the Company, shall be allocated among the Members as follows:

(a)　　Profits for each Fiscal Year shall be allocated among the Members in the following manner and order of priority:

(i)　　First, to the Members, pro rata, in the proportions that aggregate cash distributions (other than a Return of Capital) to each Member during or with respect to such Fiscal Year bear to the aggregate distributions to all Members (other than a Return of Capital) during or with respect to

such Fiscal Year, until aggregate allocations of Profits pursuant to this Section 5.1(a)(i) equal the aggregate distributions to all Members pursuant to this Article V during or with respect to such Fiscal Year; and

(ii)     Second, to the Members in the following manner; 50% of the Profits shall be allocated pro rata to the holders of Class A Units and 50% of the Profits shall be allocated to the holder of Class B Units.

(b)     Losses for each Fiscal Year shall be allocated among the Members in the following manner and order of priority:

(i)     First, if one or more Members have Capital Accounts with positive balances, to those Members, pro rata, in the proportions that the positive balances of their respective Capital Accounts bear to the aggregate positive balances of all such Capital Accounts, until (after giving effect to such allocation of Losses) no Member has a Capital Account with a positive balance; and

(ii)     Second, to the Members in the following manner; 50% of the Losses shall be allocated pro rata to the holders of Class A Units and 50% of the Losses shall be allocated to the holder of Class B Units.

Provided, however, that notwithstanding the foregoing, (i) if one or more Members shall have positive balances in their Capital Accounts, Profits shall be allocated to those Members, if any, having deficit balances in their Capital Accounts to the extent of and in proportion to such deficit balances, and (ii) if one or more Members shall have deficit balances in their Capital Accounts, Losses shall be allocated to those Members, if any, having positive balances in their Capital Accounts to the extent of and in proportion to such positive balances

(b)     <u>Regulatory Allocations</u>.  Notwithstanding the allocations set forth in Section 5.1(a), Profits, Losses and items thereof shall be allocated to the Members in the manner and to the extent required by the Regulations under Section 704 of the Code, including without limitation, the provisions thereof dealing with minimum gain chargebacks, partner minimum gain chargebacks, qualified income offsets, partnership nonrecourse deductions, partner nonrecourse deductions, the provisions dealing with deficit capital accounts in Sections 1.704-2(g)(1), 1.704-2(i)(5), and 1.704-1(b)(2)(ii)(d), and any provisions dealing with allocations related to the forfeiture of a Membership Interest.  The Manager shall apply such provisions in its good faith discretion based on advice from the Company's tax advisors.

(c)     <u>Loss Limitation</u>.  Losses allocated pursuant to Section 5.1(a) or (b) shall not exceed the maximum amount of Losses that can be allocated without causing any Member to have a negative Capital Account balance at the end of any taxable year or other period (after taking into account the adjustments, allocations and distributions described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6)).  In the event some but not all of the Members would have negative Capital Account balances as a consequence of an allocation of Losses pursuant to Section 5.1(a) or (b), the limitation set forth in this Section 5.1(c) shall be applied on a Member by Member basis and Losses not allocable to any Member as a result of such limitation shall be allocated to other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Losses to such Member under Regulations Section 1.704-1(b)(2)(ii)(d).

5.2     <u>Code Section 704(c) Allocations</u>.  Notwithstanding any other provision in this Article V, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss,

and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value on the date of contribution. If the Book Value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to that asset will take into account any variation between the adjusted basis of the asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the related Regulations. Any elections or other decisions relating to allocations under this Section 5.2 will be made in any manner that the Members, by unanimous written consent, determine reasonably reflects the purpose and intention of this Agreement.

5.3     Profits and Losses and Distributions in Respect of a Transferred Interest. If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such Fiscal Year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon its respective Membership Interest at the close of such day.

5.4     Distributions; 10% Cumulative Preferred Return. Subject to Section 5.5, the Company may distribute all or a part of the undistributed Net Cash Flow, if any, for any period if the Manager so decides in its discretion. All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor the Manager shall incur any liability for making distributions in accordance with this Section 5.4. Distributions made pursuant to this Section 5.4 shall be made to the Members in the following manner and order of priority:

(a)     All Members holding Class A Preferred Units shall be entitled to an annual 10% cumulative return on their Capital Contributions during the Term of the Company (the "**Preferred Return**"), and therefore, any distributions under this Section 5.4 shall first be made to all Members holding Class A Preferred Units up to an amount equal to their Preferred Return;

(b)     After the amounts described in Section 5.4(i) have been distributed to the Members, the Company shall distribute to the holders of Class B Profits Units an amount equal to the Preferred Return; and

(c)     After the amounts described in Sections 5.4(i) and (ii) have been distributed, any remaining undistributed Net Cash Flow shall be distributed in the following manner: 50% of the remaining undistributed Net Cash Flow shall be distributed pro rata to the holders of Class A Units and 50% of the remaining undistributed Net Cash Flow shall be distributed to the holder of Class B Units.

For avoidance of doubt, in the event that any Member acquires his or her Units after the Company has purchased a particular film's foreign distribution rights, the amount of cash distributions that such Member is entitled to receive with respect to such foreign distribution rights will be based on a weighted average number of days that such Member held a beneficial interest in such foreign distribution rights.

5.5     Reinvestment of Participation Profits. Notwithstanding anything to the contrary contained in this Agreement, any Member may elect on an annual basis to reinvest either 100% or 50% of such Member's allocable share of Participation Profits that would otherwise be distributed to such Member under

this Agreement. Such election shall be made on an annual basis on or before June 30 of each year, and such election shall remain in effect for the entire year beginning on July 1 and ending on June 30 (the "**Reinvestment Period**"). Failure to make a timely election to reinvest Participation Profits shall be deemed an election *not* to reinvest any Participation Profits for the subsequent Reinvestment Period. To the extent any Member elects to reinvest Participation Profits, such reinvestment shall be deemed a Capital Contribution and shall increase such Member's Capital Account. In addition, any Participation Profits reinvested under this Section 5.5 shall be deemed a cash distribution for all purposes under this Agreement and shall be deemed a distribution for purposes of calculating such Member's Preferred Return under Section 5.4 herein. A Member's election to reinvest Participation Profits shall not be deemed a purchase of additional Preferred Units and no Member shall be entitled to any increase in the number of Preferred Units as a result electing to reinvest Participation Profits.

5.6     Limitations on Distributions to Class B Profits Units.     It is the intention of the parties to this Agreement that distributions to any holder of Class B Profits Unit be limited to the extent necessary so that the related Membership Interest constitutes a profits interest that carries with it no initial Capital Account balance and constitutes an interest only in the future profits of the Company and that, if immediately following the issuance of a Class B Profits Unit pursuant to this Agreement, all of the Company's assets were to be sold and the proceeds therefrom were to be distributed to the Members in liquidation of the Company, no distributions would be made with respect to the Class B Profits Unit.

5.7     Distributions with respect to a Return of Capital or Liquidation Event.     Notwithstanding the foregoing, distributions of cash or property with respect to a Return of Capital or Liquidation Event shall be distributed to the Members in the following manner:

          (a)     Distributions shall be made to the Members in proportion to the Members' positive Capital Account balances until all Member Capital Accounts have been reduced to zero;

          (a)     Thereafter, distributions shall be made to the Members in proportion to the Members' Percentage Interests.

5.8     Tax Distributions.     Notwithstanding the foregoing, subject to applicable law and only to the extent permitted under any financing or other agreements to which the Company may be subject, the Manager shall, as soon as practicable after the close of each fiscal year, cause the Company to make distributions to all Members in proportion to the Profits allocated to them pursuant to this Article V for such fiscal year in amounts sufficient to enable the Members to discharge their United States federal, state and local income tax liabilities arising from such allocations. The amounts distributable pursuant to this Section 5.6 shall be determined by the Manager in its reasonable discretion and the same tax rate assumptions will be applied to each Member regardless of actual tax status.

5.9     Restriction on Distributions.     No distribution shall be made to the Members (i) if, after giving effect to the distribution, the Company would not be able to pay its debts as they become due in the usual course of business or (ii) the Company's total assets would be less than the sum of its total liabilities.

5.10     Withholding on Distributions.     Each Member acknowledges and agrees that to the extent required under applicable law, the Manager may withhold a portion of any distribution made hereunder in order to comply with such applicable law, and each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and comply with any applicable law. All amounts of tax paid or withheld pursuant to

the Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Company or the Members, or income allocated to the Company or Members, shall be treated as amounts distributed to the Members pursuant to this Article V for all purposes under this Agreement. The Manager shall allocate any such amounts among the Members in any manner that is consistent with the provisions of this Agreement relating to allocations and distributions.

5.11    Return of Distributions.  Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest Owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

# ARTICLE VI

## TRANSFER AND ASSIGNMENTS OF MEMBERSHIP INTERESTS

6.1    Transfer and Assignment of Membership Interests.  Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his or her Membership Interest without the express written consent of the Manager.  In the event any Member is allowed to transfer his or her Membership Interest under this Section 6.1, such Member shall forfeit any undistributed profits accrued up to the date of transfer.  Transfers in violation of this Article VI shall only be effective to the extent set forth in Section 6.5.  After the consummation of any transfer of any part of a Member's Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

6.2    Substitution of Members.  A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Section 6.1 are satisfied, and (ii) such Person becomes a party to this Agreement.

6.3    Rights of Legal Representatives.  If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's right for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member.  If a Member is a trust, the power of that Member may be exercised by its trustee, legal representative or successor.

6.4    Marital Settlements and Court Orders.  All Members agree that any purported transfer of a Member's Membership Interest arising from or in connection with any divorce decree, marital settlement, arbitration award or any court order or judicial decree of any kind shall be subject to the terms and conditions contained in this Article VI, and the transferee of any purported or attempted transfer in violation of this Article VI shall be deemed to hold only an Economic Interest

6.5    No Effect to Transfers in Violation of Agreement.  Upon any transfer of a Membership Interest in violation this Article VI, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only

receive the share of the Company's Profits, Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

# ARTICLE VII

## ACCOUNTING, RECORDS, REPORTS FOR MEMBERS

7.1     Books and Records.  The Manager shall cause complete and accurate books and records of the Company to be maintained in accordance with the Act and with the accounting methods followed for federal income tax purposes.  The Manager shall report to the Members quarterly on the financial condition and results of operations of the Company.  The Company shall maintain at its principal office in California all of the documents necessary to comply with the requirements of the Act.

7.2     Bank Accounts.  The Manager shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

7.3     Accounting Decisions.  The Manager shall make all decisions as to accounting matters, and shall from time to time cause the Company to make such tax elections as he deems to be in the best interest of the Company and the Members.

7.4     Tax Matters Member.  SAC Advisory Group, LLC shall be designated the tax matters partner with respect to the Company, as defined in Section 6231 of the Code.

7.5     Reports.  The Manager shall provide the Members with quarterly financial statements that reflect the Company's profit and loss during the quarter.  The Manager shall cause the Company to deliver to the Members unaudited consolidated and consolidating financial statements and Schedule K-1s for the Company and each such Member within 90 days of the end of each year.

# ARTICLE VIII

## DISSOLUTION AND WINDING UP

8.1     Dissolution.   Except as otherwise provided in this Section 9.1, no Member may cause the Company's dissolution before the expiration of its stated term.  The Company shall be dissolved on the happening of any of the following events:

(a)     The Manager, in its discretion, determines to dissolve the Company, in which case the Manager will notify all Members of such determination;

(b)     As otherwise provided by the Act; or

(c)     No later than ten years from the formation date of the Company, the Manager shall begin the process of winding up and dissolving the Company.

8.2     Certificate of Dissolution.  As soon as possible following the occurrence of any of the events specified in Section 8.1, the Manager shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act.  The

Manager who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a Certificate of Cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

8.3     Winding Up.  Upon the occurrence of any event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors.  The Manager shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of the Company and its assets, shall either cause its assets to be sold or distributed, and if sold, shall cause the proceeds therefrom to be applied and distributed as provided in Section 8.5. The Manager winding up the affairs of the Company shall be entitled to reasonable compensation for such services.

8.4     Distributions in Kind.  Any non-cash asset distributed to one or more Members shall first be valued at its fair market value to determine the Profit or Loss that would have resulted if such asset were sold for such value, such Profit or Loss shall then be allocated pursuant to Article V, and the Member's Capital Accounts shall be adjusted to reflect such allocations.  The amount distributed and charged to the Capital Account of each Member receiving an interest in such distributed asset shall be the fair market value of such interest (net of any liability secured by such asset that such Member assumes or takes subject to).  In the event there is no public market for the non-cash asset being distributed, the fair market value of such assets shall be determined in good faith by the Manager.

8.5     Order of Payment of Liabilities Upon Dissolution.  After determining that all known debts and liabilities of the Company in the process of winding-up have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with Section 5.5.  Notwithstanding the foregoing, no distributions shall be made pursuant to this Section 8.5 before giving effect to the allocations of Profit, Loss and other items, pursuant to Article V.

8.6     Limitations on Payments Made in Dissolution.  Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of the Company for the return of its positive Capital Account balance and shall have no recourse against any other Member for its Capital Contribution and/or share of Profits (upon dissolution or otherwise).

8.7     No Deficit Restoration Obligation; No Liability for Return of Capital.  A negative or deficit balance in any Member's Capital Account shall not be deemed to be an asset of the Company, and no Member with such a balance shall have any obligation to the Company, to any other Member, or to any third party or creditor to restore such balance.  No Member shall be personally liable for the return of all or any part of the Capital Contribution of any other Member.  Any such return shall be made solely from Company Property.

# ARTICLE IX

## MISCELLANEOUS

9.1     Complete Agreement; Waiver.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members.  No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Articles conflicts with any provision of this Agreement, the Articles shall control.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

9.2     Dispute Resolution.  If a dispute arises between the Members relating to this Agreement, the Members agree to use the following procedure prior to either party pursuing other available remedies:

(a)     A meeting shall be held promptly between the Members to attempt in good faith to negotiate a resolution of the dispute.

(b)     If, within thirty (30) days after such meeting, the parties have not succeeded in negotiating a resolution of the dispute, they will jointly appoint a mutually acceptable neutral person not affiliated with any of the parties (the "**Mediator**"), seeking assistance in such regard from the American Arbitration Association if they have been unable to agree upon such appointment within forty (40) days from the initial meeting.  The fees of the Mediator shall be shared equally by the parties.

(c)     In consultation with the Mediator, the parties will select or devise an alternative dispute resolution procedure ("**ADR**") by which they will attempt to resolve the dispute, and a time and place for the ADR to be held, with the Mediator making the decision as to the procedure, and/or place and time (but unless circumstances require otherwise, not later than sixty (60) days after selection of the Mediator) if the parties have been unable to agree on any of such matters within twenty (20) days after initial consultation with the Mediator.

(d)     The parties agree to participate in good faith in the ADR to its conclusion as designated by the Mediator.  If the parties are not successful in resolving the dispute through the ADR, then the parties shall submit the matter to binding arbitration pursuant to Section 9.4 below.

9.3     Governing Law.  The terms of this Agreement, and the rights and obligations of the Members with respect to this Agreement, shall be governed by California law, without regard to its principles of conflict of laws.

9.4     Arbitration.  In the event of a dispute among the parties hereto, following good faith negotiations to resolve the same, such dispute shall be settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association ("AAA") providing for the most expeditious method of arbitration resolution then offered by the AAA.  Such dispute shall be settled by an arbitration in Fresno County, California, by a disinterested arbitrator (the "Arbitrator") mutually selected by the disputing parties no later than five days prior to the commencement of the arbitration.  In the event that the parties cannot agree on the Arbitrator, each party shall select a disinterested arbitrator (each, an "Appointing

Arbitrator") of their choosing who will then mutually agree on the Arbitrator. If either party fails to appoint an Appointing Arbitrator within 10 days of a request in writing by the other party to do so, the Appointing Arbitrator appointed by the other party shall appoint the Arbitrator and such appointment shall be binding on the party failing to appoint an Appointing Arbitrator. Except as to the selection of the Arbitrator which shall be as set forth above, the arbitration shall be conducted promptly and expeditiously in accordance with the rules of the AAA providing for the most expeditious method of arbitration resolution then offered by the AAA so as to enable the Arbitrator to render a decision within 20 days of the commencement of the arbitration proceedings. The decision of the Arbitrator shall be binding upon the parties, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof. The decision of the Arbitrator shall include within the arbitration award a recovery by the prevailing party or parties of its or their expenses of arbitration, including the fees and expenses of the Arbitrator and the Appointing Arbitrators, if any, other costs associated with the arbitration proceeding and the reasonable attorneys' fees and expenses of the prevailing party or parties incurred in connection with the arbitration. Any person appointed as an Arbitrator or an Appointing Arbitrator shall be knowledgeable and experienced in the matter(s) sought to be arbitrated and shall not be employed by any Member, the Company or an Affiliate of the Company or any Member, directly, indirectly, or as an agent, except in connection with an arbitration proceeding. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, the Act, or not available in a court of law. No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by any Member except (a) an action to compel arbitration pursuant to this Section 9.4 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 9.4.

9.5     Exhibits. All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

9.6     Severability. If any provision of this Agreement or the application of such provision to any Person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to Persons or circumstances other than those to which it is held invalid shall not be affected thereby.

9.7     Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

9.8     Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing (which may include facsimile) and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice on Exhibit A hereto, unless the same shall have been changed by notice in accordance herewith.

9.9     Waiver of Partition. Each Member agrees to and irrevocably waives for the duration hereof any right or power such Member might have (a) to cause the Company or any of its assets to be partitioned, (b) to cause the appointment of a receiver for any Company property, or (c) to compel any sale of all or any part of any Company property pursuant to any applicable law, or to file a complaint or to institute any proceeding at law or in equity to cause the Company's termination or dissolution, except to enforce, compel, implement, or effect any dissolution, termination, or liquidation of the Company occurring or required to occur pursuant to Article VIII.

9.10     Amendments.  The terms and conditions of this Agreement may only be amended in a writing signed by all of the Members.

9.11     Successors and Assigns.  This Agreement shall be binding upon, and, as to permitted or accepted successors, transferees and assigns, inure to the benefit of the Members and the Company and their respective successors and assigns.

9.12     Attorneys' Fees.  In the event of any litigation, arbitration or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other costs and expenses incurred in connection with settling or resolving such dispute.

9.13     Counterparts.  This Agreement may be executed in several counterparts, and all counterparts so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.


# ARTICLE X

# INVESTMENT REPRESENTATIONS

Each Member hereby represents and warrants to, and agrees with, the Manager, the other Members, and the Company as follows:

10.1     Preexisting Relationship or Experience.  He or she has a preexisting personal or business relationship with the Company, the Manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by the Company or any affiliate or selling agent of the Company, he or she is capable of evaluating the risks and merits of an investment in the Company and of protecting his or her own interests in connection with this investment.

10.2     Investment Intent.  He or she is acquiring the Membership Interest for investment purposes for his or her own account only and not with a view to or for sale in connection with any distribution of all or any part of the Membership Interest.  No other person will have any direct or indirect beneficial interest in or right to the Membership Interest.

10.3     Accredited Investor; Economic Risk.  He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of an investment in the Membership Interest, including the total loss thereof.

10.4     No Disposition in Violation of Law.  Without limiting the representations set forth above, he or she will not make any disposition of all or any part of the Membership Interest that will result in the violation of the Securities Act or any other applicable securities laws.  Without limiting the foregoing, he or she agrees not to make any disposition of all or any part of the Membership Interest unless and until he or she has notified the Company of the proposed disposition and has furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and (ii) if reasonably requested by

the Manager, he or she has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

10.5     <u>Investment Risk</u>.  He or she acknowledges that the Membership Interest is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment in the Company, and that he or she understands and take full cognizance of the risk factors related to the purchase of the Membership Interest.

10.6     <u>No Other Warranties</u>.  He or she acknowledges that in connection with purchasing Units no oral or written representations have been made by the Company, Manager or any officer, employee, agent other than representations include in the Confidential Information Statement or this Agreement.

10.7     <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, the Manager concerning the terms and conditions of the purchase of Units and other matters pertaining to the investment in the Company in order to evaluate the merits and risks of the purchase of the Units.


          IN WITNESS WHEREOF, this Agreement is executed as of the date first written above by the Manager on its own behalf and each Member executing a counterpart signature page.


                              **MANAGER:**

                              **SAC ADVISORY GROUP, LLC**
                              a California limited liability company




                              _____
                              Ryan Spiegel, Manager

**COUNTERPART SIGNATURE PAGE**

**OF**

**OPERATING AGREEMENT**

**OF**

**FORTUNE FILM FUND TWO LLC**

**BY AND AMONG**

**FORTUNE FILM FUND TWO LLC**

**AND EACH MEMBER NAMED THEREIN**

The undersigned hereby executes and delivers the operating agreement of Fortune Film Fund Two LLC, a California limited liability company, (the "Agreement ") to which this Counterpart Signature Page is attached, effective as of the date of this Counterpart Signature Page, together with all other Counterpart Signature Pages of all the Agreement, shall constitute one and the same document in accordance with the terms of such Agreement.

Dated: _____, 2017      _____
                                                                    Print Name of Member

                                                                    _____
                                                                    Signature

                                                                    _____
                                                                    Title, if applicable

                                                                    Address:

                                                                    _____

                                                                    _____

                                                                    Wire Instructions:

                                                                    _____

                                                                    _____

## GLOSSARY OF DEFINED TERMS

"*Act*" means the provisions of the California Revised Uniform Limited Liability Company Act, as codified in California Corporations Code Sections 17701.01 – 17713.13, as the same may be amended from time to time.

"*Affiliate*" means, when used with reference to a specified Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any Person who or which has the right to exercise, directly or indirectly, more than 50% of the outstanding voting interests of such Person, (iii) any spouse, child, parent, grandchild, grandparent, sibling, aunt, uncle or first cousin of such Person, and (iv) any partnership, trust or tax or estate planning vehicle established for the sole benefit of such Person or any of such Person's other Affiliates and under which such Person is the sole trustee.

"*Agreement*" means this operating agreement, as originally executed and as amended from time to time.

"*Articles*" means the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

"*Capital Account*" means with respect to any Member the capital account that the Company establishes and maintains for such Member pursuant to the terms of this Agreement.

"*Capital Contribution*" means the total value of cash contributed to the Company by each Member.

"*Class A Preferred Units*" means Membership Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class A Preferred Units" in this Agreement.

"*Class B Profits Units*" means Membership Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B Profits Units" in this Agreement.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time.

"*Company*" means Fortune Film Fund Two LLC, a California limited liability company.

"*Covered Person*" means the Manager, agent, representative, Member, officer or employee of the Company, as applicable, and each of their respective successors and assigns.

"*Economic Interest*" means a Member's or Economic Interest Owner's share of one or more of the Company's Profits, Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management.

"*Economic Interest Owner*" means the owner of an Economic Interest who is not a Member.

"*Fiscal Year*" means the Company's fiscal year, which shall be the calendar year.

"*Gross Asset Value*" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the Manager;

(b)     The Gross Asset Values of all assets of the Company shall be adjusted to equal their respective gross fair market values as of the following times: (A) the acquisition of an additional interest in the Company by any new

or existing Member in exchange for more than a de minimis Capital Contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of property (including cash) as consideration for an interest in the Company; (C) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); and (D) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company; provided, however, that the adjustments pursuant to clauses (A) and (B) above shall be made only if and to the extent that the Tax Matters Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(c)     The Gross Asset Value of any asset of the Company distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as reasonably determined by the Manager; and

(d)     The Gross Asset Value of the assets of the Company shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Value shall not be adjusted pursuant to this paragraph (iv) to the extent that the Tax Matters Member determines that an adjustment pursuant to paragraph (ii) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph.  If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i), (ii), or (iv) of this definition, the Gross Asset Value of such asset shall thereafter be adjusted by the depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

*"Liquidation Event"* means either (i) the sale, lease, transfer or other disposition, in a single transaction or series of related transactions, by the Company of all or substantially all the assets of the Company taken as a whole; or (ii) the winding up and dissolution of the Company pursuant to Article VIII.

*"Manager"* means the manager named in Section 4.1(a) of this Agreement and any Person who is elected as a manager of the Company pursuant to Section 4.1(a).

*"Member"* shall mean each Person who is an initial signatory to this Agreement, or has been admitted to the Company as a Member in accordance with the terms of this Agreement.

*"Membership Units"* represent a Member's ownership rights in the Company. For convenience, Membership Units may be referred to herein as "*Units.*"   Depending on the circumstances, Units may represent a Member's entire Membership Interest in the Company or may simply represent an Economic Interest.  With respect to capital contributions made by the Members as contemplated in Articles 2 of this Agreement, each Unit represents one U.S. dollar of capital contributed to the Company.

*"Membership Interest"* shall mean a Member's entire interest in the Company, including the Member's Economic Interest, the right to vote and the right to receive information concerning the Company as set forth herein

*"Net Cash Flow"* means, with respect to any period, the net cash proceeds for such period from operations, plus cash previously set aside as reserves that the Manager, in its discretion, determines is no longer needed to be retained as reserves and is available for distribution, less (1) the part of such cash proceeds set aside as reserves (in an amount determined by the Manager in its discretion) for the conduct of business and (2) any costs and expenses payable for such period.  The items constituting "Net Cash Flow" shall be determined on a cash basis, and no deduction therefrom shall be made for depreciation or amortization or similar non-cash expenditures or for accrued but unrealized losses and expenses.

*"Participation Advance"* means the money paid by the Company to purchase the foreign distribution rights of a particular movie from the movie's producer or the person that holds such movie's foreign distribution rights.

*"Participation Fee"* means the money received by the Company from a third-party distributor or media company for the purchase of a particular movie's foreign distribution rights that are owned by the Company.

"*Participation Profits*" means the excess of the Participation Fee over the Participation Advance.

"*Percentage Interest*" means the percentage of a Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

"*Person*" means an individual, general partnership, limited partnership, corporation, trust, estate, association, limited liability company, limited liability partnership, real estate investment trust, association or other entity, whether domestic or foreign.

"*Profits*" and "*Losses*" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)        Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)        Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

(c)        If the Gross Asset Value of any asset of the Company is adjusted pursuant to paragraph (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)        Gain or loss resulting from any disposition of property by the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(e)        Notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Section 5.1(b) shall not be taken into account in computing Profits or Losses.

"*Regulations*" means the regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

"*Reserves*" means funds set aside from Capital Contributions or revenues as reserves.  Such Reserves shall be maintained in amounts reasonably deemed sufficient by the Manager for working capital and the payment of taxes, insurance, debt service, compensation expense, fees, or other costs or expenses incident to the business and operations of the Company, or in the alternative, the dissolution of the Company.

"*Return of Capital*" means the portion of any distribution to the Members that represents a return of their Capital Contribution and doesn't represent a distribution of Net Cash Flow.

**EXHIBIT B**

**MEMBER SCHEDULE**

| Member Name and Address | Capital Contribution | Type of Membership Units | Number of Membership Units | Percentage Interest |
|---|---|---|---|---|
| SAC Advisory Group, LLC | -0- | Class B Profits Units[1] | 10,000,000 | 50.00% |
| SAC Advisory Group, LLC | $200,000 | Class A Preferred Units | 200,000 | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |
| | | Class A Preferred Units | | |

---

[1] The number of actual Class B Profits Units issued to SAC Advisory Group will depend on the number of Class A Preferred Units sold by the Company. The number of Class B Profits Units issued by the Company will always equal the number of Class A Preferred Units sold to investors.

## SECOND AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## SAC ADVISORY GROUP, LLC
## A CALIFORNIA LIMITED LIABILITY COMPANY

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT (the "**Agreement**") is made as of April 1, 2019 by and between the parties listed on the signature page hereof, with reference to the following facts:

A.      SAC Advisory Group, LLC, a California limited liability company (the "**Company**"), was initially formed as a member-managed limited liability company under the laws of the State of California;

B.      The Members previously executed an Amended and Restated Operating Agreement ("**First Amended Operating Agreement**") dated May 11, 2017 in order to change the Company to a manager-managed limited liability company; and

C.      The Members now wish to amend the First Amended Operating Agreement in order to modify the Percentage Interests of the Members by amending Exhibit A attached hereto.

NOW, THEREFORE, effective as of the date hereof, the parties (hereinafter sometimes collectively referred to as the "**Members**," or individually as "**Member**") by this Agreement set forth the operating agreement for the Company under the laws of the State of California upon the terms and subject to the conditions of this Agreement.

## ARTICLE I

## THE COMPANY

1.1      <u>Name</u>.  The name of the Company shall be "SAC Advisory Group, LLC."  The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Managers deem appropriate or advisable.  The Managers shall file any fictitious name certificates and similar filings, and any amendments thereto, that the Managers consider appropriate or advisable.

1.2      <u>Term</u>.  The term of this Agreement shall be effective as of the date hereof and shall continue until terminated as provided herein.

1.3      <u>Office and Agent</u>.  The Company shall continuously maintain an office and registered agent in the State of California as required by the Act.  The principal office of the Company and its registered agent shall be as the Managers may determine.

1.4      <u>Purpose of the Company</u>.  The purpose of the Company is to engage in any lawful activity for which a limited liability company may be organized under the Act.

1.5      <u>Definitions</u>.  Capitalized terms used herein shall have the meanings specified in the Glossary of Defined Terms attached hereto as Exhibit B, or the meanings specified in the text of the Agreement.

# ARTICLE II

## CAPITAL CONTRIBUTIONS

2.1     Capital Contributions; Capital Accounts.     Each Member shall make an initial Capital Contribution as mutually determined by the Managers and each Member.  A Capital Account shall be established on the Company's books for each Member and shall be maintained in accordance with Treas. Reg. § 1.704-1(b).  The initial Capital Accounts for each Member shall be such Member's initial Capital Contribution.  The Managers may modify the manner in which the Members' Capital Accounts are maintained, or in which any credits or debits thereto are computed, to comply with Treas. Reg. § 1.704-1(b). The Managers also may make any appropriate modifications if unanticipated events might otherwise cause this Agreement not to comply with Treas. Reg. § 1.704-1(b).

2.2     Additional Capital Contributions. No Member shall be required to make any additional Capital Contributions.  To the extent approved by all Managers, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire.  In that event, all Members shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a pro rata basis in accordance with their Percentage Interests.  Immediately following such additional Capital Contributions, the Percentage Interests shall be adjusted by the Managers to reflect the new relative proportions of the Capital Accounts of the Members.

2.3     Return of Capital; Limited Liability.  Except as specifically provided in this Agreement, (i) no Member may withdraw any portion of his Capital Contribution and (ii) no Member shall be entitled to a return of such Member's Capital Contribution.  Except as required under the Act or as expressly set forth in this Agreement, no Member shall be personally liable for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise.

# ARTICLE III

## MEMBERS

3.1     Admission of Additional Members.  Except as required under the Act or as expressly set forth in this Agreement, the Company may not admit any new Members without the unanimous consent of all Members.  Any additional Member must become a party to this Agreement.

3.2     Transactions with the Company.  Subject to any limitations set forth in this Agreement and with the consent of the Managers, a Member may lend money to and transact other business with the Company.  Subject to other applicable law, such Member has the same rights and obligations with respect thereto to a Person who is not a Member.

3.3     Remuneration to Members.  Except as otherwise authorized in, or pursuant to, this Agreement, no Member is entitled to remuneration for acting in the Company business.

3.4     Manager-Managed Company.  Pursuant to Section 4.1, and notwithstanding anything to the contrary in the Articles, the management of the Company is vested in the Managers.

3.5     Member Voting Rights.  Except as expressly provided in this Agreement or the Act, in all matters in which a vote, approval or consent of the Members is required, a vote, consent or approval of all Members, voting on a per capita basis, shall be required to authorize or approve such matters.

# ARTICLE IV

## MANAGEMENT AND CONTROL OF THE COMPANY

4.1    <u>Management of Company.</u>

(a)    <u>Management - In General</u>.  The full, complete, and exclusive discretion and authority to manage the Company shall be vested in the Managers, who shall have sole and exclusive management authority over, and responsibility for, the Company's day-to-day affairs and all other Company affairs, decisions, and actions.

(b)    <u>Number and Term</u>.  Initially, the Company shall have two Managers.  The initial Managers shall be Jeff Spiegel and Ryan Spiegel (the "**Initial Managers**").  The number of Managers of the Company may be fixed from time to time by the vote or consent of the Members.  Unless a Manager resigns or is removed, a Manager shall hold office until a successor shall have been elected and qualified.  A Manager may be elected or removed at any time and for any reason by the vote or written consent of the Members.

(c)    <u>Death of Managers</u>.  Upon the death of any one of the initial Managers, the surviving Manager (the "**Surviving Manager**") shall be the sole and exclusive Manager of the Company and the Company shall then have only one Manager.  Upon the death of the Surviving Manager, the Members hereby agree that Sean Paul Casey Kolina (the "**Administrative Manager**") shall be elected, and is hereby elected, as the sole Manager of the Company, whose only duties shall be the orderly winding up and dissolution of the Company pursuant to Article VIII herein.

(d)    <u>Specific Authority</u>.  In furtherance and not in limitation of Section 4.1(a) and the other provisions hereof, the Managers shall have all specific rights and powers required or appropriate for the management of the Company and is specifically authorized and empowered for and on behalf of the Company to do the following:

(1)    execute and file in the appropriate recording offices any amendment to the Articles required by the Act and any and all other documents and instruments necessary or appropriate in connection therewith and take any and all actions contemplated thereby;

(2)    employ personnel;

(3)    maintain facilities to conduct the Company's business;

(4)    make any and all decisions that the Company may be entitled and/or required to make under the terms of any and all documents, agreements, or other instruments relating to the operation of the Company's business;

(5)    generally bind the Company and execute and deliver any and all documents and instruments on the Company's behalf;

(6)    incur debt and execute any and all instruments and documents, and take any act, required by any lender in connection with any loan or loans to the Company;

(7)    execute any and all instruments or documents with any third party, including executing any contract, bank resolution and signature card, release, discharge, and any other document or instrument in any way related thereto or necessary or appropriate in connection therewith;

(8)     to the extent that Company funds are available therefor, pay all taxes, assessments, and other impositions applicable to the Company;

(9)     to the extent that Company funds are available therefor, pay all debts and other obligations of the Company;

(10)     prepare, or cause to be prepared, the books and records described in Section 4.3;

(11)     periodically distribute assets (in cash or in-kind) to the Members;

(12)     place and carry public liability, workers' compensation, fire, extended coverage, business interruption, errors and omissions, and any other necessary or appropriate insurance, in the Managers' discretion;

(13)     obtain all management, legal, accounting, and other services necessary or appropriate, in the Managers' discretion, in connection with the Company's business;

(14)     apply for and obtain any and all governmental and non-governmental permits, approvals, and licenses;

(15)     generally do all things in connection with any of the foregoing or any other businesses or activities of the Company, manage and administer the Company's day to day business and affairs, execute all documents on behalf of the Company, pay all costs or expenses connected with the operation or management of the Company, and sign or accept all checks, notes, and drafts on the Company's behalf; and

(16)     do all things generally consistent with any and all of the foregoing on the Company's behalf.

4.2     Books and Records. During the Company's term, the Company shall keep such books and records as the Managers shall determine.

4.3     Fiduciary Relationship. The Managers shall not be deemed to be a fiduciary for the Company or for any Member, except to the extent required by applicable law.

4.4     Outside Activities. The Managers may engage or invest in, independently or with others, any business activity of any type or description, including without limitation those that might be the same as or similar to the Company's business and that might be in direct or indirect competition with the Company. Neither the Company nor any Member shall have any right in or to such other ventures or activities or to the income or proceeds derived therefrom. The Managers shall not be obligated to present any investment opportunity or prospective economic advantage to the Company, even if the opportunity is of the character that, if presented to the Company, could be taken by the Company. The Managers shall have the right to hold any investment opportunity or prospective economic advantage for his own account or to recommend such opportunity to persons other than the Company. The Members acknowledge that each Manager owns and/or manages other businesses, including businesses that may compete with the Company and for such Manager's time. The Members hereby waive any and all rights and claims which they may otherwise have against a Manager and its partners, agents, employees, and Affiliates as a result of any of such activities.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1    <u>Allocations of Net Profit and Net Loss</u>.  Except for the special class allocation described below, Net Profits and Net Loss shall be allocated to the Members in the following manner: 70% of all Net Profits and Net Loss shall be allocated to Jeff Spiegel and 30% of all Net Profits and Net Loss shall be allocated to Ryan Spiegel.

5.2    <u>Allocation of Net Profits and Losses and Distributions in Respect of a Transferred Interest</u>.  If any Membership Interest is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any Fiscal Year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such Fiscal Year shall be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based upon his or her respective Membership Interest at the close of such day.

5.3    <u>Distribution of Cash or Property by the Company</u>.  Subject to Section 5.4 herein, and any other limitations contained elsewhere in this Agreement, the vote or consent of the Managers shall be required to distribute cash or property to the Members.  All distributions of cash or property to Members shall be distributed to the Members in accordance with the allocation percentages set forth in Section 5.1 herein.  All such distributions shall be made only to the persons who, according to the books and records of the Company, are the holders of record of the Economic Interests in respect of which such distributions are made on the actual date of distribution.  Neither the Company nor the Managers shall incur any liability for making distributions in accordance with this Section 5.4.

5.4    <u>Restriction on Distributions</u>.  No distribution shall be made to the Members (i) if, after giving effect to the distribution, the Company would not be able to pay its debts as they become due in the usual course of business or (ii) the Company's total assets would be less than the sum of its total liabilities.

5.5    <u>Withholding on Distributions</u>.  Each Member acknowledges and agrees that to the extent required under applicable law, the Managers may withhold a portion of any distribution made hereunder in order to comply with such applicable law, and each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and comply with any applicable law.

5.6    <u>Return of Distributions</u>.  Except for distributions made in violation of the Act or this Agreement, no Member or Economic Interest owner shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company.

## ARTICLE VI

## TRANSFER AND ASSIGNMENTS OF INTERESTS

6.1    <u>Transfer and Assignment of Membership Interests</u>.  Except as otherwise provided herein, no Member shall be entitled to transfer, assign, convey, sell, encumber or in any way alienate all or any part of his Membership Interest without the vote or written consent of all Members (excluding the vote or written consent of the Member who desires to transfer or assign his Membership Interest). Transfers in

violation of this Article VI shall only be effective to the extent set forth in Section 6.4. After the consummation of any transfer of any part of a Member's Membership Interest, the Membership Interest so transferred shall continue to be subject to the terms and provisions of this Agreement and any further transfers shall be required to comply with all the terms and provisions of this Agreement.

6.2 <u>Substitution of Members</u>. A transferee of a Membership Interest shall have the right to become a substitute Member only if (i) the requirements of Sections 6.1 are met, (ii) such person becomes a party to this Agreement.

6.3 <u>Rights of Legal Representatives</u>. If a Member who is an individual dies or is adjudged by a court of competent jurisdiction to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's right for the purpose of settling the Member's estate or administering the Member's property, including any power the Member has under the Articles or this Agreement to give an assignee the right to become a Member. If a Member is a trust, the power of that Member may be exercised by his or her legal representative or successor.

6.4 <u>Marital Settlements and Court Orders</u>. All Members agree that any purported transfer of a Member's Membership Interest arising from or in connection with any divorce decree, marital settlement, arbitration award or any court order or judicial decree of any kind shall be subject to the terms and conditions contained in this Article VI, and the transferee of any purported or attempted transfer in violation of this Article VI shall be deemed to hold only an Economic Capital Interest

6.5 <u>No Effect to Transfers in Violation of Agreement</u>. Upon any transfer of a Membership Interest in violation this Article VI, the transferee shall have no right to vote or participate in the management of the business, property and affairs of the Company or to exercise any rights of a Member. Such transferee shall only be entitled to become an Economic Interest Owner and thereafter shall only receive the share of the Company's Net Profits, Net Losses and distributions of the Company's assets to which the transferor of such Economic Interest would otherwise be entitled.

# ARTICLE VII

## ACCOUNTING, RECORDS, REPORTING BY MEMBERS

7.1 <u>Books and Records</u>. The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for federal income tax purposes. The Company shall maintain at its principal office in California all of the documents necessary to comply with the requirements of the Act.

7.2 <u>Bank Accounts</u>. The Managers shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

7.3 <u>Accounting Decisions</u>. The Managers shall make all decisions as to accounting matters, and shall from time to time cause the Company to make such tax elections as they deems to be in the best interest of the Company and the Members.

7.4 <u>Tax Matters Partner</u>. Jeff Spiegel shall be designated the tax matters partner with respect to the Company, as defined in Section 6231 of the Code.

## ARTICLE VIII

## DISSOLUTION AND WINDING UP

8.1 <u>Dissolution</u>. The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following:

(a) Upon the entry of a decree of judicial dissolution;

(b) Upon the vote or consent of all Members; or

(c) Upon the death of both Jeff Spiegel and Ryan Spiegel.

8.2 <u>Certificate of Dissolution</u>. As soon as possible following the occurrence of any of the events specified in Section 8.1, the Manager(s) shall execute a Certificate of Dissolution in such form as shall be prescribed by the California Secretary of State and file the Certificate as required by the Act. The Manager who filed the Certificate of Dissolution shall cause to be filed in the office of, and on a form prescribed by, the California Secretary of State, a Certificate of Cancellation of the Articles upon the completion of the winding up of the affairs of the Company.

8.3 <u>Winding Up</u>. Upon the occurrence of any event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors. The Manager(s) shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the liabilities of Company and assets, shall either cause its assets to be sold or distributed, and if sold, shall cause the proceeds therefrom to be applied and distributed as provided in Section 8.5. The Manager winding up the affairs of the Company shall be entitled to reasonable compensation for such services. In the event the Administrative Manager is elected to wind up and dissolve the Company, the Administrative Manager shall be entitled to receive a payment of $50,000 as compensation for managing the dissolution of the Company.

8.4 <u>Dissolution of Fortune Film Funds and Other Funds Managed by the Company</u>. Upon the occurrence of any event specified in Section 8.1, the Manager(s) shall wind up and dissolve all investment funds that are managed by the Company and distribute the assets of such investment fund in accordance with each funds' operating agreement. For example, upon the death of both Jeff Spiegel and Ryan Spiegel, the Administrative Manager shall wind up and dissolve the Company pursuant to this Article VIII, and concurrently with the dissolution of this Company, the Administrative Manager shall also immediately elect to wind up and dissolve Fortune Film Fund One, LLC and Fortune Film Fund Two, LLC, both California limited liability companies (the "**Movie Funds**"), and distribute the assets of the Movie Fund to its Members in accordance with the Movie Fund's operating agreement.

8.5 <u>Order of Payment of Liabilities Upon Dissolution</u>. After determining that all known debts and liabilities of the Company in the process of winding-up have been paid or adequately provided for, the remaining assets shall be distributed to the Members in accordance with the allocation percentages set forth in Section 5.1 herein.

8.6 <u>Limitations on Payments Made in Dissolution</u>. Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely at the assets of Company for the return of its positive Capital Account balance and shall have no recourse for its Capital Contribution and/or share of Net Profits (upon dissolution or otherwise) against any other Member.

# ARTICLE IX

## MISCELLANEOUS

9.1     <u>Complete Agreement</u>.  This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter herein and therein and replace and supersede all prior written and oral agreements or statements by and among the Members. No representation, statement, condition or warranty not contained in this Agreement or the Articles will be binding on the Members or have any force or effect whatsoever.  To the extent that any provision of the Articles conflict with any provision of this Agreement, the Articles shall control.

9.2     <u>Governing Law; Arbitration</u>.  The terms of this Agreement, and the rights and obligations of the Members with respect to this Agreement, shall be governed by California law.  Except as otherwise provided in this Agreement, any controversy between the parties arising out of this Agreement shall be submitted to the American Arbitration Association for arbitration in Contra Costa County, California.  The costs of the arbitration, including any American Arbitration Association administration fee, the arbitrator's fee, and costs for the use of facilities during the hearings, shall be borne equally by the parties to the arbitration.  Attorneys' fees may be awarded to the prevailing or most prevailing party at the discretion of the arbitrator.  The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, the Act, or not available in a court of law.  No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by any Member except (a) an action to compel arbitration pursuant to this Section 9.2 or (b) an action to enforce and award obtained in an arbitration proceeding in accordance with this Section 9.2.

9.3     <u>Exhibits</u>.  All Exhibits attached to this Agreement are incorporated and shall be treated as if set forth herein.

9.4     <u>Severability</u>.  If any provision of this Agreement or the application of such provision to any person or circumstance shall be held invalid, the remainder of this Agreement or the application of such provision to persons or circumstances other than those to which it is held invalid shall not be affected thereby.

9.5     <u>Waiver of Partition</u>.  Each Member agrees to and irrevocably waives for the duration hereof any right or power such Member might have (a) to cause the Company or any of its assets to be partitioned, (b) to cause the appointment of a receiver for any Company property, or (c) to compel any sale of all or any part of any Company property pursuant to any applicable law, or to file a complaint or to institute any proceeding at law or in equity to cause the Company's termination or dissolution, except to enforce, compel, implement, or effect any dissolution, termination, or liquidation of the Company occurring or required to occur pursuant to Article VIII.

9.6     <u>Amendments</u>.  The terms and conditions of this Agreement may be amended by the unanimous vote or unanimous written consent of all Members.

*(Signature page follows this page.)*

IN WITNESS WHEREOF, all of the Members below have executed this Agreement, effective as of the date written above.

MEMBERS:

_____
Jeff Spiegel

_____
Ryan Spiegel

## EXHIBIT A

## PERCENTAGE INTERESTS OF MEMBERS

| Member | Percentage Interests |
|--------|---------------------|
| Jeff Spiegel | 50% |
| Ryan Spiegel | 50% |

# EXHIBIT B

## GLOSSARY OF DEFINED TERMS

*"Act"* shall mean the provisions of the California Revised Uniform Limited Liability Company Act, as codified in California Corporations Code Sections 17701.01 – 17713.13, as the same may be amended from time to time.

*"Agreement"* shall mean this operating agreement, as originally executed and as amended from time to time.

*"Articles"* shall mean the Articles of Organization for the Company originally filed with the California Secretary of State and as amended from time to time.

*"Capital Account"* shall mean with respect to any Member the capital account that the Company establishes and maintains for such Member pursuant to the terms of this Agreement.

*"Capital Contribution"* shall mean the total value of cash contributed to the Company by each Member.

*"Code"* shall mean the Internal Revenue Code of 1986, as amended from time to time.

*"Company"* shall mean SAC Advisory Group, LLC, a California limited liability company.

*"Economic Interest"* shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses, and distributions of the Company's assets pursuant to this Agreement and the Act, but shall not include any other rights of a Member, including, without limitation, the right to vote or participate in the management.

*"Economic Interest Owner"* shall mean the owner of an Economic Interest who is not a Member.

*"Fiscal Year"* shall mean the Company's fiscal year, which shall be the calendar year.

*"Manager"* shall mean a manager named in Section 4.1(b) of this Agreement and any person who is elected as a manager of the Company pursuant to Section 4.1(b) or (c).

*"Member"* shall mean each Person who is an initial signatory to this Agreement, or has been admitted to the Company as a Member in accordance with the terms or this Agreement.

*"Member"* shall mean each Person who is an initial signatory to this Agreement, or has been admitted to the Company as a Member in accordance with the terms or this Agreement.

*"Membership Interest"* shall mean a Member's entire interest in the Company including the Member's Economic Interest, the right to vote and the right to receive information concerning the Company as set forth herein.

*"Net Profits"* and *"Net Losses"* shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with federal tax accounting principles.

*"Percentage Interest"* shall mean the percentage of a Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time pursuant to the terms of this Agreement.

*"Regulations"* shall mean the regulations that have been issued by the U.S. Department of Treasury pursuant to its authority under the Code.

# Exhibit G

# SUBSCRIPTION AGREEMENT- FORTUNE FILM FUND TWO LLC

**Subscription**

1.     The undersigned subscriber ("**Subscriber**") having received and read the Confidential Information Statement of Fortune Film Fund Two LLC, a California limited liability company (the "**Company**"), dated December 7, 2017 hereby subscribes to that number of the Company's Class A Preferred Units set forth below at the price of $1.00 per Preferred Unit.

**Representations and Warranties**

2.     Subscriber acknowledges having read all supporting documents provided by the Company to Subscriber in connection with Subscriber's purchase of Preferred Units including the Company's Operating Agreement and understands and accepts the risks associated with such investment.  Subscriber expressly warrants having reviewed the Investment Representations contained in the Company's Operating Agreement and agrees that such Investment Representations as applied to Subscriber are true and correct in all respects.

**Specific Power of Attorney**

3.     Subscriber hereby appoints and designates any representative of SAC Advisory Group, LLC, the Company's Manager (the "**Manager**"), as Subscriber's attorney in fact and grants such representative the right and power to sign on behalf and in the name of Subscriber the Company's Operating Agreement.  Furthermore, Subscriber represents and warrants having read the Company's Operating Agreement and agrees that upon the execution of the Company's Operating Agreement by the Manager's representative as provided in this Section 3 (Specific Power of Attorney), Subscriber shall be contractually bound to the terms and conditions of the Operating Agreement.

_Jocelyn S. Carter_
Name of Subscriber

_100,000_
Number of Class A Preferred Units

_[signature]_
Signature of Subscriber

_01.04.2018_
Date

ID Number: _561.82.0961_

Address:  _2175 Eunston Ave_

_San Francisco Ca 94116_

Phone:  _(415)664.1791_

Email:  _jscmamacita@hotmail.com_

Make all checks payable to: Fortune Film Fund Two LLC.

**Manager acknowledges full payment of the Membership Units subscribed hereunder.**

_[signature]_

_1/8/18_
Date

FORTUNE FILM FUND TWO LLC
By: SAC Advisory Group, LLC
      By:  Ryan Spiegel, its Manager

**COUNTERPART SIGNATURE PAGE**

**OF**

**OPERATING AGREEMENT**

**OF**

**FORTUNE FILM FUND TWO LLC**

**BY AND AMONG**

**FORTUNE FILM FUND TWO LLC**

**AND EACH MEMBER NAMED THEREIN**

The undersigned hereby executes and delivers the operating agreement of Fortune Film Fund Two LLC, a California limited liability company, (the "Agreement ") to which this Counterpart Signature Page is attached, effective as of the date of this Counterpart Signature Page, together with all other Counterpart Signature Pages of all the Agreement, shall constitute one and the same document in accordance with the terms of such Agreement.

Dated: _01·04·2018_ , 2017

JOCELYN S. CARTER , TRUSTEE
Print Name of Member JOCELYN S. CARTER
1992 REV. TRUST

_____
Signature

Trustee
_____
Title, if applicable

Address:

2175 Funston AVE
San Francisco, Ca. 94116

Wire Instructions:

_____

_____

17

the Manager, he or she has furnished the Company with a written opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of any securities under the Securities Act or the consent of or a permit from appropriate authorities under any applicable state securities law.

10.5 <u>Investment Risk</u>. He or she acknowledges that the Membership Interest is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment in the Company, and that he or she understands and take full cognizance of the risk factors related to the purchase of the Membership Interest.

10.6 <u>No Other Warranties</u>. He or she acknowledges that in connection with purchasing Units no oral or written representations have been made by the Company, Manager or any officer, employee, agent other than representations include in the Confidential Information Statement or this Agreement.

10.7 <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, the Manager concerning the terms and conditions of the purchase of Units and other matters pertaining to the investment in the Company in order to evaluate the merits and risks of the purchase of the Units.

IN WITNESS WHEREOF, this Agreement is executed as of the date first written above by the Manager on its own behalf and each Member executing a counterpart signature page.

**MANAGER:**

**SAC ADVISORY GROUP, LLC**
a California limited liability company

_____
Ryan Spiegel, Manager

16

# SAC ADVISORY GROUP LLC

To : Prospective purchasers of Class A Membership Units (the **"Securities"**) offered by Fortune Film Fund Two LLC, a California limited liability company (the **"Company"**).

The Securities are being sold only to "accredited investors" (**"Accredited Investors"**) as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the **"Securities Act"**), in reliance on the exemption provided under Rule 506(c) of Reg. D of the Securities Act. In connection with your purchase of the Securities, we have attached the following documents to this cover letter for your review and consideration:

      (i)      Confidential Information Statement;
      (ii)     Subscription Agreement;
      (iii)    Accredited Investor Representation Letter; and
      (iv)    The Company's Operating Agreement

The purpose of the attached Accredited Investor Representation Letter (the **"Rep Letter"**) is to collect information from you to determine whether you are an Accredited Investor and otherwise meet the suitability criteria established by the Company for investing in the Securities. As part of verifying your status as an Accredited Investor, you may be asked to submit supporting documentation as described in the Letter. It is possible that you were not required to submit this type of information in past offerings in which you have participated. However, the nature of this offering, together with changes made to Regulation D in September 2013, impose additional obligations on the Company to verify that each investor is in fact an Accredited Investor. Accordingly, you must fully complete and sign the Rep Letter, and deliver all required supporting documentation, before the Company will consider your proposed investment.

By submitting the Rep Letter, you agree to provide all required supporting documentation within 60 days after the date that you submit the Rep Letter.

All of your statements in the Rep Letter and all required supporting documentation delivered by you or on your behalf in connection with the Letter (collectively, the **"Investor Information"**) will be treated confidentially. However, you understand and agree that the Company may present the Investor Information to such parties as it deems appropriate to establish that the issuance and sale of the Securities (a) is exempt from the registration requirements of the Securities Act or (b) meets the requirements of applicable state securities laws.

You understand that the Company will rely on your representations and other statements and documents included in the Investor Information in determining your status as an Accredited Investor, your suitability for investing in the Securities and whether to accept your subscription for the Securities.

The Company reserves the right, in its sole discretion, to verify your status as an Accredited Investor using any other methods that it may deem acceptable from time to time. However, you should not expect that the Company will accept any other such method. The Company may refuse to accept your request for investment in the Securities for any reason or for no reason.

Dear Fortune Film Fund Two LLC:

I am submitting this Accredited Investor Representation Letter (the "**Letter**") in connection with the offering of Class A Membership Units (the "**Securities**") of Fortune Film Fund Two LLC, a California limited liability company (the "**Company**"). I understand that the Securities are being sold only to accredited investors ("**Accredited Investors**") as defined in Rule 501(a) of Regulation D of the Securities Act of 1933, as amended (the "**Securities Act**").

I hereby represent and warrant to the Company that I qualify as an Accredited Investor on the basis that:

(You must choose Part A or B below and check the applicable boxes.)

A.  I am a NATURAL PERSON and:

(An investor using this Part A must check box (1) or (2).)

[ ]     (1)     **Income Test**: My individual income exceeded $200,000 in each of the two most recent years or my joint income together with my spouse exceeded $300,000 in each of those years;
                         **and**
                         I reasonably expect to earn individual income of at least $200,000 this year or joint income with my spouse of at least $300,000 this year.

                         To support the representation in A(1) above:

                         (You **must** check box (a), (b) or (c).)

              [ ]     (a)     I will deliver to the Company copies of Form W-2, Form 1099, Schedule K-1 of Form 1065 or a filed Form 1040 for each of the two most recent years showing my income or my joint income with my spouse as reported to the IRS for each of those years. I understand that I may redact such documents to avoid disclosing personally identifiable information, such as Social Security numbers, that is not necessary to confirm annual income.

                                         **OR**

              [ ]     (b)     My salary or my joint salary with my spouse is publicly available information that has been reported in a document made available by the U.S. government or any state or political subdivision thereof (for example, reported in a filing with the Securities and Exchange Commission) and I will deliver to the Company copies of such publicly available materials identifying me or me and my spouse by name and disclosing the relevant salary information for each of the two most recent years.

                                         **OR**

              [ ]     (c)     In accordance with the procedures described below under the heading "Independent Third-Party Verification," I will assist in arranging for a registered broker-dealer, SEC-registered investment adviser, licensed

attorney, or certified public accountant to deliver to the Company written confirmation of my status as an Accredited Investor based on my individual income or my joint income together with my spouse.

[ ]    (2)    **Net Worth Test:** My individual net worth, or my joint net worth together with my spouse, exceeds $1,000,000.

For these purposes, "net worth" means the excess of:
* total assets at fair market value (including all personal and real property, but excluding the estimated fair market value of my primary residence) **minus**
* total liabilities.

For these purposes, "liabilities":
* exclude any mortgage or other debt secured by my primary residence in an amount of up to the estimated fair market value of that residence; but
* include any mortgage or other debt secured by my primary residence in an amount in excess of the estimated fair market value of that residence.

In addition, I confirm that I have not incurred any incremental mortgage or other debt secured by my primary residence in the 60 days preceding the date of this Letter, and I will not incur any incremental mortgage or other debt secured by my primary residence prior to the date of the closing for the sale of the Securities. I agree to promptly notify the Company if, between the date of this Letter and the date of the closing for the sale of the Securities, I incur any incremental mortgage or other debt secured by my primary residence.

To support the representations in A(2) above:

(You must check box (a) or (b).)

    (a)    I will deliver to the Company:

        (i)    Copies of bank statements, brokerage statements, other statements of securities holdings, certificates of deposit, tax assessments and/or appraisal reports issued by independent third parties that show my individual assets or my joint assets together with my spouse;

        **and**

        (ii)    A copy of a consumer credit report for me (or copies of consumer credit reports for me and my spouse) issued by TransUnion, EquiFax or Experian.

            I understand that each document described in paragraphs (i) and (ii) above must be dated no earlier than three months prior to the date of the closing for the sale of the Securities. I understand that I may redact any of these documents to avoid disclosing personally identifiable information, such as Social Security numbers, that is not necessary to confirm net worth.

**OR**

[ ]    (b)      In accordance with the procedures described below under the heading "Independent Third-Party Verification," I will assist in arranging for a registered broker-dealer, SEC-registered investment adviser, licensed attorney, or certified public accountant to deliver to the Company written confirmation of my status as an Accredited Investor based on my individual net worth or my joint net worth together with my spouse

B.    I am a LEGAL ENTITY that is:

(An investor using this Part B must check at least one box below.)

[ ]    (1)      A bank as defined in Section 3(a)(2) of the Securities Act, or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

[ ]    (2)      A broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

[ ]    (3)      An insurance company as defined in the Securities Act.

[ ]    (4)      An investment company registered under the Investment Company Act of 1940 (the **"Investment Company Act"**).

[ ]    (5)      A business development company as defined in Section 2(a)(48) of the Investment Company Act.

[ ]    (6)      A private business development company as defined in the Investment Advisors Act of 1940.

[ ]    (7)      A Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or 301(d) of the Small Business Investment Act of 1958.

[ ]    (8)      An organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the Securities, with total assets in excess of $5,000,000.

[ ]    (9)      A plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

[ ]    (10)    An employee benefit plan within the meaning of Title I of the Employment Retirement Income Security Act of 1974, if the investment decision is made by a plan fiduciary, as defined in such Act, which is either a bank, savings and loan association, insurance company, or registered investment advisor, or if the employee benefit plan has total assets in excess of $5,000,000, or if a self-directed plan, the investment decisions are made solely by persons that are accredited investors.

[ ]    (11)    A trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Securities, whose purchase is directed by a "sophisticated" person.

[ ]    (12)    An entity in which all of the equity owners are Accredited Investors.

                    (NOTE: If box (12) is checked, each equity owner of the entity must individually complete and submit to the Company his or her own copy of this Letter.

## INDEPENDENT THIRD-PARTY VERIFICATION

(NOTE: An investor should only complete this section if, in Part A(1)(c) or A(2)(b) above, you have agreed to arrange for a third party to deliver written confirmation of your status as an Accredited Investor.)

To verify my status as an Accredited Investor, I hereby request that the Company or its agent contact:

Name: _____
Firm name:_____
Email:_____
Telephone:_____
Address: _____

        [ ] registered broker-dealer
        [ ] SEC-registered investment adviser
        [ ] licensed attorney
        [ ] certified public accountant

(NOTE: You must check one of the boxes above. If none are applicable, then you may not rely on independent third-party verification and you must instead directly submit to the Company copies of the other supporting documentation described in Part A(1)(a), A(1)(b) or A(2)(a) above.)

I have informed the person named above that the Company will contact him or her to verify my status as an Accredited Investor and I hereby authorize the Company and its agents to communicate with the person or firm named above to obtain such verification.

**I understand that I am solely responsible for paying any fees charged by the person or firm named above in connection with verifying my status as an Accredited Investor.**

## SUPPORTING DOCUMENTATION

Within 60 days after the date that I submit this Letter to the Company, I will deliver to the Company, or arrange to have delivered to the Company on my behalf, all required supporting documentation.

All supporting documentation must be submitted to the Company either electronically, in PDF form, to Ryan Spiegel at ryan@spiegelcorp.com or by mail or overnight service to Ryan Spiegel at SAC Advisory Group, LLC   2300 Contra Costa Blvd., Suite 425, Pleasant Hill, CA 94523. I understand that the Company may request additional supporting documentation from me in order to verify my status as an Accredited Investor and I hereby agree to promptly provide any such additional supporting documentation. I further understand that, even if I complete and execute this Letter and provide all additional supporting documentation requested by the Company, the Company may in its sole discretion refuse to accept my subscription for the Securities for any reason or for no reason.

## RELIANCE ON REPRESENTATIONS; INDEMNITY

I understand that the Company and its counsel are relying upon my representations in the Letter and upon the supporting documentation to be delivered by me or on my behalf in connection with the Letter (collectively, the **"Investor Information"**). I agree to indemnify and hold harmless the Company, its Managers, Members, representatives and agents, and any person who controls any of the foregoing, against any and all loss, liability, claim, damage and expense (including reasonable attorneys' fees) arising out of or based upon any misstatement or omission in the Investor Information or any failure by me to comply with any covenant or agreement made by me in the Investor Information.

## INVESTOR'S SIGNATURE AND CONTACT INFORMATION

Date: _01·04·2018_

Name: _JOCELYN S. CARTER_

Signature: _____

## SPOUSE'S SIGNATURE AND CONTACT INFORMATION

(NOTE: The investor's spouse need only sign this letter if the investor is a natural person proving its accredited investor status based on joint income or joint net worth with the spouse under Part A(1)(a) or Part A(2)(a). A spouse who signs this letter makes all representations set out in this letter, including those relating to joint income or joint net worth, as applicable.)

Date: _____

Name: _____

Signature: _____

vi