# Exhibit B

CLERK, U.S. DISTRICT COURT

APR - 5 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____RS_____ DEPUTY

1  KATHRYN C. WANNER (Cal. Bar No. 269310)
   Email: wannerk@sec.gov
2  M. LANCE JASPER (Cal. Bar No. 244516)
   Email: jasperml@sec.gov
3
4  Attorneys for Plaintiff
   Securities and Exchange Commission
   Michele Wein Layne, Regional Director
5  Alka N. Patel, Associate Regional Director
   Amy J. Longo, Regional Trial Counsel
6  444 S. Flower Street, Suite 900
   Los Angeles, California 90071
7  Telephone: (323) 965-3998
   Facsimile: (213) 443-1904
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11

12  SECURITIES AND EXCHANGE          Case No. **2:21-CV-02927-CAS-GJSx**
    COMMISSION,
13                                   **COMPLAINT**
14              Plaintiff,
                                     **JURY DEMAND**
15       vs.
                                     **(FILED UNDER SEAL)**
16  ZACHARY J. HORWITZ; AND
    1INMM CAPITAL, LLC,
17
18              Defendants,

19
20
21
22
23
24
25
26
27
28

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The SEC brings this emergency action pursuant to authority conferred on it by Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin the Defendants Zachary J. Horwitz ("Horwitz") and 1inMM Capital, LLC ("1inMM") (collectively "Defendants") from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.  The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a) and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Horwitz resides in this district and Defendant 1inMM has its principal place of business in this district.

## SUMMARY

4.     Horwitz, a Los Angeles based actor, and his company 1inMM conducted an offering fraud and Ponzi scheme in violation of the federal securities laws.  Since March 2014, until at least December 2019, Defendants raised over $690 million from investors by selling promissory notes issued by 1inMM, using fabricated agreements

and fake emails with prominent third party companies with whom Defendants had no actual business relationship.  Horwitz then misappropriated and misused the offering proceeds, including for the purchase of a luxury home he has recently listed for sale.

5.     Defendants represented that the purpose of the offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").  To persuade investors to purchase the promissory notes, Horwitz made materially false and misleading statements, including that he had experience acquiring and licensing distribution rights in movies to HBO and Netflix, and that he had, in the past, used the profits from those transactions to repay investors in 1inMM's promissory notes.  Horwitz described himself to investors in company documents as bringing "a wealth of knowledge, reputation, and experience[.]"  Defendants also claimed that HBO, Netflix, and other media corporations were 1inMM's "Strategic Partners[]".

6.     Horwitz showed investors numerous fictitious documents to substantiate his claimed deals with HBO and Netflix, including numerous fake movie distribution agreements.

7.     Defendants promised returns in excess of 35% on 1inMM's Promissory Notes.

8.     In reality, 1inMM and Horwitz had no relationship with either HBO or Netflix and never licensed any movie rights to either company.

9.     Instead, Horwitz misappropriated investor funds to pay putative returns on earlier investments.

10.    In addition, in 2018 Horwitz misappropriated investor funds to purchase his $5.7 million personal home.

11.    Horwitz also transferred some investor funds into his personal bank account.  Moreover, since March 2014, until at least December 2019, Horwitz also spent lavishly from his personal bank account.

12.    For example, in 2016 and 2017 alone, Horwitz spent over $100,000 on

2

trips to Las Vegas.  Then in 2018, after purchasing his Beverlywood home, Horwitz made payments to American Express of at least $1,842,840 and paid almost $700,000 to a celebrity interior designer.

13.     In late 2019, Horwitz began defaulting on outstanding notes issued by 1inMM, leaving investors with more than $234 million in unreturned principal. Horwitz falsely blamed his default on refusals by HBO and Netflix to pay for distribution rights they had licensed from 1inMM and claimed he was engaged in promising negotiations with them to obtain past-due payments.

14.     From early 2020 to at least March 2021, Horwitz has been lulling investors with false promises that he and 1inMM are on the verge of reaching agreements with HBO and/or Netflix, and would soon be able to repay investors from the proceeds of those settlements.  To make his lies more convincing, Horwitz shows investors fabricated email communications with representatives of HBO as well as false collections accounts allegedly showing funds available from HBO and Netflix for distribution.

15.     On or about January 21, 2021, Horwitz listed his personal home for sale, threatening to dissipate all that may remain of the more than $690 million he raised from 1inMM's investors.

16.     As a result of the conduct alleged in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 17j(b), ("Exchange Act"), and Exchange Act Rule 10b-5, 17 C.F.R. § 240.10b-5.  Unless restrained and enjoined, Defendants will engage in future violations of the federal securities laws.  The SEC seeks an emergency asset freeze, accounting and document preservation order, as well as permanent injunctions, disgorgement of ill-gotten gains derived from the conduct alleged in the Complaint plus prejudgment interest thereon, and civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. §§ 78u(d)(3).

**DEFENDANTS**

17.    **Zachary J. Horwitz** ("Horwitz"), age 34, is a resident of Los Angeles, California, and the managing member of 1inMM.  He controlled 1inMM and its bank accounts at all relevant times as its sole principal.  Horwitz purports to be an actor based in Los Angeles.

18.    **1inMM Capital, LLC** ("1inMM") is a California limited liability company formed in September 2013.  Its principal place of business is Horwitz's home in Los Angeles, California.  Neither 1inMM nor its securities offerings are registered with the Commission.

**FACTS**

**A.    The Promissory Notes**

19.    Beginning in or about March 2014, Horwitz raised investor funds pursuant to promissory notes issued by 1inMM (the "Promissory Notes").

20.    The Promissory Notes had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months.

21.    Principal amounts for the Promissory Notes ranged from approximately $35,000 to $1.5 million.

22.    Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

23.    Defendants represented that 1inMM would use the proceeds from each Promissory Note to finance transactions in which Defendants would: (1) acquire distribution rights in a specific movie; (2) license those rights to a specific media company; and (3) use the profits from these transactions to satisfy the note.

24.    In many instances, Horwitz provided investors documentation purporting to grant the investor a security interest in the movie rights acquired through the proceeds of that note.

25.    The following table illustrates the terms of a representative sample of

Promissory Notes:

| Date | Putative Movie | Putative Licensee | Principal | Payment at Maturity | Maturity Date | Return at Maturity |
|------|----------------|-------------------|-----------|---------------------|---------------|--------------------|
| Dec. 17, 2018 | *Active Measures* | Netflix | $1,398,000 | $1,994,700 | Dec. 17, 2019 (12 months) | 43% |
| Feb. 27, 2019 | *Lucia's Grace* | Netflix | $1,397,500 | $1,994,625 | Feb. 27, 2020 (12 months) | 43% |
| May 29, 2019 | *Run With The Hunted* | HBO | $744,500 | $1,004,084 | Nov. 29, 2019 (6 months) | 35% |
| June 12, 2019 | Desolation | HBO | $740,250 | $1,004,304 | Dec. 12, 2019 (6 months) | 35% |
| July 12, 2019 | *Blood Quantum* | HBO | $735,000 | $998,865 | Jan. 1, 2020 (6 months) | 36% |
| Oct. 18, 2019 | *La Melodie* | HBO | $739,850 | $997,840 | April 18, 2020 (6 months) | 35% |

26.    Horwitz represented to investors that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

27.    Horwitz told some investors that 1inMM would profit from the transactions in additional ways, including by retaining certain distribution rights acquired in the transactions and licensing those rights for 1inMM's benefit.

**B.    Identification and Solicitation of Investors**

28.    Horwitz relied on personal relationships and word-of-mouth referrals to obtain investors.

29.    Horwitz typically solicited investors in person, over the telephone, and via email.

30.    Horwitz raised money from five principal investors, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in the Promissory Notes.

31.    Horwitz's five principal investors raised funds from more than 200 downstream investors, some of whom raised funds from further downstream

investors to finance purchases of Promissory Notes.

32.    Often, investors combined capital for the purchase of an individual Promissory Note.

33.    In many instances, Horwitz was aware that investors were combining funds for the purchase of an individual Promissory Note.

**C.    The Fraud**

34.    Horwitz told investors he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

35.    Horwitz represented that investments in the Promissory Notes were safe because Netflix and HBO were established media companies that had an urgent need for new content, were willing to pay Horwitz a premium to license the rights he acquired, and had the financial ability to pay for those rights.

36.    Horwitz promised to use the proceeds from each note to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

37.    Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

38.    Horwitz made these representations directly to investors over the telephone, in person, and via email.

39.    For example:

(a)    During a June 2017 telephone call, Horwitz falsely represented to a potential investor that 1inMM had licensed movies for distribution in Latin America to HBO and Netflix; that he had longstanding relationships with both HBO and Netflix; and that he and 1inMM had a successful track record of using investor funds to purchase distribution rights that he licensed to HBO and Netflix at a significant

markup.  That potential investor subsequently invested approximately in 34 specific movies, each associated with a separate promissory note issued by 1inMM. Defendants defaulted on paying on 12 of those promissory notes, and owe at least $8,000,955 to this investor.

(b)     On or about June 29, 2017, Horwitz met personally with another potential investor and represented that he would use that investor's funds to acquire the rights to specific movie titles and license those rights to HBO.  That potential investor subsequently invested in 108 movies with corresponding promissory notes. At this time, Defendants owe this investor at least $8,746,227.81

40.    To support his false representations, Horwitz sent documents to investors that purported to evidence his business dealings with HBO and Netflix, including distribution agreements that appeared to reflect agreements by Netflix and HBO to license rights from 1inMM in the specific movie titles for which investors had purchased the Promissory Notes.

41.    For example, among numerous other fake distribution agreements, Horwitz provided investors with the following forged distribution agreements:

(a)     Distribution agreement with HBO, dated June 1, 2019, for the movie titled "Behind the Walls."

(b)     Distribution agreement with HBO, dated May 17, 2019, for the movie titled "Run With the Hunted."

(c)     Distribution agreement with HBO, dated July 11, 2019, for the movie titled "Coyote Lake."

(d)     Distribution agreement with Netflix, dated March 4, 2019, for the movie titled "Lucia's Grace."

42.    At times, Horwitz provided putative investors with 1inMM annual reports, describing 1inMM's purported acquisitions and sales of rights in dozens of movies to Netflix and HBO.

43.    Horwitz sent documents to investors via email, including through a

secure email account, and through at least one Dropbox account to which Horwitz and certain of his investors had access over the Internet.

44.     Horwitz's representations and the documents he provided were important to investors who purchased the Promissory Notes.

45.     It was particularly important to investors that Horwitz had business relationships with HBO and Netflix, and that HBO and Netflix were the ultimate purported counterparties to the business deals underlying their investments. Defendants advertised the security of these business relationships, stating in 1inMM's Annual Report, "[w]e believe that the safety of our investor's funds should always be our first priority . . . Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase prior to us releasing funds for the film[.]"

46.     Investors found it credible that HBO and Netflix had an urgent need for new content, were willing to pay a premium for that content, had the financial ability to do so, and would pay 1inMM in a timely fashion for the rights they licensed.  One investor stated that "I believed that if HBO was involved, my investment was safe."

47.     Over time, 1inMM's investors were also deceived by Horwitz's consistent track record of paying large profits supposedly generated by his deals with Netflix and HBO.

48.     Horwitz's representations were false and misleading, and the documents he sent investors were fabricated.

49.     Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO.  They did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

50.     Horwitz used investor funds to pay purported returns on previously issued notes, which induced investors to purchase additional notes and to raise funds from downstream investors.

8

51.     For example, during at least the following periods, Defendants received investor funds into accounts that only contained investor funds, and immediately used those funds to pay returns to other investors:

(a)     March 2017, Horwitz made at least three payments to investors using funds raised from other investors, including, but not limited to, payments of $883,667, $713,758 and $721,128;

(b)     November 2018, Horwitz made at least four payments to investors using funds raised from other investors, including, but not limited to, payments of $861,288, $945,412, $929,560 and $929,680; and

(c)     June 2019, Horwitz made at least four payments to investors using funds raised from other investors, including, but not limited to, payments of $500,000, $931,387, $1,168,900 and $1,173,940.

52.     In at least one instance, on or about the month of September 2017, Horwitz falsely represented to an investor group that he was personally co-investing in several of the Promissory Notes with them.

53.     In fact, the funds Horwitz supplied were misappropriated from other investors.

54.     In March of 2018, when it came time to pay off those Promissory Notes, 1inMM paid the investor group approximately $9 million purporting to be the return of principal and the agreed upon profit.  In turn, the investor group paid Horwitz $2.33 million of that amount based on his co-investment.

55.     In fact, this money was largely misappropriated from other investors.

56.     Horwitz used his $2.33 million of the alleged co-investment, in combination with other money misappropriated directly from investors, to purchase his personal residence for approximately $5.7 million (in cash).

57.     Horwitz completed the purchase of his residence by transferring over $5.6 million to the escrow company on March 28, 2018, the day after he received the $2.33 million, and shortly after transferring other investor funds to his personal

account.

58.     Horwitz also deposited or transferred at least some investor funds to his personal bank accounts.

59.     Horwitz used money from his personal City National Bank account ending in 5270, for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the previously described purchase of his multi-million-dollar home.

60.     For example, in 2016 through 2017, Horwitz spent from his personal City National Bank account ending in 5270, $124,582 on trips to Las Vegas.

61.     In 2018 alone, among other expenses, Horwitz spent the following:

> (a)     payments to American Express of $1,842,840;
>
> (b)     payments to a celebrity interior decorator of $691,800;
>
> (c)     payments for high-end automobiles of $165,408;
>
> (d)     payments for chartered jet flights of $137,072, and
>
> (e)     payments for a luxury watch subscription service of $54,600.

**D.     Lulling Conduct and Attempts to Raise Additional Funds**

62.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding Promissory Notes.

63.     By text message and email, Horwitz provided investors false explanations for why he had stopped making payments.

64.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

65.     For example, Horwitz told one investor that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM.

66.     Horwitz then sent that same investor documents that Horwitz claimed

10

were (1) a term sheet with HBO Latin America Holdings and (2) a draft form of the consolidated distribution agreement with HBO Latin America Holdings.

67.    Horwitz then sent a text message to the investor with a picture of what Horwitz claimed was the signature page for that consolidated distribution agreement, allegedly signed by a Senior VP of Global Licensing to HBO Latin America Holdings.

68.    The alleged term sheet, consolidated distribution agreement, and signature page to the consolidated distribution agreement between HBO Latin America Holdings and 1inMM were all fake.

69.    There is no company named HBO Latin America Holdings.  While HBO Latin America Holdings, LLC is a real company, it is merely a holding company and does not license any content.

70.    Instead, HBO-Latin America Group is the entity that licenses third-party rights for content distributed by HBO in Latin America.  HBO-Latin America Group never licensed content from 1inMM.

71.    Throughout 2020, Horwitz lulled investors with false promises that negotiations with HBO and Netflix would soon lead to large payments to 1inMM and, in turn, the repayment of outstanding notes.

72.    For example, Horwitz falsely claimed to one investor that HBO had agreed to pay 1inMM by October 15, 2020, but that HBO asked for a one-week grace period to remit payment, suggesting payment would be complete by the end of October 2020.

73.    Horwitz then represented to at least some investors that on or about December 1, 2020, a collections account was established at Freeway Entertainment, a collections account management company, and that HBO had deposited money due to 1inMM in that account on multiple occasions.

74.    In addition to falsely representing the existence of ongoing negotiations with HBO and Netflix, Horwitz sent investors fabricated documents purportedly

11

evidencing those negotiations, including falsified emails purportedly sent by representatives of HBO.

75.     For example, Horwitz claimed to copy and paste fake emails from HBO into text messages that he then sent to investors, including an email suggesting that HBO had future business deals for 1inMM that would be very lucrative.

76.     Horwitz promised investors that payment is forthcoming, and on or about March 12, 2021, by email, represented to some investors that "[g]ood news is that we heard back that we will have an 'execute-able' amendment by mid-next week that reflects a release of funds by April 9th (at the latest)."

77.     Also on or about March 12, 2021, by email, Horwitz suggested to the representative of a different investor group that investors could provide funds to 1inMM to pay legal counsel in connection with 1inMM's alleged efforts to obtain payment from HBO, stating that "1inMM is not in a position to cover the full cost of litigation so options on the table are sharing the financial burden with investors (highly doubtful)[.]"  Notably, approximately a month before Horwitz sent this email, on or about February 15, 2021, 1inMM's attorney had informed Netflix by email that he was withdrawing from representing 1inMM.

78.     Horwitz's lulling statements are false and misleading because Defendants have never had any contractual or other business relationship with HBO or Netflix.

**E.      Defendants Acted with a High Level of Scienter, or in the Alternative, Were Negligent**

79.     Horwitz acted with a high level of scienter.

80.     Horwitz knew, or acted recklessly in not knowing, that the representations he made to investors in 1inMM about his and 1inMM's alleged business relationships with HBO and Netflix and his use of investor funds were materially false and misleading.

81.     In addition, Horwitz's conduct was negligent.  Horwitz's conduct in

offering and selling securities issued by 1inMM, while lying about his business relationships with HBO and Netflix and his intended use of investor funds was a departure from the ordinary standard of care of a person offering and selling securities.

82.     Horwitz's state of mind is imputed to 1inMM because he controls it.

## FIRST CLAIM FOR RELIEF

### Fraud in the Connection with the Purchase and Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (against all Defendants)

83.     The SEC realleges and incorporates by reference paragraphs 1 through 82 above.

84.     As set forth above, Defendants Horwitz and 1inMM made several material misrepresentations, and omitted material information, to 1inMM investors, including statements that they had business relationships with HBO and Netflix; that they had successfully sold movie rights to HBO and Netflix; and that they would use the proceeds of the Promissory Notes to buy and sell movie rights to HBO and Netflix.

85.     In addition, Defendants Horwitz and 1inMM engaged in a scheme to defraud whereby they induced investors to invest in 1inMM, including: (1) by fabricating distribution agreements between 1inMM and HBO/Netflix, which they provided to investors; (2) by using investor funds to make Ponzi payments to previous investors, thereby giving the false impression that they had successfully purchased and licensed movie rights for a profit; and (3) by misappropriating millions of dollars in investor funds for the purchase of Horwitz's luxury home.

86.     By engaging in the conduct described above, Defendants Horwitz and 1inMM, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or

artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

87.     By engaging in the conduct described above, Defendants Horwitz and 1inMM violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Sections 17(a) of the Securities Act
### (against All Defendants)

88.     The SEC realleges and incorporates by reference paragraphs 1 through 82 above.

89.     By engaging in the conduct described above, Defendants Horwitz and 1inMM obtained money or property by means of false statements to investors in connection with the offer or sale of investments in 1inMM, and omitted to disclose material information about 1inMM and Horwitz.

90.     In addition, Defendants Horwitz and 1inMM engaged in a scheme to defraud whereby they induced investors to invest in 1inMM, including by (1) fabricating distribution agreements between 1inMM and HBO/Netflix, which they provided to investors; (2) by using investor funds to make Ponzi payments to previous investors, thereby giving the false impression that they had successfully purchased and licensed movie rights for a profit; and (3) by misappropriating millions of dollars in investor funds for the purchase of Horwitz's luxury home.

91.     By engaging in the conduct described above, Defendants Horwitz and 1inMM, directly or indirectly, in the offer or sale of securities by the use of means or

instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

92.   Defendants Horwitz and 1inMM, with scienter, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  In the alternative, Defendants Horwitz and 1inMM were negligent.

93.   By engaging in the conduct described above, Defendants Horwitz and 1inMM violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Enter a temporary restraining order and preliminary injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, freezing assets, requiring an accounting, prohibiting destruction of documents, and an order to show cause why the asset freeze should not continue until this matter is determined on the merits.

///

///

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

### IV.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### VI.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

### VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

///
///
///
///
///

## **Jury Demand**

The SEC demands a trial by jury on all claims so triable.

Dated:  April 5, 2021

*/s/ Kathryn C. Wanner*

Kathryn C. Wanner
M. Lance Jasper
Attorneys for Plaintiff
Securities and Exchange Commission

# Exhibit C

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**4/5/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

04/05/21

**CENTRAL DISTRICT OF CALIFORNIA**
BY: _____ jm _____ DEPUTY

|  |  |
|---|---|
| United States of America | |
| v. | Case No.    2:21-mj-01631-DUTY |
| Zachary Joseph Horwitz, | |
| Defendant | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 14, 2018, in the county of Los Angeles, in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

John Verrastro, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        04/05/21                          _____
                                               *Judge's signature*

City and state:    Los Angeles, California     Hon. Maria A. Audero, U.S. Magistrate Judge
                                               *Printed name and title*

AUSA: Alexander Schwab x1259/David Chao x0166

## **AFFIDAVIT**

I, John Verrastro, being duly sworn, declare and state as follows:

## I.  **INTRODUCTION**

1.   I am a Special Agent of the Federal Bureau of Investigation ("FBI") in the Los Angeles Field Office and have been so employed since 2004.  For approximately fifteen years, my primary responsibility has been investigating securities fraud, mail fraud, wire fraud, money laundering, and other fraud violations.  My experience includes interviewing witnesses, gathering documents, analyzing financial documents, conducting surveillance, and serving grand jury subpoenas.  I have also received training in investigating financial crimes, including securities fraud, bank fraud, wire fraud, and money laundering. Prior to becoming an FBI agent, I worked for ten years in financial services at a bank and an investment firm.  In the course of my FBI employment, I have participated in executing many search warrants of businesses and residences in connection with financial fraud offenses.  In investigating fraudulent schemes, I have become familiar with the types of records and documents that individuals and entities use to perpetrate their schemes, and have executed and participated in the execution of search warrants at homes and businesses of individuals involved in fraudulent schemes.

## II. __PURPOSE OF AFFIDAVIT__

2.   This affidavit is made in support of a complaint and arrest warrant for ZACHARY JOSEPH HORWITZ for a violation of wire fraud, in violation of 18 U.S.C. § 1343.  It is also made in support of an application for a warrant to search the premises located at 9615 Bolton Road, Los Angeles, California 90034 (the "SUBJECT PREMISES") for the evidence, contraband, fruits, and instrumentalities of securities fraud, mail fraud, wire fraud, aggravated identity theft, and money laundering, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10-b; and 18 U.S.C. §§ 1341, 1343, 1028A, 1956, and 1957 (the "Subject Offenses").

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various law enforcement personnel, other government agencies, and witnesses, and my review of records.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. __PREMISES TO BE SEARCHED__

4.   The SUBJECT PREMISES is located at 9615 Bolton Road, Los Angeles, California 90034.  The SUBJECT PREMISES is a white and tan colored two-story home with an attached two-car garage.

There is a support pillar on the front porch with the numbers 9615 shown vertically.

## IV. STATEMENT OF PROBABLE CAUSE

5.      Since 2013, ZACHARY JOSEPH HORWITZ, who goes by the screen name "Zach Avery," has operated a film distribution company called 1inMM Capital LLC ("1inMM Capital").  Based in Los Angeles, California, 1inMM Capital is purportedly engaged in the business of buying and selling film distribution rights.  To raise money to acquire film rights, HORWITZ solicited investments through the issuance of promissory notes to investors, particularly private investors.  To attract investors, HORWITZ falsely represented that 1inMM Capital used investor funds to acquire film distribution rights, which he would then license to major online platforms such as Netflix or HBO, thus enabling 1inMM Capital to provide investors lucrative rates of return on the promissory notes, often in excess of 25 percent.  In reality, as HORWITZ knew, 1inMM Capital did not use the investor funds for the stated purpose and did not have licensing deals with these online platforms, but instead diverted the funds for his personal benefit and to make payments on earlier promissory notes in the style of a classic Ponzi scheme.  To date, HORWITZ, through 1inMM Capital, is in default to investors on a total outstanding principal of approximately $227 million.

**A.    Background on Zachary HORWITZ, 1inMM Capital, and JJMT Capital**

6.    Based on my review of law enforcement databases and public source documents, I know that HORWITZ is an actor and self-described Hollywood entrepreneur who lives in Los Angeles. In 2013, he founded 1inMM Capital, a Los Angeles-based film distribution company that claimed to acquire and distribute English language feature films to the Latin American market through partnerships with online platforms like Netflix and HBO.

7.    California Secretary of State records show that HORWITZ is the sole manager of 1inMM Capital.  Records from City National Bank ("CNB") show that HORWITZ is also the sole signatory for a CNB checking account in the name of 1inMM Capital ending in -0290 (the "1inMM Capital account").

a.    I have reviewed a corporate "Statement of Information" for 1inMM Capital filed with the California Secretary of State on October 18, 2019.  The Statement of Information lists the SUBJECT PREMISES as the "Business Address" for 1inMM Capital.  That is the most recent record for 1inMM Capital available through the California Secretary of State's online "Business Search" database.

b.    I have reviewed CNB bank records showing that, no later than May 31, 2018, the address of record for the 1inMM Capital account was the SUBJECT PREMISES.  The SUBJECT PREMISES has remained the address of record through the most recent account records I have reviewed, which cover the period through February 26, 2021.

8.    Based on witness interviews, my review of declarations provided by investors with 1inMM Capital, as well as information obtained from other government agencies, I am aware of five main groups of private investors with HORWITZ through 1inMM Capital: JJMT Capital, LLC ("JJMT"); Movie Fund, LLC ("Movie Fund"); Fortune Film Fund One, LLC, Fortune Film Fund Two, LLC, and SAC Advisory Group, LLC (collectively, "SAC"); Vausse Films ("Vausse"); and Pure Health Enterprises, Inc. ("Pure Health").

9.    By far the largest source of investor funds was a private firm, JJMT.  I have interviewed J.A., a principal of JJMT.  Communications between HORWITZ and JJMT occurred via telephone, email, and text, as well as through meetings in person.

a.    HORWITZ began pitching to investors, including JJMT, an opportunity to provide funds to 1inMM Capital to purchase regional distribution rights to films, typically in the post-production stage of development, which 1inMM Capital would then license to online platforms such as HBO and Netflix for distribution in particular regions outside the United States, including Latin America.  HORWITZ explained to investors that, based on his business relationships, 1inMM Capital could reliably license the film distribution rights to the online platforms for sums greater than what he paid for the distribution rights, thereby providing a predictable profit opportunity each time 1inMM Capital acquired a film's distribution rights.

    i.   HORWITZ's representations were also reduced
to writing.  For example, attached as Exhibit 1 is a copy of a
document titled "1inMM Capital Annual Report" provided by
HORWITZ through 1inMM Capital to investors.  According to
information relayed by counsel for JJMT, HORWITZ sent hard
copies of this Annual Report to the principals of JJMT -- along
with a bottle of Johnny Walker Blue Label scotch -- via U.S.
mail in July 2015, and sent electronic versions to them by email
in August 2015.  In the Annual Report, HORWITZ represented that
in the past year, he had "acquired and successfully distributed
49 films through the 1inMM Capital banner without incurring a
single loss in the process."  He reported that 1inMM Capital
"continue[d] to source quality feature film projects, solidify
our reputation and relationships with our current output deals
and continuously search for additional profitable partnerships."
HORWITZ also claimed that "we have expanded our business model
with HBO Entertainment and NETFLIX to not only service the
thriving Latin American marketplace but now are distributing
feature films to Australia and New Zealand as well."  "With this
growth," he wrote, "we have the ability to safely and profitably
distribute more than 25 additional films per year, creating
ample opportunity for investment and substantial growth of our
thriving feature film library."

    ii.  To bolster the claims of 1inMM Capital's
"film library," the Annual Report contains a one-page spread
under the heading "Library Snapshot" featuring thumbnail size
posters for 52 films.

                              6

iii. To bolster the claims of 1inMM Capital's ability to secure output deals for distribution in Latin America, the Annual Report contained a one-page spread under the heading "Our Strategic Partnerships" featuring the logos of HBO, Netflix, and Sony above the label "Distribution Partner," as well as the logos and names of several purported "Foreign Sales Partner[s]."

iv.  The Annual Report also contains several detailed representations concerning how the investments were secured.  Under the heading "Investment Focus," HORWITZ wrote, "our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation."  He explained, "[t]he acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a different output deal."  More specifically, HORWITZ elaborated that "in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole."  In other words, "in the event that Netflix, HBO or Sony defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell

the film to one of the two remaining output platforms that
already have agreed to license the rights of the film."
Finally, HORWITZ claimed that "through our solid relationships,
we receive confirmation from each of our outputs indicating
their desire to acquire the rights to any title we purchase
PRIOR to us releasing funds for the film so that in the event of
any unexpected occurrence, we are able to recover our investment
through an alternative company."

      b.   Based on these representations, defendant HORWITZ
solicited investments through the issuance of a series of
promissory notes, which guaranteed a specified payment on a
particular maturity date, typically 6 months or 12 months in the
future.  Each promissory note corresponded to the purported
purchase of the distribution rights to a specific film and was
secured by an assignment of the distribution rights to that
film.  Following this structure, 1inMM Capital and JJMT entered
into approximately 500 such promissory notes through 2019 based
on J.A.'s estimation.[1]

      i.   For example, 1inMM Capital and JJMT entered
into a promissory note dated September 27, 2019, signed by
HORWITZ, pursuant to which 1inMM Capital borrowed $742,250 from
JJMT and promised to repay $999,845 within six months,
representing a calculated return of approximately 35 percent.
The promissory note is purportedly secured by an assignment to
JJMT of the distribution rights to the film "Bitter Harvest."

---

[1] J.A. recalled that one of the earliest promissory notes
the JJMT principals entered with 1inMM Capital was dated October
6, 2014.

Account records for the 1inMM Capital account reflect an incoming wire payment of $742,250 on September 27, 2019.

        ii.  Similarly, 1inMM Capital and JJMT entered into a promissory note dated December 17, 2018, signed by HORWITZ, pursuant to which 1inMM Capital borrowed $1,425,500 from JJMT and promised to repay $1,998,825 within twelve months, representing a calculated return of approximately 40 percent. The promissory note is purportedly secured by an assignment to JJMT of the distribution rights to the film "Active Measures." Records for the 1inMM Capital account reflect an incoming wire payment of $1,425,500 on December 14, 2018, with "ACTIVE MEASURES FUNDING" listed on the wire item.[2]  The wire transfer was originated by JJMT, which is based in Chicago, Illinois.

        c.  To reassure the investors of 1inMM Capital's legitimacy and the likelihood of returns on their investments, HORWITZ would inform the investors both that 1inMM Capital had entered into agreements with film producers to license the distribution rights to specific films, and that online platforms had entered into agreements with 1inMM Capital to distribute the specific films.  To support these claims, HORWITZ provided copies of these purported licensing agreements and distribution agreements to investors.

        i.  For example, HORWITZ provided JJMT with a 12-page license agreement dated October 2, 2019, between Sierra/Affinity, as agent for Meyer Media Group, and 1inMM

---

[2] For purposes of the requested complaint, this interstate wiring is the selected execution of the scheme.

Capital, pursuant to which Meyer Media Group purportedly licensed to 1inMM Capital the exclusive rights to distribute the film "Bitter Harvest" in certain Latin American and African territories for a term of 15 years, in exchange for a license fee of $739,500.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "EVP International Sales" for Sierra/Affinity.

       ii.  Additionally, HORWITZ provided JJMT with a 13-page distribution agreement dated September 11, 2019, between 1inMM Capital and HBO, pursuant to which 1inMM purportedly licensed to HBO the rights to distribute the film "Bitter Harvest" in Africa and Latin America for a term of three years, in exchange for an advance of $999,845, payable and due in six months.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "President of Operations" for HBO Latin America Holdings.

       iii. Similarly, HORWITZ provided JJMT with a 12-page license agreement dated December 17, 2018, between Sierra/Affinity, as agent for Shooting Films, and 1inMM Capital, pursuant to which Shooting Films purportedly licensed to 1inMM Capital the exclusive rights to distribute the film "Active Measures" in certain Latin American and African territories for a term of 15 years, in exchange for a license fee of $1,425,500. The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by the "EVP International Sales" for Sierra/Affinity.

iv.   Additionally, HORWITZ provided JJMT with a 20-page distribution agreement dated December 21, 2018, between 1inMM Capital and Netflix, pursuant to which 1inMM purportedly licensed to Netflix the rights to distribute the films "Active Measures" and "Divide and Conquer" in certain Latin American and Caribbean territories for a term of three years, in exchange for a fee of $4.2 million for both titles, payable and due in twelve months.  The agreement bears handwritten signatures by HORWITZ for 1inMM Capital and purportedly by Funa Maduka, the "VP, Content Acquisition" for Netflix.

d.   Prior to the end of 2019, 1inMM Capital generally honored its promissory notes with investors, including JJMT. But since December 2019, 1inMM Capital has continually defaulted on its outstanding promissory notes with investors.  With respect to JJMT alone, 1inMM Capital appears to have defaulted on over 160 promissory notes relating to films that were supposed to be distributed by the online platforms.  As a result, 1inMM Capital has defaulted in more than $160 million in principal to JJMT alone and owes approximately $59 million more in returns per the terms of the defaulted promissory notes.

e.   Based on my review of declarations provided by investors and information provided by other government agencies, I am aware that HORWITZ, through 1inMM Capital, made substantially the same misrepresentations described above to the four other major investor groups, namely, by falsely representing that he would use borrowed funds to acquire film rights that would be licensed to online platforms such as

Netflix and HBO.  And just like with JJMT, at certain points in time in 2019, 1inMM Capital began serially defaulting on its promissory notes with these other investors.  Specifically, 1inMM Capital has defaulted on approximately $29.7 million in principal with SAC, approximately $20 million in principal with Movie Fund, approximately $10 million in principal with Pure Health, and approximately $8 million with Vausse.  In sum, HORWITZ, through 1inMM Capital, is in default to investors on a total outstanding principal of approximately $227 million.

      **B.**    **1inMM Capital Defaults and HORWITZ Dissembles**

    10.  Beginning in December 2019, 1inMM Capital and HORWITZ began defaulting on every promissory note with JJMT with a maturity date on or after December 11, 2019.

    11.  To prolong the scheme and maintain the illusion that 1inMM Capital was a legitimate business in the wake of these mounting defaults, HORWITZ falsely represented to JJMT that the online platforms had refused to pay on time for the distribution rights as obligated, and provided excuses that were purportedly given by Netflix and HBO.  To support these claims, HORWITZ repeatedly sent JJMT emails in which he forwarded purported email correspondence with employees of Netflix and HBO, respectively, discussing the underlying licensing agreements.

    12.  With respect to Netflix, HORWITZ fabricated the excuse that Netflix was performing an audit on all the licensed films to ensure clear title and would pay the license fees upon completion of the audit.

      a.  On February 13, 2020, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, all of whom live in the greater Chicago area, in which he forwarded purported email correspondence from the same day with J.G., Senior Counsel at Netflix.  In the email, J.G., using a "@netflix.com" domain email address, purportedly wrote that Netflix was performing an audit to confirm "that all materials are in place, rights are cleared, paperwork is in order, etc." for all content that associated with 1inMM Capital.

      b.  In the months that followed, HORWITZ sent numerous emails to JJMT forwarding purported email correspondence from J.G. informing HORWITZ of the progress of the audit.

13.  With respect to HBO, HORWITZ fabricated the excuse that HBO Latin America was entering a restructuring that would entail modifications to its existing business practices.

      a.  On February 21, 2020, HORWITZ, using the email account "zach@1inMM.com," sent an email to the principals of JJMT, in which he forwarded purported email correspondence from the same day from L.V., using a "@hbo.com" domain email address and writing on behalf of the "HBO Latin America Team."  In the email, L.V. purportedly wrote that HBO Latin America was in the process of bringing in HBO Brasil Partners, which would be accompanied by "modifications to our previous business practices," including "payment cycles, exploitation windows, profit participation cycles, audit reviews, providing participation statements, renegotiating currently licensed

titles to increase licensing period, adding licensing territories and more."

b.    On March 5, 2020, HORWITZ, using the email account "zach@1inmm.com," sent an email to the principals of JJMT, which forwarded purported email correspondence on the same day from L.V., again on behalf of the "HBO Latin America Team." In the email, L.V. purportedly expressed his appreciation to HORWITZ and another individual for meeting in person to discuss their relationship.  L.V. also purportedly included minutes of their meeting on March 2 and 3, 2020, at the "HBOLA Office in Coral Gables and W Miami Hotel," which covered the names of attendees, including HORWITZ, and discussion topics, including "[d]iscussion of Zach's concern regarding 3rd party investor pressure."

c.    In the months that followed, HORWITZ sent numerous emails to JJMT in which he forwarded purported email correspondence from L.V. that supposedly reflected the status of discussions regarding the business relationship between HBO and 1inMM Capital.

14.    As of today's date, however, 1inMM Capital has not satisfied any of its promissory notes with JJMT which have become due after December 11, 2019.  Each of these notes was tied to a film to which 1inMM Capital purportedly held distribution rights that it had licensed to HBO or Netflix.

**C.    HORWITZ's Misuse of Investor Funds**

15.    Based on my review of bank records, I believe much of the investor money sent to the 1inMM Capital account for the

purchase of film licensing rights in Latin America was diverted
to other purposes, such as payment of personal expenses or
payment of returns on earlier investments in a manner consistent
with a Ponzi scheme.

        1.   Purchase of the SUBJECT PREMISES

    16.  One personal expense to which it appears investor
funds were improperly diverted was the purchase of the SUBJECT
PREMISES itself.  I have reviewed records for a CNB account for
an account in HORWITZ's name ending -5270 (the "HORWITZ personal
account").  The most recent records, which continue through
February 2021, list the SUBJECT PREMISES as the address on
record for the HORWITZ personal account.  According to the
records, the HORWITZ personal account had a balance of
$311,130.70 as of February 28, 2018, but by March 28, 2018,
HORWITZ made a wire payment of $5,556,401.13 to complete the
purchase of the SUBJECT PREMISES.[3]  The credits to the HORWITZ
personal account between February 28 and March 28 all come from
three sources: JJMT, the 1inMM Capital Account, and a second CNB
account HORWITZ maintained for 1inMM Capital ending in -2944 for
which he was the sole signer ("1inMM Capital account 2").

        a.   On March 27, 2018, the HORWITZ personal account
received a wire transfer directly from JJMT for $2,225,564.

        b.   On March 28, 2018, the 1inMM Capital account made
two transfers to the HORWITZ personal account: one for $800,000
and one for $900,000.  These payments also appear mostly to

        [3] HORWITZ wired a payment of $171,375 from the HORWITZ
personal account to the same escrow company on January 29, 2018,
in what appears to have been an earnest money payment.

comprise funds from investors in 1inMMC Capital, particularly
JJMT.  As of March 15, 2018, for example, the 1inMM Capital
account had a balance of $1,910,149.30.  From that date through
March 28, 2018, the 1inMM Capital account received the following
wire payments: March 16: $720,375.00 from JJMT; March 20:
$694,850.00 from "Global Hospitality Concepts"; March 22:
$612,620.00 from JJMT; March 22: $650,175.00 from JJMT; March
22: $675,550.00 from JJMT; March 22: $690,800.00 from JJMT;
March 22: $1,406,250.00 from JJMT; March 22: $1,428,700.00 from
JJMT; March 23: $180,000.00 from Creative Artists Agency; March
27: $1,380,900.00 from JJMT; March 27: $1,405,000.00 from JJMT;
March 28: $622,100.00 from JJMT; March 28: $685,250.00 from
JJMT; and March 28: $725,400.00 from JJMT.

     c.   Between March 14 and March 28, 2018, 1inMM
Capital account 2 transferred a total of $2,675,000 to the
HORWITZ personal account across four transfers.  As of February
12, 2018, 1inMM Capital account 2 had an ending balance of
$735,583.  That same day and the next, 1inMM Capital account 2
received three wire transfers from investors: $685,350 from
Fortune Film Fund Two LLC, $705,700 from Fortune Film Fund Two
LLC, and $620,000 from SAC Advisory Group LLC.  On March 20,
2018, 1inMM Capital account 2 received another wire payment for
$620,185 from investor Fortune Film Fund Two LLC.  These four
wire transfers were the only credits to 1inMM Capital account 2
between February 12, 2018, and March 28, 2018.

    17.  Because HORWITZ transferred funds from his bank
accounts to pay off substantial credit card balances, it is

difficult to glean a full picture of HORWITZ's lifestyle from these financial records alone.  Just a week before paying over $5.5 million to complete the purchase of the SUBJECT PREMISES, for example, he paid $70,328.05 from the HORWITZ personal account to American Express.  The next month, he made another payment to American Express of $57,351.25 on April 20, and on May 3, he made a payment of $164,241.06.

18.  I have reviewed photographs of the SUBJECT PREMISES from its Zillow listing, and these photographs are consistent with an expensive personal lifestyle.  The house includes an extensive home theater, home gym, and wine "cellar."  Shots of the interior show artwork and what appears to be a grand piano. In March 2018, the same month HORWITZ purchased the SUBJECT PREMISES, the HORWITZ personal account wired two payments of $70,000 to Lonni Paul Design for "RETAINER/COUCH/SIDETABLE." Some of the photographs that I reviewed from the Zillow listing are attached as Exhibit 2 to this affidavit.

2.  _Ponzi Scheme Payments_

19.  In addition to the misuse of investor funds on personal expenses, I have also identified movements of funds consistent with a Ponzi scheme.  Based on my review of bank records for the 1inMM Capital account, it appears that incoming investor money was used to repay investors for previous investments.  In some instances, the investors were repaid with their own money.  In addition, funds were sent to the HORWITZ personal account.

17

20.   Focusing on December 2018 and January 2019, the ending balance in account the 1inMM Capital account as of November 30, 2018, was $4,332,730.51.  On December 4, 2018, there were two wire transfers to JJMT.  One transfer was for $1,795,585 with "NETFLIX WISH UPON" noted in the wire records under the caption "ORIG TO BNF INFO," and a second wire transfer was for $1,792,525 with "NETFLIX JUST LIKE OUR PARENTS" noted under the caption "ORIG TO BNF INFO."

a.   Based on my interview of J.A., as well as my training and experience reviewing wire transfer payments, I believe the ORIG to BNF INFO on these wires indicates that they were repayments of notes with JJMT for the movies "Wish Upon" and "Just Like Our Parents."  Though the wires indicate the wire transfers related to Netflix, consistent with HORWITZ's representation that he sold film rights to Netflix, I have seen no indication in the bank records that I have reviewed from this time period that 1inMM Capital or HORWITZ received any payments from Netflix consistent with the licensing of film rights, which is consistent with the declaration of Melinda LeMoine, which stated that Netflix had no business with 1inMM Capital.

b.   Between December 4, 2018, and December 7, 2018, there were two wire transfers from the 1inMM Capital account totaling $161,000, one check paid in the amount $9,500, and a transfer to the HORWITZ personal account for $150,000 -- a total

of $320,500 in outgoing payments, which collectively brought the ending balance on December 7, 2018, to $424,120.51.[4]

       c.   Between December 14, 2018, and December 31, 2018, the 1inMM Capital account received nineteen wire transfers totaling $16,380,450.  Thirteen wire transfers were from JJMT for a total of $12,763,900, though this latter amount includes a $55,000 figure that may have been transferred as a Christmas present on December 24.

       d.   During the same time period, one check for $11,000 made payable to "Great Buy Tickets" posted to the 1inMM Capital account, and two transfers were made from 1inMM Capital account to the HORWITZ personal account totaling $500,000 (along with one additional $30,000 wire transfer to a CNB account for 1inMM Productions ending -1130 that listed the SUBJECT PREMISES as the address on file).  In addition, thirteen wire transfers were paid to investors, including JJMT, totaling $14,830,820.00.  The ending balance for the 1inMM Capital account on December 31, 2018, was $1,432,750.51.  To summarize the 1inMM Capital account for December 2018:

| | |
|---|---|
| Ending Balance 11/30/2018 | $4,332,730.51 |
| Total Wires In | $16,380,450.00 |
| Total Wires Out Investors | $18,418,930.00 |
| Other Wires Out | $161,000.00 |
| Transfers to HORWITZ accounts | $680,000.00 |

---

[4] There was also a December 7, 2018, wire transfer of $150,000 to Jellyfish Pictures Ltd listing "SHOOKUM - INVOICE" on the wire records.  At this point, I have not yet verified the basis for this payment.

```
Checks Paid                      $20,500.00

Ending Balance 12/31/2018        $1,432,750.51
```

21.  Based on my training and experience, the figures above are consistent with a Ponzi scheme rather than a legitimate business along the lines of what HORWITZ described to his investors.  The bank records do not show outgoing payments to sales agents or film production companies consistent with the acquisition of distribution rights, nor do they show incoming payments from the online platforms to which HORWITZ claimed to be licensing the film rights.  Rather, it shows incoming funds to investors, outgoing funds to investors, with transfers to other accounts HORWITZ controls along the way.

**D.   HORWITZ's Fraud Exposed**

22.  In reality, neither HORWITZ nor 1inMM Capital ever engaged in email correspondence with Netflix or HBO, nor did HORWITZ or 1inMM Capital ever have any business relationship with Netflix or HBO at all.  The email exchanges and licensing agreements were fake.

23.  I have reviewed signed declarations from Melinda LeMoine, the Director of Content Litigation at Netflix, and Patrick Younan, Senior Litigation Administrator at Warner Media, which owns HBO.

a.   According to Ms. LeMoine, Netflix has no business relationship with HORWITZ or 1inMM Capital.  In fact, on February 12, 2021, Ms. LeMoine sent a cease-and-desist letter to HORWITZ both via his LinkedIn account and through his attorney. The letter stated that Netflix learned HORWITZ and his company

1inMM Capital had used forged documents to represent to third
parties that 1inMM Capital had licensing agreements with
Netflix, but that, in fact, Netflix had no such agreements with
1inMM Capital or HORWITZ.  The letter further stated that
HORWITZ has used fabricated emails purportedly exchanged with a
Netflix employee to represent to others that he anticipates
receiving funds from Netflix, and that those emails are also
fraudulent.  The letter demands that HORWITZ stop making
misrepresentations regarding his agreements with Netflix.

   b. According to Mr. Younan, Warner Media and its
subsidiary HBO also have no business relationship with either
HORWITZ or 1inMM Capital.  Mr. Younan verified that HBO had
never licensed various film projects that HORWITZ had claimed to
have licensed to HBO in his communications with investors.  In
the case of some films, Mr. Younan confirmed that HBO had
licensed the distribution rights, but that it had done so from
companies like Lionsgate or Sony that had no affiliation with
HORWITZ or 1inMM Capital.

  24. Notwithstanding these facts, HORWITZ continues to
communicate with victims, providing excuses as to why they have
yet to be repaid.

   a. For example, on March 12, 2021, HORWITZ, using
the email account "zach@1inmm.com," sent an email to the
principals of JJMT, positing that there has been much discussion
with his lawyer regarding a settlement with HBO that would
enable 1inMM Capital, and thus JJMT, to be paid without the need
for litigation.  In the same email, HORWITZ also wrote that

"Netflix is a real problem at the moment," that he had been
"complying with every single thing that is being asked of me and
doing absolutely everything I can to assist, facilitate and
explain whatever is needed," and that he "will let [JJMT] know
further information and progress as soon as I have that
information and am able to share."

25.  Not only are the distribution agreements with HBO and
Netflix fabrications, it appears from my investigation that the
license agreements through which 1inMM Capital purportedly
acquired distribution rights were also fraudulent.  On April 2,
2021, I spoke on the phone with Kendra Dousette, an attorney for
Sierra/Affinity, a sales agent listed on numerous license
agreements HORWITZ purportedly entered on behalf of 1inMM
Capital.  Ms. Dousette explained that she has worked for
Sierra/Affinity since 2015 and is generally familiar with the
businesses that license Sierra/Affinity's library of films given
her involvement in reviewing license agreements.  She had never
heard of HORWITZ or 1inMM Capital.  When asked about 1inMM
Capital's purported license agreement with Sierra/Affinity for
the distribution rights to the film "Active Measures," she noted
that Sierra/Affinity has no record of that film and that real
license agreements Sierra/Affinity entered would be signed by
the chief operating officer or president -- not an "EVP"
(executive vice president), as stated on the purported
agreement.

E.    **HORWITZ and the SUBJECT PREMISES**

26.   There is considerable evidence to show HORWITZ resides at the SUBJECT PREMISES and that it contains evidence, fruits, and instrumentalities of the Subject Offenses.  The SUBJECT PREMISES is listed as the "Business Address" for 1inMM Capital and is the address on file for the 1inMM Capital account.

27.   The SUBJECT PREMISES is currently listed for sale on the website Zillow, and according to Zillow's website, has been listed since January 21, 2021.  On April 1, 2021, however, I was told by another FBI Agent who had been told by a real estate agent for the property that the SUBJECT PREMISES is currently owner occupied, in escrow, and undergoing inspection.  Because I know, from my training and experience, that it is common for individuals who have recently moved to set up mail forwarding with the U.S. Postal Service, I also communicated with a United States Postal Inspector.  The Postal Inspector determined there was no record of a forwarding address for the SUBJECT PREMISES as of March 31, 2021.

28.   This property is currently titled to Leslie S. Klinger in his capacity as trustee of the MJLZ Trust.  I have reviewed CNB account documents for an account ending -0501 for the MJLZ Trust.  HORWITZ is listed as the grantor.  Beginning in February 28, 2020, and continuing through the most recent available statement for this account dated February 26, 2021, the bank statements are addressed to MJLZ Trust, by Zachary Horwitz, Grantor and lists the SUBJECT PREMISES as the address.

29.  On April 1, 2021, I obtained a search warrant for location information for a Verizon telephone number for which HORWITZ is the subscriber at the SUBJECT PREMISES.  Location information show that HORWITZ was in the area of the SUBJECT PREMISES as recently as April 5, 2021.

30.  Based on my training and experience, and information from other experienced investigators of fraud offenses, I also know the following:

a.   Individuals involved in fraud schemes often use the proceeds of the fraud to purchase expensive items, or store the proceeds in the form of cash to make it more difficult to trace.  In fact, in reviewing the photographs from the online Zillow listing for the SUBJECT PREMISES, I saw numerous examples of what appear to be expensive items, including artwork, racks of wine bottles in what appears to be a wine cellar, and a fully equipped home gym.

b.   Typically, individuals involved in fraud schemes maintain evidence where it is close at hand and safe, such as in their residences, vehicles, and digital devices, which are also commonly stored in their residences and vehicles.  Indeed, in this case, HORWITZ appears to have made substantial use of digital devices to communicate in furtherance of the scheme by email and text message with his victims.  I know that individuals who commit crimes with the aid of electronic devices do not readily discard them, as computers, tablets, and cell phones are expensive items that are typically used for years before being upgraded or discarded.  Digital devices can be used

to communicate between co-conspirators and may contain
information relating to the crime under investigation.  And,
even when those who use digital devices to commit fraud do
upgrade them, they often transfer data across devices, such as
contact lists, email and text communications, and documentary
records.

       c.    Individuals involved in fraud frequently keep the
most damaging evidence and/or proceeds of the scheme at their
residences and in their vehicles to help conceal the fraud from
third parties, such as associates who may have access to such
documents at a workplace.  Proceeds such as cash and gifts are
easier to conceal at the fraudster's residence rather than in
plain view of coworkers.

       d.    More sophisticated or cagey criminals may rent
public storage units, safe deposit boxes, or other third-party
space to further distance themselves from incriminating evidence
or to hide their illicit profits from law enforcement or civil
litigants. Such individuals typically maintain items relating to
those third-party locations at their homes, such as keys,
addresses, and leasing documents.

    31.  The requested search warrant seeks not only to seize
evidence of crimes but also the "fruits of crime" and "property
designed for use, intended for use, or used in committing a
crime." Fed. R. Crim. P. 41(c).  Even long after a crime has
been completed, the illicit proceeds of a crime often still
exist, frequently secreted in forms or locations difficult to
detect by law enforcement.  For that reason, there is probable

cause to seize evidence pertaining to HORWITZ's current assets, such as his ownership of the SUBJECT PREMISES, and whether it was purchased using funds derived from his investment fraud scheme.

## V.   REQUEST FOR SEALING

32.   I also request that the Court order that the requested complaint and search warrant be sealed.  The fact that HORWITZ has taken steps to sell the SUBJECT PREMISES and not all the proceeds of his fraud scheme have been traced mean that he is a flight risk, since he has both the resources to flee and likely has already taken some steps to find an alternate residence once the sale of the SUBJECT PREMISES is complete.  Additionally, the criminal investigation is not yet public, and premature disclosure of the warrants could cause HORWITZ to destroy or conceal evidence or assets constituting the fruits of his crimes.

## VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

33.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HORWITZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of HORWITZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.  In depressing HORWITZ's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them

36.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

37.   For all the reasons described above, there is probable cause to believe that HORWITZ has committed wire fraud and that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a

//

//

search of the SUBJECT PREMISES, as further described above and
in Attachment A of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  5th  day of
April, 2021.

_____   MAA
UNITED STATES MAGISTRATE JUDGE

31

EXHIBIT 1

# 1INMM

# CAPITAL

# ANNUAL
# REPORT

**2015**

# CHEERS TO OUR INVESTORS

**Thank you for your investment and trust in 1inMM Capital over the past year.** Our managing partners have worked tirelessly to provide a landscape that balances the protection of your investment with the proper amount of risk to garnish the profits that you have grown accustomed to obtaining. We could not be more pleased with our progress and we look extremely optimistically into our future.

Over the past year, we have managed our business model with the solid foundation that it was built on. We continue to source quality feature film projects, solidify our reputation and relationships with our current output deals and continuously search for additional profitable partnerships. We are ecstatic to report that over the past year, we have acquired and successfully distributed 49 films through the 1inMM Capital banner without incurring a single loss in the process. But this is only the beginning...

As we look into the future, 1inMM Capital's road ahead is extremely bright. As many of you are aware, we have expanded our business model with HBO Entertainment and NETFLIX to not only service the thriving Latin American marketplace but now are distributing feature films to Australia and New Zealand as well. With this growth, we have the ability to safely and profitably distribute more than 25 additional films per year, creating ample opportunity for investment and substantial growth of our thriving feature film library.

In the following pages, you will see the high level details of our investment overview. If you have any questions in regards to your investment/s or would like additional information in regards to the process, you know that we are always available.

Cheers!
**1inMM Capital Team**



# OUR MANAGING PARTNERS

## ZACH HORWITZ
*PRINCIPAL*

Zach is responsible for the companies overall strategy, capital transactions, operations, investor relations and content acquisitions. With ample experience working with 1inMM Productions, 1inMM Capital's parent company, Zach brings a wealth of knowledge, reputation and experience when growing 1inMM Capital to a prominent force in the foreign distribution landscape. Zach's main focus is providing investors an unparalleled financial business model in which he highlights gaps in an already profitable marketplace and takes advantage of these niche markets in order to garner returns for investors. Zach is a serial entrepreneur, founding and successfully managing or exiting four companies since his graduation from Indiana University in 2009.

## JULIO HALLIVIS
*PRINCIPAL*

Julio is responsible for bookkeeping, content acquisition, foreign sales agent relations and head of our Latin America distribution arm. Julio has an unprecedented knowledge of film production that allows him to have the ability of spotting projects at an early stage with the potential to become extremely profitable prior to being shopped at a film market. With these tools, Julio works closely with foreign sales agents to pinpoint projects for acquisition prior to them going on the market and eliminating the chance of a higher acquisition cost. Additionally, Julio has strong roots within the Latin American film landscape that allows 1inMM Capital to get inside access into an extremely difficult territory to capitalize. Julio is a credited commercial and film producer working with brands such as Porsche, Audi and Volkswagen prior to getting into film distribution.

# OUR MANAGING PARTNERS

## GUSTAVO MONTAUDON
*PRINCIPAL*

Gustavo is responsible for output deal relations with Netflix, Sony and HBO. Gustavo is a veteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable. Gustavo founded Alebrije Entertainment, a leading programming distribution company for high quality products for television. This venture allowed him to negotiate multiple successful output deals with prominent companies such as Netflix, Sony Worldwide and HBO in Latin America, in addition to distributing Mexican films in the United States Hispanic video market. Prior to forming Alebrije Entertainment, Gustavo was Vice President of TV Distribution in Latin America for 20th Century Fox for 28 years, where he oversaw all sales of TV and Theatrical product in Latin America, including Video On Demand, Pay---Per---View, Free TV, Basic Cable, Internet and Syndication. Gustavo was credited for creating synergies between Fox divisions in Mexico and Latin America to launch Theatrical movies and DVD releases of movies, sequels, TV series and the licensing of products.



# OUR STRATEGIC PARTNERSHIPS



PARENT COMPANY



LEADING LATIN AMERICA
DISTRIBUTION COMPANY



FOREIGN SALES PARTNER



DISTRIBUTION PARTNER



FOREIGN SALES PARTNER



FOREIGN SALES PARTNER



FOREIGN SALES PARTNER



ENTERTAINMENT
ATTORNEY



DISTRIBUTION PARTNER

DISTRIBUTION PARTNER



PRIMARY BANKING
INSTITUTION

# OUR INVESTMENT FOCUS

**We believe that the safety of our investor's funds should always be our first priority.** Due to this notion, our strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation. The acquisition of each film that we acquire uses the asset acquired (Distribution Rights of the film) as collateral against any unexpected negative event that may occur. If, at any point, one of our current output deals (HBO / SONY / NETFLIX) would default on a payment owed to the company; the rights to distribute the film would immediately revert back to the distributor (1inMM Capital) and the distributor would place the film through a different output deal. Through our solid relationships, we receive confirmation from each of our outputs indicating their desire to acquire the rights to any title we purchase PRIOR to us releasing funds for the film so that in the event of any unexpected occurrence, we are able to recover our investment through an alternative company.

*\*Due to this fact, in the event of one output platform defaulting on payment, 1inMM Capital has confirmation that this title will be acquired by a secondary deal and therefore making the investment whole. Simply stated, in the event that Netflix, HBO or SONY defaults on a payment, declares bankruptcy or displays contractual delinquency in any form, we simply sell the film to one of the two remaining output platforms that already have agreed to license the rights of the film.*

# LIBRARY SNAPSHOT



EXHIBIT 2







Exhibit D

TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
DAVID H. CHAO (Cal. Bar No. 273953)
Assistant United States Attorneys
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-1259/4586
    Facsimile: (213) 894-0141
    E-mail:    alexander.schwab@usdoj.gov
            david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>          v.<br><br>ZACHARY JOSEPH HORWITZ,<br><br>      Defendant. | No. CR 21-214-MCS<br><br>PLEA AGREEMENT FOR DEFENDANT<br>ZACHARY JOSEPH HORWITZ |

1.   This constitutes the plea agreement between ZACHARY JOSEPH HORWITZ ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count one of the

1  indictment in <u>United States v. Zachary Joseph Horwitz</u>, CR No. 21-214-

2  MCS, which charges defendant with securities fraud, in violation of

3  15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

4         b.   Not contest facts agreed to in this agreement.

5         c.   Abide by all agreements regarding sentencing contained

6  in this agreement.

7         d.   Appear for all court appearances, surrender as ordered

8  for service of sentence, obey all conditions of any bond, and obey

9  any other ongoing court order in this matter.

10         e.   Not commit any crime; however, offenses that would be

11  excluded for sentencing purposes under United States Sentencing

12  Guidelines ("USSG" or "Sentencing Guidelines") § 4A1.2(c) are not

13  within the scope of this agreement.

14         f.   Be truthful at all times with the United States

15  Probation and Pretrial Services Office and the Court.

16         g.   Pay the applicable special assessment at or before the

17  time of sentencing unless defendant has demonstrated a lack of

18  ability to pay such assessments.

19         h.   Defendant agrees that any and all criminal debt

20  ordered by the Court will be due in full and immediately.  The

21  government is not precluded from pursuing, in excess of any payment

22  schedule set by the Court, any and all available remedies by which to

23  satisfy defendant's payment of the full financial obligation,

24  including referral to the Treasury Offset Program.

25         i.   Complete the Financial Disclosure Statement on a form

26  provided by the USAO and, within 30 days of defendant's entry of a

27  guilty plea, deliver the signed and dated statement, along with all

28  of the documents requested therein, to the USAO by either email at

usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial Litigation Section at 300 North Los Angeles Street, Suite 7516, Los Angeles, CA 90012.  Defendant agrees that defendant's ability to pay criminal debt shall be assessed based on the completed Financial Disclosure Statement and all required supporting documents, as well as other relevant information relating to ability to pay.

j.  Authorize the USAO to obtain a credit report upon returning a signed copy of this plea agreement.

k.  Consent to the USAO inspecting and copying all of defendant's financial documents and financial information held by the United States Probation and Pretrial Services Office.

l.  Agree that all court appearances, including his change of plea hearing and sentencing hearing, may proceed by video-teleconference ("VTC"), so long as such appearances are authorized by Order of the Chief Judge 20-097 or another order, rule, or statute. Defendant understands that, under the Constitution, the United States Code, the Federal Rules of Criminal Procedure (including Rules 11, 32, and 43), he may have the right to be physically present at these hearings.  Defendant understands that right and, after consulting with counsel, voluntarily agrees to waive it and to proceed remotely. Defense counsel also joins in this consent, agreement, and waiver. Specifically, this agreement includes, but is not limited to, the following:

i.  Defendant consents under Section 15002(b) of the CARES Act to proceed with his change of plea hearing by VTC.

ii.  Defendant consents under Section 15002(b) of the CARES Act to proceed with his sentencing hearing by VTC if personal appearance is deemed by the Court to be unsafe due to COVID-19

3

concerns.  The parties agree to use best efforts to conduct the
sentencing hearing in person with the Court's approval.

iii. Defendant consents under 18 U.S.C. § 3148 and
Section 15002(b) of the CARES Act to proceed with any hearing
regarding alleged violations of the conditions of pretrial release by
VTC or telephone, if VTC is not reasonably available.

<u>THE USAO'S OBLIGATIONS</u>

3.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained
in this agreement.

c.   At the time of sentencing, move to dismiss the
remaining counts of the indictment as against defendant.  Defendant
agrees, however, that at the time of sentencing the Court may
consider any dismissed charges in determining the applicable
Sentencing Guidelines range, the propriety and extent of any
departure from that range, and the sentence to be imposed.

d.   At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offense up to
and including the time of sentencing, recommend a two-level reduction
in the applicable Sentencing Guidelines offense level, pursuant to
USSG § 3E1.1, and recommend and, if necessary, move for an additional
one-level reduction if available under that section.

<u>NATURE OF THE OFFENSE</u>

4.   Defendant understands that for defendant to be guilty of
the crime charged in count one, that is, securities fraud, in
violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, the
following must be true:

1    (1) defendant willfully used a device or scheme to defraud
2    someone, made an untrue statement of a material fact, failed to
3    disclose a material fact that resulted in making the defendant's
4    statements misleading, or engaged in any act, practice, or
5    course of business that operates or would operate as a fraud or
6    deceit upon any person;
7    (2) defendant's acts were undertaken, statement was made, or
8    failure to disclose was done in connection with the purchase and
9    sale of securities within the meaning of 15 U.S.C. § 78c(a)(10);
10   (3) defendant directly or indirectly used wire communications in
11   connection with these acts, making this statement, or this
12   failure to disclose; and
13   (4) defendant acted knowingly.
14   "Willfully" means intentionally undertaking an act, making an
15   untrue statement, or failing to disclose for the wrongful purpose of
16   defrauding or deceiving someone.  Acting willfully does not require
17   that the defendant know that the conduct was unlawful.
18   A fact is material if there is a substantial likelihood that a
19   reasonable investor would consider it important in making the
20   decision to purchase securities.
21   It is not necessary that an untrue statement passed through or
22   over the wire communications so long as the wire communications were
23   used as a part of the transaction.
24   It is not necessary that defendant made a profit or that anyone
25   actually suffered a loss.
26                        <u>PENALTIES AND RESTITUTION</u>
27   5.   Defendant understands that the statutory maximum sentence
28   that the Court can impose for a violation of 15 U.S.C. §§ 78j(b),

5

78ff and 17 C.F.R. § 240.10b-5 is: twenty years of imprisonment; a three-year period of supervised release; a fine of $5 million or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6. Defendant understands that defendant will be required to pay full restitution to the victims of the offense to which defendant is pleading guilty and agrees to make such restitution. Defendant understands and agrees that although a violation of 18 U.S.C. § 1343 does not constitute the count of conviction in this plea agreement, this plea agreement relates to such a charge, which is an offense against property, within the meaning of 18 U.S.C. § 3663A(c)(2), thereby bringing this offense within the ambit of 18 U.S.C. § 3663A. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victims of the offense to which defendant is pleading guilty, and in amounts greater than those alleged in the count to which defendant is pleading guilty, so long as such persons qualify as "victims," within the meaning of 18 U.S.C. § 3663A(a)(2), of defendant's offense and/or relevant conduct. In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any counts dismissed pursuant to this agreement as well as all relevant conduct, as defined in USSG § 1B1.3, in connection with those counts. Defendant understands that the Court may impose, and the USAO reserves the right to seek, restitution on any basis permitted by law.

7.     Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8.     Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9.     Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future.

1   Defendant understands that while there may be arguments that

2   defendant can raise in immigration proceedings to avoid or delay

3   removal, removal is presumptively mandatory and a virtual certainty

4   in this case.  Defendant further understands that removal and

5   immigration consequences are the subject of a separate proceeding and

6   that no one, including his attorney or the Court, can predict to an

7   absolute certainty the effect of his conviction on his immigration

8   status.  Defendant nevertheless affirms that he wants to plead guilty

9   regardless of any immigration consequences that his plea may entail,

10  even if the consequence is automatic removal from the United States.

11                               FACTUAL BASIS

12      10.  Defendant admits that defendant is, in fact, guilty of the

13  offense to which defendant is agreeing to plead guilty.  Defendant

14  and the USAO agree to the statement of facts provided below and agree

15  that this statement of facts is sufficient to support a plea of

16  guilty to the charge described in this agreement and to establish the

17  Sentencing Guidelines factors set forth in paragraph 12 below but is

18  not meant to be a complete recitation of all facts relevant to the

19  underlying criminal conduct or all facts known to either party that

20  relate to that conduct.

21      In or about 2013, defendant founded 1inMM Capital, LLC ("1inMM

22  Capital"), which defendant promoted as a film distribution company.

23  1inMM Capital's principal place of business was in Los Angeles,

24  California.

25      Beginning no later than in or about March 2014, and continuing

26  through at least on or about April 6, 2021, in Los Angeles County,

27  within the Central District of California, and elsewhere, defendant

28  knowingly and willfully, by the use of the means and

instrumentalities of interstate commerce, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, by: (1) employing a scheme to defraud; (2) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (3) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon purchasers of securities (the "investors").  Defendant did so by making and causing to be made materially false and fraudulent statements and material omissions to the investors about defendant and 1inMM Capital's use of their investments.

In execution of the fraudulent scheme, defendant made offers to investors to purchase promissory notes issued by 1inMM Capital, which notes constituted "securities" within the meaning of the Securities Exchange Act of 1934, by making a series of false and misleading statements and by using various deceptive contrivances.  Each of these statements and contrivances was material to investors.  Specifically, defendant falsely represented to investors that 1inMM Capital would purchase distribution rights to certain films, which defendant falsely claimed 1inMM Capital would then profitably license to online streaming platforms such as HBO and Netflix for further distribution in regions outside the United States.  To raise funds for 1inMM Capital's purported business activities, defendant solicited investments from the investors by offering to sell them promissory notes issued by 1inMM Capital and signed by defendant.

The promissory notes guaranteed a specified payment on a specified maturity date, typically six or twelve months in the future.  Each note listed the principal amount of money borrowed, which typically ranged from approximately $35,000 to $1.5 million, as well as the specified amount to be paid at maturity, a calculated return that ranged from 25 to 45 percent.

    In connection with the sale of these promissory notes, defendant falsely represented that 1inMM Capital would use the principal amount of money invested pursuant to each note to purchase distribution rights for the film(s) specified as collateral for the note. Defendant also falsely represented that 1inMM Capital would satisfy its obligations under each note through the profits that 1inMM Capital would obtain by acquiring and licensing the distribution rights to the film(s) specified in each note.  Each note contained an assignment of rights provision that listed the specific film(s) that would serve as collateral for the note.  The assignment of rights provision in each note contained express representations and warranties that 1inMM Capital was the sole and exclusive owner of the rights to the listed film(s).  However, as defendant then knew, his representations concerning 1inMM Capital's business activities and the promissory notes themselves were false and deceptive because 1inMM Capital generally did not and would not acquire or possess the film distribution rights for the films specified as collateral in the promissory notes, and 1inMM Capital did not and would not enter into any distribution agreements with the online streaming platforms for these specified films.

    In furtherance of the scheme, defendant also provided investors with fraudulent copies of purported license agreements between 1inMM

Capital and the sales agents for the production companies of the films identified in the promissory notes.  In fact, as defendant then knew, these license agreements were fake because 1inMM Capital had not acquired the film distribution rights that constituted the purported collateral for the promissory notes and had not entered into the asserted license agreements with the identified sales agents.

In furtherance of the scheme, defendant also falsely represented to investors that online streaming platforms had already entered or committed to enter into distribution agreements with 1inMM Capital. Defendant provided investors with copies of these purported distribution agreements when, in fact, as defendant knew, 1inMM Capital had not entered into the asserted distribution agreements with the online streaming platforms and the purported copies of the distribution agreements were fake.

In furtherance of the scheme and to lull the investors into believing their funds were safely invested as he had promised, defendant falsely reassured investors that any missed payments on promissory notes were caused by the actions of the online streaming platforms, and that payment on the notes would resume.  To support these false claims, defendant sent the investors emails and text messages regarding progress addressing the actions purportedly causing the missed payments and the resumption of payments, which defendant claimed had been sent to him by representatives of the online streaming platforms.  In fact, as defendant then knew, he had not been in communication with the online streaming platforms, and the correspondence he was supposedly forwarding was fake.

Through the fraudulent scheme, defendant sold hundreds of promissory notes issued by 1inMM Capital and thereby fraudulently obtained at least $650 million from at least five major groups of private investors.  Defendant understood that these investor groups derived their investments, in part, from various sub-investors who did not have direct contractual agreements with 1inMM Capital, and in fact there were more than 250 such sub-investors (subject to the reservation of rights in paragraph 12 below).  Defendant did not use the invested money as promised but instead used the money to make payments to prior investors, maintain 1inMM Capital's facade of legitimate operations, make disbursements to himself and entities he controlled, and otherwise finance his own lavish lifestyle. Beginning in or about December 2019, 1inMM Capital began defaulting on all of its outstanding promissory notes.  Thus, to date, defendant, through 1inMM Capital, is in default to investors on a total outstanding principal amount of approximately $230.36 million, and defendant's scheme has caused substantial financial hardship to at least five investors.

For the purpose of executing the above-described scheme to defraud, and in furtherance of the manipulative and deceptive devices described above, defendant directly and indirectly caused the use of instrumentalities of interstate commerce in connection with the purchase and sale of securities.  For example, on or about December 14, 2018, defendant caused the interstate wire transfer of approximately $1,425,500 from Investor 1, located in Illinois, to the 1inMM Capital Account, located in California, to purchase a promissory note secured by the assignment of rights to the film "Active Measures."

SENTENCING FACTORS

11.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

12.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss of more than $150 million but not more than $250 million | +26 | USSG § 2B1.1(b)(1)(N) |
| Substantial Financial Hardship to 5 or more victims | +4 | USSG § 2B1.1(b)(2)(B) |
| Sophisticated Means | +2 | USSG § 2B1.1(b)(2)(10)(C) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.  By way of example, but not limitation, the government reserves the right to argue that defendant's offense and relevant conduct resulted in substantial financial hardship to 25 or more victims, and defendant reserves the

13

1  right to contest the number of sub-investors of the victim investor

2  groups as referenced above at page 12.

3      13.  Defendant understands that there is no agreement as to

4  defendant's criminal history or criminal history category.

5      14.  Defendant and the USAO reserve the right to argue for a

6  sentence outside the sentencing range established by the Sentencing

7  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

8  (a)(2), (a)(3), (a)(6), and (a)(7).

9                  <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

10     15.  Defendant understands that by pleading guilty, defendant

11 gives up the following rights:

12         a.   The right to persist in a plea of not guilty.

13         b.   The right to a speedy and public trial by jury.

14         c.   The right to be represented by counsel –– and if

15 necessary have the Court appoint counsel –– at trial.  Defendant

16 understands, however, that, defendant retains the right to be

17 represented by counsel –– and if necessary have the Court appoint

18 counsel –– at every other stage of the proceeding.

19         d.   The right to be presumed innocent and to have the

20 burden of proof placed on the government to prove defendant guilty

21 beyond a reasonable doubt.

22         e.   The right to confront and cross-examine witnesses

23 against defendant.

24         f.   The right to testify and to present evidence in

25 opposition to the charges, including the right to compel the

26 attendance of witnesses to testify.

27

28

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

16.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

17.   Defendant agrees that, provided the Court imposes a total term of imprisonment within the statutory maximum, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the amount and terms of any restitution order, so long as it is less than $235 million; (f) the term of probation or supervised release imposed by the Court, provided it is within the

statutory maximum; and (g) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in Second Amended General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

18. The USAO agrees that, provided (a) all portions of the sentence are at or below the statutory maximum specified above and (b) the Court imposes a term of imprisonment of no less than 235 months' imprisonment, the USAO gives up its right to appeal any portion of the sentence, with the exception that the USAO reserves the right to appeal the amount of restitution ordered.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

19. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

1

## RESULT OF VACATUR, REVERSAL, OR SET-ASIDE

2      20.  Defendant agrees that if the count of conviction is

3  vacated, reversed, or set aside, both the USAO and defendant will be

4  released from all their obligations under this agreement.

5

## EFFECTIVE DATE OF AGREEMENT

6      21.  This agreement is effective upon signature and execution of

7  all required certifications by defendant, defendant's counsel, and an

8  Assistant United States Attorney.

9

## BREACH OF AGREEMENT

10      22.  Defendant agrees that if defendant, at any time after the

11  effective date of the agreement, knowingly violates or fails to

12  perform any of defendant's obligations under this agreement ("a

13  breach"), the USAO may declare this agreement breached.  All of

14  defendant's obligations are material, a single breach of this

15  agreement is sufficient for the USAO to declare a breach, and

16  defendant shall not be deemed to have cured a breach without the

17  express agreement of the USAO in writing.  If the USAO declares this

18  agreement breached, and the Court finds such a breach to have

19  occurred, then: (a) if defendant has previously entered a guilty plea

20  pursuant to this agreement, defendant will not be able to withdraw

21  the guilty plea, and (b) the USAO will be relieved of all its

22  obligations under this agreement.

23      23.  Following the Court's finding of a knowing breach of this

24  agreement by defendant, should the USAO choose to pursue any charge

25  that was either dismissed or not filed as a result of this agreement,

26  then:

27

28

1      a.   Defendant agrees that any applicable statute of

2 limitations is tolled between the date of defendant's signing of this

3 agreement and the filing commencing any such action.

4      b.   Defendant waives and gives up all defenses based on

5 the statute of limitations, any claim of pre-indictment delay, or any

6 speedy trial claim with respect to any such action, except to the

7 extent that such defenses existed as of the date of defendant's

8 signing this agreement.

9      c.   Defendant agrees that: (i) any statements made by

10 defendant, under oath, at the guilty plea hearing (if such a hearing

11 occurred prior to the breach); (ii) the agreed to factual basis

12 statement in this agreement; and (iii) any evidence derived from such

13 statements, shall be admissible against defendant in any such action

14 against defendant, and defendant waives and gives up any claim under

15 the United States Constitution, any statute, Rule 410 of the Federal

16 Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

17 Procedure, or any other federal rule, that the statements or any

18 evidence derived from the statements should be suppressed or are

19 inadmissible.

20      COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

21      OFFICE NOT PARTIES

22      24.  Defendant understands that the Court and the United States

23 Probation and Pretrial Services Office are not parties to this

24 agreement and need not accept any of the USAO's sentencing

25 recommendations or the parties' agreements to facts or sentencing

26 factors.

27      25.  Defendant understands that both defendant and the USAO are

28 free to: (a) supplement the facts by supplying relevant information

18

1  to the United States Probation and Pretrial Services Office and the

2  Court, (b) correct any and all factual misstatements relating to the

3  Court's Sentencing Guidelines calculations and determination of

4  sentence, and (c) argue on appeal and collateral review that the

5  Court's Sentencing Guidelines calculations and the sentence it

6  chooses to impose are not error, although each party agrees to

7  maintain its view that the calculations in paragraph 12 are

8  consistent with the facts of this case.  While this paragraph permits

9  both the USAO and defendant to submit full and complete factual

10 information to the United States Probation and Pretrial Services

11 Office and the Court, even if that factual information may be viewed

12 as inconsistent with the facts agreed to in this agreement, this

13 paragraph does not affect defendant's and the USAO's obligations not

14 to contest the facts agreed to in this agreement.

15        26.  Defendant understands that even if the Court ignores any

16 sentencing recommendation, finds facts or reaches conclusions

17 different from those agreed to, and/or imposes any sentence up to the

18 maximum established by statute, defendant cannot, for that reason,

19 withdraw defendant's guilty plea, and defendant will remain bound to

20 fulfill all defendant's obligations under this agreement.  Defendant

21 understands that no one -- not the prosecutor, defendant's attorney,

22 or the Court -- can make a binding prediction or promise regarding

23 the sentence defendant will receive, except that it will be within

24 the statutory maximum.

25                        NO ADDITIONAL AGREEMENTS

26        27.  Defendant understands that, except as set forth herein,

27 there are no promises, understandings, or agreements between the USAO

28 and defendant or defendant's attorney, and that no additional

19

1   promise, understanding, or agreement may be entered into unless in a

2   writing signed by all parties or on the record in court.

3                PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

4        28.  The parties agree that this agreement will be considered

5   part of the record of defendant's guilty plea hearing as if the

6   entire agreement had been read into the record of the proceeding.

7   AGREED AND ACCEPTED

8   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
9   CALIFORNIA

10  TRACY L. WILKISON
    Acting United States Attorney

11

12  _____        9/1/2021
                                            _____
13  ALEXANDER B. SCHWAB                     Date
    DAVID H. CHAO
14  Assistant United States Attorneys

15  _____        09/01/2021
                                            _____
16  ZACHARY JOSEPH HORWITZ                  Date
    Defendant

17

18  _____        9.1.2021
                                            _____
    ANTHONY PACHECO                         Date
19  RYAN S. HEDGES
    Attorneys for Defendant
20  ZACHARY JOSEPH HORWITZ

21

22

23

24

25

26

27

28

                                    20

1                               CERTIFICATION OF DEFENDANT

2        I have read this agreement in its entirety.  I have had enough

3   time to review and consider this agreement, and I have carefully and

4   thoroughly discussed every part of it with my attorney.  I understand

5   the terms of this agreement, and I voluntarily agree to those terms.

6   I have discussed the evidence with my attorney, and my attorney has

7   advised me of my rights, of possible pretrial motions that might be

8   filed, of possible defenses that might be asserted either prior to or

9   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19

20  ZACHARY JOSEPH HORWITZ            Date 09/01/2021

    Defendant

21

1                    CERTIFICATION OF DEFENDANT'S ATTORNEY

2         I am one of ZACHARY JOSEPH HORWITZ's attorneys.  I have

3    carefully and thoroughly discussed every part of this agreement with

4    my client.  Further, I have fully advised my client of his rights, of

5    possible pretrial motions that might be filed, of possible defenses

6    that might be asserted either prior to or at trial, of the sentencing

7    factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing

8    Guidelines provisions, and of the consequences of entering into this

9    agreement.  To my knowledge: no promises, inducements, or

10   representations of any kind have been made to my client other than

11   those contained in this agreement; no one has threatened or forced my

12   client in any way to enter into this agreement; my client's decision

13   to enter into this agreement is informed and voluntary; and the

14   factual basis set forth in this agreement is sufficient to support my

15   client's entry of a guilty plea pursuant to this agreement.

16   _____          9·1·2021
                                              _____
17   ANTHONY PACHECO                          Date
     RYAN S. HEDGES
18   Attorneys for Defendant
     ZACHARY JOSEPH HORWITZ
19

20

21

22

23

24

25

26

27

28