UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOCELYN CARTER,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JEFFREY SPIEGEL, et al.,<br><br>　　　　Defendants. | Case No. 21-cv-03990-TSH<br><br>**ORDER COMPELLING ARBITRATION**<br><br>Re: Dkt. No. 17 |

　　　　Defendants Jeffrey and Ryan Spiegel move to compel arbitration of Plaintiff Jocelyn Carter's claims. For the following reasons, the Court grants the motion.[1]

**A.　　The Complaint's Allegations**

　　　　This case was filed in the aftermath of actor Zachary Horwitz's infamous Ponzi scheme. As alleged here, Horwitz raised hundreds of millions of dollars from investors through several de facto placement agents by representing that the money was to finance his company 1inMM Capital, LLC's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or HBO. Complaint, ECF No. 1, ¶¶ 19-20. It was all a hoax, supported by forged documents, and could easily have been uncovered with a simple phone call to Netflix or HBO. *Id*. ¶¶ 32-34. Horwitz has since agreed to plead guilty to securities fraud in violation of 15 U.S.C. §§ 78j and 78ff and 17 C.F.R. § 240.10b-5. ECF No. 17-

---

[1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 13, 14.

8, Ex. D.

Plaintiff Jocelyn Carter was one of those investors. She alleges that SAC Advisory Group ("SAC") was one of those de facto placement agents for Horwitz and his company. Complaint ¶ 1. She has sued SAC's managers, Defendants Jeffrey Spiegel and Ryan Spiegel. *Id.*[2] The gist of her claims is that the Spiegels had well defined duties in their role as brokers to do some investigation into the investment before offering it. Instead, they operated in willful ignorance and never sought any third party confirmation of Horwitz's stories. *Id.* ¶ 3. She alleges that if the Defendants had called HBO or Netflix, obtained 1inMM's bank records, or ordered an audit, as required by controlling regulations, before recommending this investment, the fraud would have been immediately uncovered, and Carter would not have lost her money. *Id.* ¶ 5.

More specifically, Carter alleges that the Spiegels created three investments funds for the sole purpose of investing into 1inMM: SAC Movie Fund One, LLC (created March 2017), Fortune Film Fund One, LLC (created October 2017), and Fortune Film Fund Two, LLC (created February 2018). *Id.* ¶¶ 49-51.[3] These three funds were managed by SAC, and they lent money to 1inMM for defined projects at a rate of 25% to 35% interest. *Id.* ¶ 64. SAC funded the loans via the sale of units in the funds to investors, and SAC received 50% of profits on the money invested by the funds. *Id.*

Carter alleges that SAC was effectively acting as a placement agent for 1inMM and received a 12.5% to 17.5% commission on the sales of the units. *Id.* ¶ 65. She says that placement agents such as SAC that sell private placements to retail customers for a commission are required to register with the Financial Industry Regulatory Authority ("FINRA") as broker-dealers and must comply with FINRA's rules and regulations, such as those requiring reasonable due diligence. *Id.* ¶¶ 66-67, 69-74, 76, 89. Here, SAC failed so to register, despite acting as a

---

[2] Because the Defendants have the same last name, the Court will refer to them by their first name. No disrespect is intended.

[3] Carter alleges that the unregistered securities at issue in this case are not "covered securities" within the meaning of the National Securities Market Improvement Act of 1996, 15 U.S.C. § 77r(b) and therefore the procedural requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a), do not apply.

broker-dealer, and did not comply with the requirements to perform reasonable due diligence. *Id*. ¶¶ 68, 75, 77, 90.

1inMM eventually defaulted on its loans. *Id*. ¶¶ 87-91. Carter had invested in Fortune Film Fund Two, LLC ("FF2") and has lost her entire $400,000 investment. *Id*. ¶¶ 98-104. She sues on behalf of a class of everyone who invested in the three funds from January 1, 2018 to December 31, 2020. *Id*. ¶ 105. She asserts claims for negligent misrepresentation, violation of California Corporations Code sections 25401 and 25501.5 (securities fraud), and unjust enrichment. *Id*. ¶¶ 114-53

**B.     The Motion to Compel Arbitration**

The Spiegels have moved to compel arbitration. ECF No. 17.

**1.     Factual Background**

Like any LLC, FF2 had an operating agreement. ECF No. 17-4, Ex. A, pages 27-50. The opening sentence states who the parties to the agreement are: "This Operating Agreement is entered into as of December 7, 2017 by and among SAC Advisory Group, LLC, a California limited liability company ('SAC') and the parties listed on the counterpart signature pages hereof, and any other persons who from time to time become parties hereto as provided herein." In other words, this is an agreement between (at least) SAC, the initial Manager of FF2 (*see* ¶ 4.1(a) ("The Company shall have one Manager. The initial Manager shall be SAC Advisory Group, LLC.") and everybody who countersigned the agreement. Exhibit A to the operating agreement is a glossary of defined terms, and it further clarifies that "'Member' shall mean each Person who is an initial Signatory of this Agreement, or has been admitted to the Company as a Member in accordance with the terms of this Agreement." Plaintiff Jocelyn Carter countersigned the agreement as trustee of her own revocable trust. ECF No. 17-4, Ex. G.[4] Ryan signed the operating agreement as well, but he did so on behalf of SAC (i.e., he is a Manager of the Manager), *see id*. & ECF No. 17-2 ¶ 3, so he is not actually a party to the agreement.

Jeffrey countersigned the operating agreement on his own behalf. ECF No. 23-1, Ex. A.

---

[4] Carter does not dispute that she is a party to the operating agreement.

3

1 However, he carries the FF2 investment in his living revocable trust for estate planning and estate
2 tax purposes. ECF No. 26-1 ¶ 6. Accordingly, the schedule k-1s he receives from FF2 identify
3 the trust (rather than Jeffrey) as the member of the LLC. ECF No. 27-5. He and the trust have the
4 same federal tax ID number because the trust is revocable. ECF No. 26-1 ¶ 6.

The operating agreement has provisions relating to dispute resolution. Paragraph 9.2 states:

> Dispute Resolution. If a dispute arises between the Members relating to this Agreement, the Members agree to use the following procedure prior to either party pursuing other available remedies:
>
> (a)   A meeting shall be held promptly between the Members to attempt in good faith to negotiate a resolution of the dispute.
>
> (b)   If, within thirty (30) days after such meeting, the parties have not succeeded in negotiating a resolution of the dispute, they will jointly appoint a mutually acceptable neutral person not affiliated with any of the parties (the "Mediator"), seeking assistance in such regard from the American Arbitration Association if they have been unable to agree upon such appointment within forty (40) days from the initial meeting. The fees of the Mediator shall be shared equally by the parties.
>
> (c)   In consultation with the Mediator, the parties will select or devise an alternative dispute resolution procedure ("ADR") by which they will attempt to resolve the dispute, and a time and place for the ADR to be held, with the Mediator making the decision as to the procedure, and/or place and time (but unless circumstances require otherwise, not later than sixty(60) days after selection of the Mediator) if the parties have been unable to agree on any of such matters within twenty (20) days after initial consultation with the Mediator.
>
> (d)   The parties agree to participate in good faith in the ADR to its conclusion as designated by the Mediator. If the parties are not successful in resolving the dispute through the ADR, then the parties shall submit the matter to binding arbitration pursuant to Section 9.4 below.

Paragraph 9.3 of the operating agreement provides for the governing law: "The terms of this Agreement, and the rights and obligations of the Members with respect to this Agreement, shall be governed by California law, without regard to its principles of conflict of laws."

Paragraph 9.4 of the operating agreement is the arbitration provision. The Court has bolded the first and last sentences, which describe its scope:

> Arbitration. **In the event of a dispute among the parties hereto,**

> **following good faith negotiations to resolve the same, such dispute shall be settled by arbitration in accordance with the Arbitration Rules of the American Arbitration Association ("AAA") providing for the most expeditious method of arbitration resolution then offered by the AAA.** Such dispute shall be settled by an arbitration in Fresno County, California, by a disinterested arbitrator (the "Arbitrator") mutually selected by the disputing parties no later than five days prior to the commencement of the arbitration. In the event that the parties cannot agree on the Arbitrator, each party shall select a disinterested arbitrator (each, an "Appointing Arbitrator") of their choosing who will then mutually agree on the Arbitrator. If either party fails to appoint an Appointing Arbitrator within 10 days of a request in writing by the other party to do so, the Appointing Arbitrator appointed by the other party shall appoint the Arbitrator and such appointment shall be binding on the party failing to appoint an Appointing Arbitrator. Except as to the selection of the Arbitrator which shall be as set forth above, the arbitration shall be conducted promptly and expeditiously in accordance with the rules of the AAA providing for the most expeditious method of arbitration resolution then offered by the AAA so as to enable the Arbitrator to render a decision within 20 days of the commencement of the arbitration proceedings. The decision of the Arbitrator shall be binding upon the parties, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof. The decision of the Arbitrator shall include within the arbitration award a recovery by the prevailing party or parties of its or their expenses of arbitration, including the fees and expenses of the Arbitrator and the Appointing Arbitrators, if any, other costs associated with the arbitration proceeding and the reasonable attorneys' fees and expenses of the prevailing party or parties incurred in connection with the arbitration. Any person appointed as an Arbitrator or an Appointing Arbitrator shall be knowledgeable and experienced in the matter(s) sought to be arbitrated and shall not be employed by any Member, the Company or an Affiliate of the Company or any Member, directly, indirectly, or as an agent, except in connection with an arbitration proceeding. The arbitrator shall not have any power to alter, amend, modify or change any of the terms of this Agreement nor to grant any remedy which is either prohibited by the terms of this Agreement, the Act, or not available in a court of law. **No action at law or in equity based upon any claim arising out of or related to this Agreement shall be instituted in any court by any Member except (a) an action to compel arbitration pursuant to this Section 9.4 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 9.4.** (emphasis added).

### 2.     The Parties' Arguments

The Spiegels argue that Carter's claims must be arbitrated under the Federal Arbitration Act and California Arbitration Act. They contend that her claims fall squarely within the plain language of the arbitration provision in the FF2 operating agreement. Defendants assert that Jeffrey is a party to the FF2 operating agreement and thus in contractual privity with Carter to

5

enforce the arbitration provision. Defendants state that Ryan is a Member of SAC, but identify no contract that Carter and Ryan are *both* parties to and that contains an arbitration provision. Alternatively, for both Defendants, the Spiegels rely on the doctrine of equitable estoppel to argue that they can enforce the arbitration provision as non-parties. Further, Defendants argue that Carter's naming only the Spiegels as individuals and not naming the funds or SAC as parties is an attempt to circumvent the contractual obligation to arbitrate. Finally, they argue that arbitration must be compelled on an individual basis.

Carter makes two arguments in her opposition brief. First, she argues that because the arbitration provision is silent as to class actions, the motion to compel arbitration should be denied. Second, Carter argues that the arbitration provision applies only to disputes between Members of FF2 relating to the operating agreement, and the Spiegels are not Members. The Court ordered two rounds of supplemental briefing concerning Jeffrey's status as a Member. ECF Nos. 22, 25. The parties responded at ECF Nos. 23, 24, 26, 29.[5]

### 3. Analysis

Carter's first argument is easy to dispose of; she has simply misunderstood the law. She signed an agreement that contains an arbitration provision. She is certainly right that the arbitration provision is silent as to class actions. Under *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019) and *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010), this means that if the Defendants can enforce the arbitration provision, and if Carter's claims fall within its scope, the Court must order her to arbitrate her claims on an individual basis. Contrary to her assertion that this case is only a class action does not plead an individual claim, Carter does plead

---

[5] In her initial opposition at ECF No. 18, Carter did not respond to Defendants' argument that even if they are not parties to the FF2 operating agreement, they can still enforce the arbitration provision under the doctrine of equitable estoppel. In her supplemental brief at ECF No. 29 concerning Jeffrey's status as a Member, Carter explicitly concedes that *if* her claims fall within the scope of the arbitration provision, Jeffrey can enforce it through the doctrine of equitable estoppel. ECF No. 29 at 3 ("Defendants argue at length in the alternative that Jeffrey Siegel could demand arbitration regardless of his status as a member. Plaintiff doesn't disagree, assuming the dispute were arbitrable. All the arguments in favor of Spiegel compelling arbitration are correct but only if the dispute is arbitrable. There's no question of whether Spiegel, via estoppel or as a third-party beneficiary, can invoke arbitration of an arbitrable dispute. The question here is whether the dispute is arbitrable.") (emphasis omitted).

an individual claim, as she must in a federal lawsuit that demands a plaintiff have Article III standing. *See* ECF No. 1, Complaint ¶¶ 98-104 (alleging that Carter personally lost $400,000).

Carter's second argument requires a different analysis for each Defendant. As to Jeffrey, the Court finds that he is a party to the FF2 operating agreement. The agreement says that it "is entered into . . . by and among SAC . . . and the parties listed on the counterpart signature pages," and he signed the counterpart signature page. Therefore, he is a party. How he carries this investment for tax and estate planning purposes does not alter the fact that he is a party to this agreement. Even assuming there was a transfer of title in the investment from him to his living trust, the operating agreement defines a "Member" as the *initial* signatory to the agreement, and that is him.

Accordingly, Jeffrey has contractual privity with Carter, as they are both parties to an agreement that contains an arbitration provision. Therefore, the Court must determine if Carter's claims come within the scope of the arbitration provision. They do. In interpreting the operating agreement, it is important to distinguish paragraph 9.2 from paragraph 9.4. The dispute resolution provision in paragraph 9.2 applies "[i]f a dispute arises *between the Members relating to this Agreement . . .*" (emphasis added). Once the ADR process is exhausted, "then the parties shall submit the matter to binding arbitration pursuant to Section 9.4 below." ¶ 9.2(d).

But it does not follow that paragraph 9.4 is limited to disputes between Members relating to the agreement, as paragraph 9.2 is. The arbitration provision applies to "a dispute *among the parties hereto*," (emphasis added), and one of the parties to the operating agreement is the Manager, SAC. So, a dispute between a Member and the Manager could be subject to arbitration, even though it would not be subject to the ADR procedure in paragraph 9.2.

Further, the arbitration provision seems to have a broader subject matter scope than paragraph 9.2. As noted, the first sentence of the arbitration provision states that it applies "[i]n the event of a dispute among the parties hereto . . ." However, it seems unlikely that the parties intended to require arbitration of literally any dispute that might arise between them. For example, if there were a car crash, and by random chance both drivers happened to be Members of FF2, it seems unlikely they meant for that tort claim to be arbitrated. Rather, the scope of the arbitration

obligation is surely framed by the last sentence of paragraph 9.4: "No action at law or in equity based upon *any claim arising out of or related to this Agreement* shall be instituted in any court by any Member except (a) an action to compel arbitration pursuant to this Section 9.4 or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this Section 9.4." (emphasis added). This sentence makes clear that the requirement to arbitrate extends to "any claim arising out of or related to this Agreement," except for the two listed exceptions. Thus, we see another difference in scope between paragraphs 9.4 and 9.2. The obligation in a dispute between members to submit to ADR in paragraph 9.2 extends to disputes "relating to this Agreement," whereas the obligation to arbitrate *also* applies to "any claim arising out of . . . this Agreement . . ."

Carter's claims "aris[e] out of . . . this Agreement." Carter alleges that "Defendants created Fortune Film Fund Two, LLC for the *sole* purpose of selling investment into 1inMM." Complaint ¶ 51 (emphasis added). All of her alleged financial losses stem from her investment in FF2. *Id*. ¶¶ 98-104. Executing the FF2 operating agreement is what enabled Carter to make those investments and suffer those losses. Consequently, her claims against Jeffrey arise out of that agreement and are arbitrable. *See Larkin v. Williams, Cogswell, Nakazawa & Russell*, 76 Cal. App. 4th 227, 230 (1999) (arbitration clause that applied to "[a]ny controversy or claim arising out of or relating to any provision of this [partnership] [a]greement" was "very broad"); *Bono v. David*, 147 Cal. App. 4th 1055, 1067 (2007) ("[T]he decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is 'broad' or 'narrow.' A 'broad' clause includes those using language such as 'any claim arising from or related to this agreement . . .'") (citations and emphasis omitted).[6]

Carter's claims against Ryan require further analysis, however, because he is not a party to the FF2 operating agreement. Again, Defendants point to no contract that Carter and Ryan are both parties to that has an arbitration provision. Accordingly, the Court must consider Defendants' argument that equitable estoppel allows Ryan to enforce the arbitration provision.

---

[6] Even if Jeffrey were not a party to the FF2 operating agreement, the Court would still hold that he can enforce the arbitration provision for the same reasons the Court finds that Ryan can.

"California law permits non-signatories to invoke arbitration agreements under the doctrine of equitable estoppel only in limited circumstances." *Ngo v. BMW of North America*, __ F.4th __, 2022 WL 109004, *5 (9th Cir. Jan. 12, 2022). "The two circumstances are: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement." *Id.*; *see also In re Henson*, 869 F.3d 1052, 1060 (9th Cir. 2017); *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1229 (9th Cir. 2013).

Both circumstances apply here.[7]  First, Carter's claims are intimately founded in and intertwined with the FF2 operating agreement. The whole purpose of the operating agreement was to create FF2 as an investment fund for the Members, and as noted, Carter alleges that the sole purpose for doing this was to sell investment into 1inMM. Without directly mentioning 1inMM, the operating agreement seems to confirm that allegation. FF2 Operating Agreement ¶ 1.5 ("The purpose of the Company is to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies."). The operating agreement creates the units that Carter alleges FF2 sold to the Members. *Id.* ¶¶ 2.1-2.5.  It provides that FF2 will sell those units to Members, and the Members may get a return of capital. *Id.* ¶¶ 3.1-3.2.  It creates the management of FF2 and gives it authority – authority that Carter says was abused. *Id.* ¶ 4.1.  In sum, the FF2 operating agreement created the entire mechanism through which Carter invested in 1inMM, and all of her claims against Ryan are intimately founded in and intertwined with that agreement.

Second, Carter alleges substantially interdependent and concerted misconduct by Ryan and another signatory to the operating agreement and her allegations of interdependent misconduct

---

[7] As noted above, at least as to Jeffrey, Carter has conceded that equitable estoppel applies here, assuming her claims are arbitrable. ECF No. 29 at 3.  There is no reason why equitable estoppel would apply differently to Ryan given the allegations in the complaint.

are founded in or intimately connected with the obligations of the underlying agreement. Here, that other signatory is SAC, the Manager of FF2. The first paragraph of the complaint alleges that "SAC Advisory Group ('SAC') served as the de facto placement agent or broker for a Los Angeles Ponzi Schemer, Zachary Horwitz ('Horwitz') and his 1inMM Capital, LLC ('1inMM') venture. SAC's managers were Jeffrey Spiegel ('Jeff') and Ryan Spiegel ('Ryan') (collectively, 'The Spiegels' or 'Defendants')." Carter's allegation that SAC – the signatory – *was* the placement agent and thus the principal wrongdoer is repeated elsewhere in the complaint. *See, e.g.*, Complaint ¶ 42 ("Horwitz raised money with five principal firms who acted as placement agents selling securities, including SAC, most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM."), ¶ 65 ("For all intents and purposes SAC was acting as a placement agent for 1inMM and paid a 12.5% to 17.5% commission on the sales."), ¶ 66 ("Placement agents such as SAC who sell private placements to retail customers for a commission . . . are required to register with the Financial Industry Regulatory Authority ('FINRA')."), ¶ 68 ("While SAC was not a licensed broker-dealer it acted as if it was one when selling the 1inMM Offering in exchange for what amounted to a hefty commission."). Thus, while the complaint does at other times direct its allegations against the "Defendants" (meaning Ryan and Jeffrey), it is clear that the complaint uses "Defendants" interchangeably with SAC, the company they managed. Carter's allegations against Ryan are completely interdependent with her allegations against SAC. And as explained above, her claims are founded in and intimately connected with the obligations of the underlying agreement. Further, had Carter named SAC as a Defendant, her claims against it would obviously have been arbitrable because SAC is a party to the FF2 operating agreement, and Carter's claims arise out of that agreement. Accordingly, Ryan can invoke the doctrine of equitable estoppel to enforce the arbitration provision against Carter.

It follows that the motion to compel arbitration must be granted as to both Defendants. The Court therefore grants Defendants' motion to compel arbitration on an individual basis under both the Federal Arbitration Act and the California Arbitration Act. The case is hereby stayed pending completion of the arbitration, except that Defendants may move for the award of

10

attorneys' fees incurred in connection with this motion.

**IT IS SO ORDERED.**

Dated: January 13, 2022

THOMAS S. HIXSON
United States Magistrate Judge